UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

IN RE ALUMINUM WAREHOUSING      :
ANTITRUST LITIGATION           : MDL No. 2481
                                     : Master Docket No.
This Document Relates To:         : 13-md-2481-KBF
ALL ACTIONS                 :
                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF WAREHOUSE DEFENDANTS AND FINANCIAL-FIRM DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' ANTITRUST CLAIMS FOR FAILURE TO STATE A CLAIM

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendant Pacorini Metals USA, LLC*

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants The Goldman Sachs Group, Inc., GS Power Holdings LLC, MCEPF Metro I, Inc., Mitsi Holdings LLC and Metro International Trade Services LLC*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .........................................................................................................6

    A.    The Global Financial Crisis of 2008 .........................................................6

    B.    The LME System ......................................................................................7

    C.    The "Contango" in the Aluminum Market ...............................................9

    D.    The Emergence of Delivery "Queues" in Detroit ...................................10

    E.    The LME's Minimum Load-Out Requirement.........................................11

    F.    Competition from Off-Warrant Storage at Non-LME Warehouses .....................13

    G.    The "All-In" Price for Aluminum and the Midwest Premium ...........................14

    H.    Plaintiffs' Antitrust Claims ....................................................................16

ARGUMENT ............................................................................................................................17

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 1 OF THE
SHERMAN ACT.............................................................................................18

    A.    The Complaints Do Not Adequately Allege a Plausible Horizontal
Conspiracy. .............................................................................................19

        1.    Plaintiffs' Conclusory Allegations of Agreement Are Insufficient. ..........20

        2.    Plaintiffs Allege No Direct Evidence of a Horizontal Conspiracy. ..........21

        3.    Plaintiffs' Allegations of Supposed Parallel Conduct Are
Insufficient. ..........................................................................22

            a.    Defendants Did Not Act Against Their Individual Economic
Self-Interest..................................................................24

            b.    Defendants' Participation in Certain LME Committees and
Minority Ownership Interest in the LME Are Insufficient...........26

            c.    Plaintiffs Have Not Alleged a Common Motive to Conspire. ........30

            d.    Plaintiffs Cannot Salvage Their Conspiracy Claim by
Pointing to Press Reports of Government Investigations. .............31

4.      Plaintiffs Do Not Adequately Allege a Hub-and-Spoke Conspiracy.........32

B.      The Complaints Do Not Adequately Plead a Section 1 Violation Based on the LME's Minimum Load-Out Requirement and Metro's Incentive Payments. .......33

1.      The Per Se Rule Does Not Apply to the LME's Minimum Load-Out Rule and Its Vertical Agreements with Warehouse Operators. ................34

2.      The Per Se Rule Also Does Not Apply to Metro's Payment of Incentives to Producers and Other Owners of Aluminum. .......................37

3.      Plaintiffs Do Not Even Try to State a Claim Under the Rule of Reason......................................................................................................39

II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT..........................................................................................40

A.      Plaintiffs Do Not Adequately Allege a Relevant Market That Could Be Monopolized. ...................................................................................................41

1.      Plaintiffs Fail to Allege a Proper Product Market. ...................................42

2.      Plaintiffs Fail to Allege a Proper Geographic Market. .............................44

3.      This Failure to Plead a Relevant Market Is Not Excused. .........................46

4.      Plaintiffs Do Not Allege Any Barriers to Entry........................................46

B.      Plaintiffs Do Not Allege That Metro Unlawfully Acquired or Maintained Its Supposed Monopoly. .......................................................................................47

C.      Plaintiffs Fail to Allege Any Anticompetitive Conduct. ......................................48

D.      Plaintiffs' Reliance on the Essential Facilities Doctrine Is Misplaced.................51

E.      Plaintiffs Cannot State a Claim Against All Defendants by Reciting the Elements of Different Causes of Action. ............................................................52

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER STATE ANTITRUST LAW. ........53

CONCLUSION................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Affinity LLC v. GFK Mediamark Research & Intelligence, LLC,*
    No. 12 Civ. 1728, 2013 WL 1189317 (S.D.N.Y. Mar. 25, 2013) .........................................43

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010)........................................................................................................37

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985)...................................................................................................48, 51

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,*
    155 F.3d 59 (2d Cir. 1998)...............................................................................................7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................ *passim*

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,*
    35 F. App'x 29 (2d Cir. 2002) .......................................................................................38

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)........................................................................................................50

*Burtch v. Milberg Factors, Inc.,*
    662 F.3d 212 (3d Cir. 2011) ..........................................................................................24

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
    485 U.S. 717, 724 (1988)...............................................................................................35

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
    996 F.2d 537 (2d Cir. 1993)...........................................................................................27

*Cargill, Inc. v. Monfort of Colo., Inc.,*
    479 U.S. 104 (1986)........................................................................................................50

*Chapman v. N.Y. State Div. for Youth,*
    546 F.3d 230 (2d Cir. 2008)......................................................................................39, 42

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002) .........................................................................................32

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.,*
    129 F.3d 240 (2d Cir. 1997)...........................................................................................38

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

CASES

*Emigra Grp. v. Fragomen, Del Rey, Bernsen & Loewy, L.L.P.,*
   612 F. Supp. 2d 330 (S.D.N.Y. 2009)................................................................46

*Freedom Holdings, Inc. v. Spitzer,*
   447 F. Supp. 2d 230 (S.D.N.Y. 2004)................................................................34

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
   No. 10 Civ. 8, 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) .................................38

*Gunter Harz Sports, Inc. v. United States Tennis Ass'n,*
   511 F. Supp. 1103 (D. Neb. 1981)....................................................................36

*Heerwagen v. Clear Channel Commc'ns,*
   435 F.3d 219 (2d Cir. 2006).............................................................................41

*Hinds Cnty., Miss. v. Wachovia Bank N.A.,*
   708 F. Supp. 2d 348 (S.D.N.Y. 2010).............................................................28, 31

*IDI Design Inc. v. A.O.D. Jewelry Co.,*
   No. 1:13 Civ. 08266, 2014 WL 661355 (S.D.N.Y. Feb. 19, 2014).........................42

*In re Elec. Books Antitrust Litig.,*
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)................................................................24

*In re Elevator Antitrust Litig.,*
   502 F.3d 47 (2d Cir. 2007).............................................................................19, 21

*In re Fla. Cement & Concrete Antitrust Litig.,*
   746 F. Supp. 2d 1291 (S.D. Fla. 2010) ..............................................................32

*In re Graphics Processing Units Antitrust Litig.,*
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) .............................................................32

*In re Ins. Brokerage Antitrust Litig.,*
   618 F.3d 300 (3d Cir. 2010).........................................................................21, 32

*In re Late Fee & Over-Limit Fee Litig.,*
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................................25

*In re Morgan Stanley Information Fund Sec. Litig.,*
   592 F.3d 347 (2d Cir. 2010)............................................................................35

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

**CASES**

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ..................................................................28

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
  713 F. Supp. 2d 286 (S.D.N.Y. 2010).....................................................39

*Irvin Indus. v. Goodyear Aerospace Corp.*,
  974 F.2d 241 (2d Cir. 1992)....................................................................50

*Jacobi v. Bache & Co.*,
  520 F.2d 1231, 1238 (2d Cir. 1975)........................................................36

*Justice v. Nat'l Collegiate Athletic Ass'n*,
  577 F. Supp. 356 (D. Ariz. 1983) ...........................................................36

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ................................................................28

*LaFlamme v. Societe Air Fr.*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................................................31

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..........................................................................35, 38

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) ..................................................................45

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  420 F. Supp. 2d 212 (S.D.N.Y. 2005).....................................................35

*Mathias v. Daily News, L.P.*,
  152 F. Supp. 2d 465 (S.D.N.Y. 2001).....................................................45

*Mayor and City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)............................................................ *passim*

*MCI Commc'ns v. AT&T*,
  708 F.2d 1081 (7th Cir. 1983) ................................................................52

*MLSMK Inv. Co. v. JPMorgan Chase & Co.*,
  651 F.3d 268 (2d Cir. 2011)....................................................................18

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

## CASES

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. Okla.*,
468 U.S. 85 (1984)....................................................................................37

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998).................................................................................18

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002).....................................................................32

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
No. CV-08-42, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ...............22

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
812 F. Supp. 387 (S.D.N.Y. 1993)...........................................................43

*RFP LLC v. SCVNGR, Inc.*,
788 F. Supp. 2d 191 (S.D.N.Y. 2011).......................................................17

*Shaw v. Rolex Watch, U.S.A., Inc.*,
673 F. Supp. 674 (S.D.N.Y. 1987).............................................................43

*Silver v. New York Stock Exchange*,
373 U.S. 341 (1963).................................................................................36

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
947 F. Supp. 2d 88 (D.D.C. 2013)...........................................................28

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010).....................................................................24

*State Oil Co. v. Khan*,
522 U.S. 3 (1997).....................................................................................34

*Superior Offshore Int'l, Inc. v. Bristow Grp.*,
738 F. Supp. 2d 505 (D. Del. 2010).........................................................32

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) .................................................................45

*Tese-Milner v. Diamond Trading Co.*,
No. 04 Civ. 5203, 2014 WL 43365 (S.D.N.Y. Jan. 6, 2014)...................48

## TABLE OF AUTHORITIES

*(continued)*

Page(s)

### CASES

*Texaco Inc. v. Dagher,*
  547 U.S. 1 (2006).............................................................................................35, 37

*Theatre Party Assocs. v. Shubert Org.,*
  695 F. Supp. 150 (S.D.N.Y. 1988).................................................................43

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001)......................................................................20, 41

*United States Trotting Ass'n v. Chicago Downs Ass'n,*
  665 F.2d 781 (7th Cir. 1981) ..........................................................................36

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966)..........................................................................................47

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001)......................................................................46, 48

*United States v. Topco Assocs.,*
  405 U.S. 596 (1972).........................................................................................34

*Vedder Software Grp. Ltd. v. Ins. Servs. Office, Inc.,*
  545 F. App'x 30 (2d Cir. 2013) ................................................................28, 29

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004).................................................................................47, 48, 52

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
  257 F.3d 256 (2d Cir. 2001)............................................................................50

*Wampler v. Sw. Bell Tel. Co.,*
  597 F.3d 741 (5th Cir. 2010) ..........................................................................45

### STATUTES

7 U.S.C. § 2............................................................................................... *passim*

15 U.S.C. § 1............................................................................................. *passim*

15 U.S.C. § 2............................................................................................. *passim*

## <u>TABLE OF AUTHORITIES</u>
*(continued)*

Page(s)

### STATUTES
*(continued)*

WYO. STAT. ANN. § 40-4-101(a)..................................................................................................53

### OTHER AUTHORITIES

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ............................................34, 47

### RULE

Fed. R. Civ. P. 12(b) .......................................................................................................... *passim*

Defendants The Goldman Sachs Group, Inc. and GS Power Holdings LLC (collectively, "Goldman Sachs"); MCEPF Metro I, Inc., Mitsi Holdings LLC and Metro International Trade Services LLC ("Metro"); Glencore Ltd.; and Pacorini Metals USA, LLC submit this memorandum in support of their motion, pursuant to Rule 12(b)(6), to dismiss the antitrust claims in (a) the First-Level Purchasers' Second Corrected Consolidated Amended Class Action Complaint, dated April 10, 2014 ("FLP Compl."); (b) the Commercial End-Users' Corrected Consolidated Class Action Complaint, dated March 24, 2014 ("Commercial Compl."); (c) the Consumer End-User Consolidated Amended Class Action Complaint, dated March 12, 2014 ("Consumer Compl."); (d) the Amended Complaint of Mag Instrument, Inc., dated March 12, 2014 ("Mag Compl."); and (e) the Amended Complaint of Agfa Corporation and Agfa Graphics, N.V., dated March 12, 2014 ("Agfa Compl.").[1]

## PRELIMINARY STATEMENT

The financial crisis of 2008 and the global recession that followed led to a sharp drop in industrial demand for aluminum.  Because aluminum producers around the world did not correspondingly curtail supply by shutting down smelters—which are very expensive to restart— a huge global surplus of aluminum developed that continues until this day.  As plaintiffs themselves acknowledge, global production of aluminum has exceeded consumption each and every year since 2008 (Mag Compl. ¶ 35; Agfa Compl. ¶ 36), resulting in a massive stockpile of surplus aluminum.  Sluggish demand and excess supply also have resulted in plummeting prices. More than five years after the height of the financial crisis, the price of aluminum still has not recovered; it remains nearly 30% below its peak in 2006.  This prolonged slump in aluminum

---

[1] Glencore Ltd. and Pacorini Metals USA, LLC join those portions of this memorandum and the underlying motion that address claims that have been asserted against each of them and are also submitting separate motions to dismiss on grounds particularly applicable to each of them.

prices has ultimately led aluminum producers such as Rusal and Alcoa recently to announce significant reductions in output.  (*See*, *e.g.*, Arpan Mukherjee, *Aluminum Firms Cut Output Further*, WALL ST. J., Mar. 31, 2014, at B6 (Pepperman Decl. Ex. 1) ("The aluminum industry plans to cut output again this year as producers seek to reduce excess capacity amid falling prices."); John W. Miller, *Alcoa Reports Loss As It Closes Plants*, WALL ST. J., Apr. 9, 2014, at B3 (Pepperman Decl. Ex. 2) ("The production cutbacks were in response to a global glut of aluminum, which has sent prices lower.").)

Plaintiffs' claims ignore the broader glut of aluminum and focus only on a portion of this excess supply stored in warehouses that are part of the London Metal Exchange ("LME") system.  Aluminum in LME warehouses is represented by "warrants" that are used to trade the aluminum pursuant to futures contracts on the LME.  Since the financial crisis, LME warehouses in Detroit owned or operated by one defendant, Metro, have been particularly successful in competing for storage of excess aluminum supplies, given Detroit's proximity to aluminum producers in Eastern Canada and the availability of relatively inexpensive unused warehouse space in Detroit.  According to plaintiffs, 1.56 million tons of aluminum were stored in LME warehouses in Detroit at the end of 2013.  (FLP Compl. ¶ 85.)  As the owners of this aluminum "canceled" their warrants to pursue other options they deemed more attractive—including moving metal to less expensive warehouses outside of the LME system—so-called "queues" formed at Metro's Detroit warehouses beginning in 2010 as Metro loaded out the aluminum to owners at the minimum daily rate required by LME rules while continuing to earn rent on the balance of the inventory in its warehouses.

Plaintiffs here are purchasers of aluminum and aluminum products, ranging from manufacturers that allegedly purchased aluminum directly from producers to individual consumers who purchased products such as beer cans and automobiles made in whole or in part

from aluminum.  Plaintiffs do *not* contend that they ever acquired warrants for aluminum stored in an LME warehouse or that they ever paid rent to any defendant.  Nor do they suggest that they ever waited in a warehouse queue for delivery of aluminum they owned.  As plaintiffs concede, "the vast majority of the aluminum" stored in LME warehouses is owned not by users of aluminum, but by "banks, hedge funds, and traders."  (Mag Compl. ¶ 91; Agfa Compl. ¶ 92.) Rather, plaintiffs argue that delivery queues for aluminum at Metro's warehouses in Detroit and Metro's payment of financial incentives to aluminum owners as an inducement to deposit their excess inventory into Metro's Detroit warehouses have led to an increase in something called the "Midwest Premium" that, in turn, supposedly has caused them to pay a higher price for aluminum than they otherwise would have paid—notwithstanding that aluminum prices remain well below their peak level before the financial crisis.

    In five highly duplicative complaints, plaintiffs assert federal and state antitrust claims against three warehouse companies (Metro, Henry Bath and Pacorini), the three financial firms that own them (Goldman Sachs, JPMorgan and Glencore)[2] and the LME itself.[3]  Leaving aside plaintiffs' false assertion that they have paid an inflated price for aluminum, their antitrust claims fail as a matter of law for multiple reasons.  In a separate brief, defendants address the

---

[2] Goldman Sachs and JPMorgan are large financial institutions, and Glencore is a natural resource company; for sake of convenience, the term "financial firm" is used in this memorandum to refer to all three.

[3] Plaintiffs have improperly lumped corporate affiliates together for pleading purposes by making allegations regarding groups of corporate affiliates rather than each named defendant.  (*See*, *e.g.*, FLP Compl. ¶¶ 123 (defining "Goldman Defendants" to include The Goldman Sachs Group, Inc., GS Power Holdings LLC, MCEPF Metro I, Inc., Mitsi Holdings LLC and Metro International Trade Services LLC), 130 (defining "LME" to include the LME, LME Holdings Limited and Hong Kong Exchanges & Clearing, Ltd. (after December 5, 2012)), 136 (defining "Glencore" to include Glencore Xstrata, PLC, Glencore Ltd., Pacorini Metals AG and Pacorini Metals USA LLC), 141 (defining "JPMorgan" to include JPMorgan Chase & Co., Henry Bath & Son, Ltd. and Henry Bath LLC).  Although this brief uses plaintiffs' "corporate groupings" in discussing the complaints' allegations, it should not be read in any way to endorse or concede the appropriateness of those grouping allegations.

complaints' failure to allege antitrust standing; this memorandum addresses plaintiffs' failure to plead antitrust violations under well-settled antitrust principles.

Plaintiffs do not even attempt to state a claim under the rule of reason, and they plead insufficient facts to support a plausible inference of a *per se* unlawful horizontal conspiracy among either the warehouse defendants or the financial-firm defendants.  Plaintiffs allege no direct evidence of such a conspiracy, relying instead on conclusory assertions of "agreements" that do not come close to satisfying the governing pleading standard.  The complaints do not appear to assert even in conclusory terms that there was a horizontal agreement among the financial-firm defendants, and their conspiracy allegations directed at the warehouse defendants describe only unilateral conduct by Metro, to which plaintiffs add the perfunctory assertion that Metro acted pursuant to an "agreement."  Plaintiffs never explain why competing warehouse companies such as Henry Bath and Pacorini, which are not alleged to have aluminum queues at their warehouses in the United States, would support steps by Metro to attract and maintain a large inventory of aluminum in Detroit that otherwise might have been stored at their U.S. warehouses.

Nor can plaintiffs plead a horizontal conspiracy by pointing to supposedly parallel conduct by defendants, which alone is insufficient to allege an agreement.  All of the conduct challenged here is entirely consistent with each defendant's own economic self-interest.  For example, plaintiffs assert that no warehouse operator loads out metal from its warehouses at a rate that exceeds the LME-required minimum rate.  But plaintiffs admit that "[a]luminum storage facilities, such as those owned by Defendants, have an interest in keeping aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum stored within their warehouses."  (Consumer Compl. ¶ 45.)  Warehouses thus have an independent economic interest not to load out aluminum at a rate that exceeds the LME-required

rate.  Plaintiffs also cannot create an inference of an unlawful conspiracy simply by alleging that representatives of the warehouse defendants participated (together with many others) in meetings of the LME's Warehousing Committee.  The mere "opportunities to conspire" (Consumer Compl. ¶ 5(m)) at such meetings do not support an inference that an illegal combination actually occurred.  And plaintiffs' allegations that the financial-firm defendants previously owned a minority interest in the LME, trade aluminum futures on the LME, and have acquired and cancelled LME warrants do not plead conduct against those firms' individual economic self-interest.

Without an adequately pled horizontal conspiracy, plaintiffs' challenges to the LME's minimum load-out rule (to which warehouse operators must agree to qualify as LME-approved warehouses) and to Metro's payments of incentives to producers fall far short of stating a claim under Section 1 of the Sherman Act and its state-law equivalents.  Those vertical arrangements do not fall within the narrow set of "naked restraints" that courts have held are *per se* unlawful, and plaintiffs do not even attempt to state a claim under the rule of reason, which would require them to allege both a product market and a geographic market and an adverse effect on competition.  Although they propose multiple alternative markets, the complaints plead no supporting facts—for instance, they say nothing about interchangeabilty of use, cross-elasticity of demand or the area of effective competition for any of their proposed markets.  To the contrary, plaintiffs affirmatively disavow any need to plead a relevant market because they assert only *per se* violations.  Plaintiffs also have not alleged an adverse effect on competition:  without an adequately pled horizontal agreement, the LME's imposition of a *minimum* load-out requirement leaves warehouse operators free to exceed that rate, and Metro's payment of incentives is a form of *competition* for aluminum supplies.

Lastly, plaintiffs' monopolization claim against Metro suffers from multiple fatal defects. Not only do plaintiffs fail to plead a relevant market with barriers to entry, but the complaints also do not allege that Metro unlawfully acquired or maintained its supposed monopoly. Plaintiffs do not identify a single actual or potential competitor in any of their proposed markets that supposedly was excluded or otherwise foreclosed from competing as a result of Metro's conduct. Plaintiffs also fail adequately to plead any anticompetitive conduct by Metro. They do not allege that Metro's payment of incentives was predatory—to the contrary, they acknowledge that such incentives were highly profitable for Metro because of the rent it subsequently collected. To the extent that plaintiffs are complaining that Metro's incentive payments provided producers with an alternative to selling their excess inventory to users of aluminum, they are complaining about competition, not a restraint on competition. And plaintiffs nowhere explain why Metro's transfers of aluminum to other warehouses in Detroit (at the express direction of the owner of the metal) or its failure to load out aluminum at a rate that exceeded the LME-required minimum harmed the competitive process.

In short, under well-settled antitrust principles, these cases should be dismissed now before highly burdensome and costly discovery begins, both for the parties themselves and for the numerous third parties that already have received broad subpoenas for documents.

## STATEMENT OF FACTS

### A.      The Global Financial Crisis of 2008

The allegations in these cases have their roots in the global financial crisis that began in 2008. (*See* Mag Compl. ¶¶ 52-53; Agfa Compl. ¶¶ 53-54; Commercial Compl. ¶¶ 58, 115.) "Demand for aluminum decreased sharply as a result of that crisis, which led to increasing inventories of aluminum being stored in warehouses rather than being sold to consumers." (Mag Compl. ¶ 52; Agfa Compl. ¶ 53.) The financial crisis and recession that followed it also caused

the spot price for aluminum to fall dramatically.  (Commercial Compl. ¶ 115.)  Although the global economy began to recover in 2010, global production of aluminum has exceeded consumption each and every year since 2008, resulting in an unprecedented stockpile of surplus aluminum and historically low prices.  (Mag Compl. ¶ 35; Agfa Compl. ¶ 36.)

This "substantial over-supply of aluminum" (Mag Compl. ¶ 36) needed to be stored somewhere.  "With reduced demand, producers needed a place to put their aluminum output to maintain production.  They could do this by housing the metal in warehouses and selling the warrants . . . on the London exchange."  (Dustin Walsh, *Aluminum Bottleneck*, CRAIN'S DETROIT BUS., June 26, 2011 (Pepperman Decl. Ex. 3) (cited by Agfa Compl. ¶ 95).)[4]  They also could store their aluminum off-warrant outside of the LME system.  "From the end of 2008 to the present . . . the amount of aluminum held in LME warehouses worldwide soared, from about 1.1 million tonnes in July 2008 to about 5.5 million tonnes in April 2013."  (Mag Compl. ¶ 49; Agfa Compl. ¶ 50.)

B.     The LME System

Headquartered in London, the LME is a Recognised Investment Exchange and the leading exchange for trading non-ferrous metals futures, including aluminum futures.  (FLP Compl. ¶ 124; Commercial Compl. ¶ 27; Consumer Compl. ¶ 46.)  Like other futures exchanges, the LME lists standardized contracts for various metals providing for the delivery of a particular product on a specified date.  LME futures contracts are settled through the delivery of a "warrant" issued by an LME-approved warehouse.  (FLP Compl. ¶ 146; Commercial Compl. ¶ 53; Consumer Compl. ¶ 54.)  An LME warrant is a bearer document of title that pertains to a

---

[4] The Court may consider documents "incorporated in the complaint by reference, as well as matters [subject to] judicial notice."  *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998).  All references to "Ex." are to the exhibits accompanying the Declaration of Richard C. Pepperman II, dated April 23, 2014 ("Pepperman Decl.").

specified lot of metal stored at a specified LME warehouse.  (Mag Compl. ¶ 44; Agfa Compl. ¶ 45.)  The LME employs a so-called "seller's-choice" model, which means that the short (*i.e.*, seller) has the choice of which warrant to deliver to settle a futures contract.  (FLP Compl. ¶ 152.)  Because the long (*i.e.*, buyer) has no control over which warrant it will receive and thus the location of the underlying metal—the metal could be stored in a faraway warehouse very distant from the buyer—users of industrial metals typically do not use LME warrants in satisfying their needs for metal, preferring instead to purchase metal directly from producers.

The LME does not own the warehouses that store the metal covered by LME warrants.  It instead has fostered a large network of independently owned warehouses that are certified by the LME and that operate under LME rules.  (Consumer Compl. ¶¶ 51-52.)  This global network today consists of more than 700 warehouses worldwide, with close to 200 warehouses located in various cities in this country.  (Mag Compl. ¶ 42; Agfa Compl. ¶ 43.)  LME warehouses—which are prohibited by LME rules from owning the metal they store—derive revenue from collecting from warrant holders both daily storage charges based on the amount of metal in storage and exit charges (called Free on Truck or "FoT" charges) when the metal leaves the warehouse.  (FLP Compl. ¶¶ 22, 52; Commercial Compl. ¶ 67; Consumer Compl. ¶ 45.)  Each warehouse operator sets its own rent and FoT charges, which the LME publishes annually.  (FLP Compl. ¶ 205.)  The warehouse defendants here own or operate multiple LME-approved warehouses.  (FLP Compl. ¶¶ 122, 133, 138; Commercial Compl. ¶¶ 30, 33, 36; Consumer Compl. ¶¶ 22, 26, 31.)

LME warehouses are viewed as the "market of last resort" for metals producers in times of surplus.  (Commercial Compl. ¶¶ 50, 115.)  As plaintiffs state, "during times of an economic downturn, the last resort is to ship aluminum into LME warehousing.  LME warehouse aluminum supplies [thus] should increase during an economic downturn."  (FLP Compl. ¶ 17.)  The LME system served this important function during the global financial crisis.  (Commercial

Compl. ¶ 115.)  In North America, a large volume of the excess supply of aluminum flowed into LME warehouses in Detroit because of its proximity to large aluminum producers in Eastern Canada.  (*See* FLP Compl. ¶ 20 (chart showing Detroit LME warehouse aluminum inventory as percentage of U.S. LME warehouse aluminum inventory between 2007 and 2012).)

As the leading operator of LME warehouses in Detroit, Metro was in the right place at the right time in 2008, and was able to take full advantage of the spike in demand for warehousing services by acquiring unused warehouse space amidst the economic downturn in Detroit.  As of March 2013, Metro owned or operated 29 of 37 LME-approved storage facilities in the Detroit area.  (FLP Compl. ¶ 122.)[5]  In competing with other warehouses in Detroit and elsewhere for rental income, Metro also began offering "financial incentives to primary aluminum producers and traders to store aluminum in [its] LME-approved warehouses." (Commercial Compl. ¶ 70; *see also* Consumer Compl. ¶ 99.)  Those payments assisted Metro in attracting "a huge stockpile of aluminum, from which it derived substantial income from storage fees." (Commercial Compl. ¶ 70.)

### C.    The "Contango" in the Aluminum Market

As is typical in an oversupplied commodities market, the aluminum market generally has been in "contango" since 2008, which means that the futures price of aluminum has been higher than the present spot price.  (FLP Compl. ¶ 355.)  Throughout this period, "the supply of aluminum was plentiful due to the downturn in demand . . . and aluminum futures prices exceeded spot prices." (Commercial Compl. ¶ 58; *see also id.* ¶ 116; Mag Compl. ¶ 60; Agfa Compl. ¶ 61.)  Plaintiffs allege that "[d]ue to historically low interest rates, savvy traders were

---

[5]  The balance of the LME-approved warehouses in Detroit are owned by three different competitors.  (*See* LME List of Active Approved Warehouses (Pepperman Decl. Ex. 4) (cited by FLP Compl. ¶ 356).)

able to purchase aluminum at the spot price, finance the aluminum purchased at a low interest rate, pay to warehouse and insure it, and sell it on the futures market at a higher price." (Commercial Compl. ¶ 58.)  "As a result," plaintiffs say, "producers and others in the aluminum supply chain converted inventories of aluminum into cash and engaged in other transactions that resulted in large inventories of aluminum being held by traders and financial institutions."  (Mag Compl. ¶ 52; Agfa Compl. ¶ 53.)  Plaintiffs allege that because of these transactions, "a large amount of the aluminum inventory held in Metro's Detroit warehouses is owned by banks, hedge funds, and traders."  (Mag Compl. ¶ 58; Agfa Compl. ¶ 59; FLP Compl. ¶ 383.)

### D.     The Emergence of Delivery "Queues" in Detroit

To obtain the underlying metal from the warehouse in which it is stored, an LME warrant holder "cancels" the warrant, which triggers an obligation for the warehouse to load out the metal and deliver it to the warrant holder.   (FLP Compl. ¶ 147.)   The warrant holder is responsible for picking up the metal from the warehouse and controls where it is sent next.

The existence of a large inventory of metal in a warehouse by itself does not lead to delays between the time a warrant is cancelled and the time a warehouse loads out the aluminum. Rather, the combination of a large inventory, a high rate of warrant cancellations and Metro's loading out of aluminum at the LME's minimum load-out rate has led to load-out delays at Metro's Detroit warehouses and the formation of a "queue" in which metal is loaded out in the order in which the warrants were cancelled.  Despite the massive increase in aluminum inventory in 2008 and 2009, the rate of warrant cancellations did not spike until 2011, particularly late 2011 and early 2012, which led to lengthy delivery queues at Metro's Detroit warehouses.  (*See* Mag Compl. ¶ 59 (chart showing "LME Global Warehouse Stocks 2007-13—Live and Cancelled Warrants"); *see also* Mag Compl. ¶ 61; Agfa Compl. ¶ 62.)  Plaintiffs do not argue that there are aluminum queues at any warehouse in the United States other than Metro's Detroit

warehouses, and no plaintiff contends that Henry Bath has delivery queues at any of its warehouses anywhere in the world or that Pacorini has delivery queues at any of its warehouses in the United States.

### E.     The LME's Minimum Load-Out Requirement

Beginning in the fall of 2003, the LME adopted rules that dictate the minimum volume of metal an LME warehouse operator must load out to holders of cancelled warrants from each warehouse location (a geographic area defined by the LME) each day.  (*See* Consumer Compl. ¶ 58.)  The LME has modified these rules multiple times over the last decade in response to changing conditions in the marketplace.  These rules—which the LME publishes—balance a number of interests within the LME system.

In November 2003, the LME adopted a rule requiring a minimum load-out of 1,500 metric tons ("MT") of metal each business day at each warehouse location.  Before then, there was only an informal understanding that warehouse operators would load out a minimum of 1,000 MT of metal each day.  In announcing this new requirement in 2003, the LME explained that "[n]early all respondents who commented on this point believed that the market could be adequately served by having a top delivery out rate of 1,500mt.  The delivery out rates will be kept under review and if felt necessary may be amended to a higher level at a later date."  (LME Mem. dated Nov. 24, 2003 at 1-2 (Pepperman Decl. Ex. 5).)  This rule became effective in April 2004 and applied for the next eight years.  (*See* FLP Compl. ¶ 163; Commercial Compl. ¶ 77; Consumer Compl. ¶ 59.)

As it stated it would do, the LME continued to review its minimum load-out requirement in view of changing conditions and in response to feedback from industry participants.  This review included hiring a consultant, Europe Economics, to assess the load-out requirement in light of the dramatic increase in the stockpile of aluminum in the LME system (particularly in

-11-

Detroit) following the 2008 financial crisis.  (FLP Compl. ¶¶ 192-193; Commercial Compl. ¶ 155; Consumer Compl. ¶ 116.)  The LME ultimately decided to modify its rule by linking a warehouse company's minimum load-out rate to the total amount of metal stored at a location and by doubling the minimum daily load-out requirement for large warehouse locations (with over 900,000 MT of metal stored) from 1,500 to 3,000 MT each business day.  (*See* FLP Compl. ¶ 199; Commercial Compl. ¶ 88; Consumer Compl. ¶ 60.)  Recognizing "the current concern about queues," the LME stated that "[t]he effectiveness of these changes will be kept under constant review."  (LME Mem. dated July 15, 2011 ¶ 8 (Pepperman Decl. Ex. 6) (cited by Consumer Compl. ¶ 87).)  This new minimum load-out requirement took effect in April 2012.  (Consumer Compl. ¶ 138.)

The most recent significant proposed modification to the LME's minimum load-out requirement was announced in November 2013 after a lengthy consultation period in which the LME received written comments from 33 market participants and met with every market participant that so requested.  (*See* LME Mem. dated Nov. 7, 2013 ¶ 1 (Pepperman Decl. Ex. 7) (cited by FLP Compl. ¶ 263).)  The LME's new proposed load-out rule, which is specifically designed to reduce the length of aluminum queues at certain warehouses, would require warehouses with queues longer than 50 calendar days at a particular location to deliver out more metal than they take in at that location based on an LME formula.  (FLP Compl. ¶ 265; Commercial Compl. ¶ 172; Consumer Compl. ¶ 153.)  In announcing the new rule, the LME explained:

> [I]n the context of the Consultation, no alternative course of action to address queues has been proposed which, in the opinion of the Exchange, better balances the need to manage queues down within the practical and legal framework under which the LME operates, the logistical constraints of certain warehouse facilities, the equitable right of warehouse operators to recoup the significant investment made in LME facilities, and concerns from producers as to the effects of large quantities of stored metal being discharged into the market over a short period of time.

(LME Mem. dated Nov. 7, 2013 ¶ 9 (Pepperman Decl. Ex. 7).)  The LME also noted that "[t]he Consultation has confirmed the view that physical users are unlikely to make significant direct use of LME warrants as a direct avenue of metal sourcing, even in a non-queue environment." (*Id*. ¶ 13.)[6]

### F.   Competition from Off-Warrant Storage at Non-LME Warehouses

LME warehouses are not the only suppliers of aluminum storage.  Instead, two different types of storage exist:  "on-warrant" and "off-warrant."  (FLP Compl. ¶ 393; Commercial Compl. ¶ 135.)  On-warrant storage is with an LME-approved warehouse that has issued a warrant for the particular lot of aluminum.  Off-warrant metal is not subject to an LME warrant and can be stored both with companies that operate LME-approved warehouses and with other companies.  (FLP Compl. ¶ 393; Mag Compl. ¶ 92; Agfa Compl. ¶ 93.)  Because aluminum will not degrade if stored outside—and, unlike other metals, is not subject to serious theft risk given its value relative to its weight—off-warrant aluminum can be stored essentially anywhere at relatively little cost.

Off-warrant storage of metal operates entirely outside the LME system and is not subject to LME rules; off-warrant aluminum also cannot be traded on the LME.  (*See* Tatyana Shumsky, *Millions of Tons of Metals Stashed in Shadow Warehouses*, WALL ST. J., Dec. 26, 2013 (Pepperman Decl. Ex. 9) (cited by Mag Compl. ¶ 92).)  Because off-warrant storage is not subject to the same regulations and does not provide the same liquidity as LME warrants, rent for off-warrant storage is substantially less (often ten times cheaper or more) than LME rates for on-

---

[6] On March 27, 2014, the High Court of Justice, Queen's Bench Division, enjoined implementation of the LME's new load-out rule pending further proceedings.  (*See* Pepperman Decl. Ex. 8.)  In an action commenced by Rusal, a leading aluminum producer, the Court concluded that the LME's consultation process was procedurally unfair and unlawful because the LME did not disclose sufficient information about its consideration of, and did not adequately consider, the alternative of banning or capping warehouses' collection of rent for metal while the metal is waiting in a queue.

warrant storage.  (*See* Commercial Compl. ¶ 131 (chart showing LME rent of "47 cent/lb" and non-LME rent of "2.5 cent/lb").)  Investors seeking to take advantage of the "contango" in the aluminum market thus have acquired "'on-warrant' aluminum stock stored in LME warehouses," cancelled the warrants and then moved the aluminum to off-warrant storage "held in non-LME warehouses which incur lower storage costs and, thus, provide for greater profitability" on their trades.  (Commercial Compl. ¶ 135; FLP Compl. ¶ 393.)

In some instances, Metro has attempted to compete with these non-LME warehouses by offering warrant holders the opportunity, after they have cancelled their warrants and waited in whatever queue existed at the time, to move their aluminum to a different Metro warehouse in Detroit for off-warrant storage at a reduced rent with the option of re-warranting the metal should they choose to do so.  This competition has resulted in the so-called "shuttling of metal from one warehouse to another" to which the complaints refer.  (*See*, *e.g.*, FLP Compl. ¶ 55; Commercial Compl. ¶ 4; Consumer Compl. ¶ 4; Mag Compl. ¶¶ 90-92; Agfa Compl. ¶¶ 91-93.)

The competition posed by off-warrant storage at non-LME warehouses cannot be overstated.  (*See* Shumsky, *supra* ("Some companies . . . are seeking a cheaper alternative to the LME warehouses, which can be 10 times as expensive as the unregulated storage . . . .").)  As of October 2013, a record "7 to 10 million tonnes of aluminum [were] being" stored off-warrant at non-LME facilities, "known within the industry as 'shadow warehouses.'"  (Mag Compl. ¶ 92; Agfa Compl. ¶ 93.)  That "amount dwarfs the 5.5 million tons of aluminum in the LME-licensed warehouses" about which plaintiffs complain.  (Shumsky, *supra*.)

## G.     The "All-In" Price for Aluminum and the Midwest Premium

As in any market, the price for delivered physical aluminum is set by what willing buyers are prepared to pay to willing sellers.  Although nothing binds such buyers and sellers from negotiating any price they wish, plaintiffs allege that buyers and sellers, for their own reasons,

often negotiate a price for aluminum using the LME spot price as a baseline and adding to it a differential reflecting, among other things, the cost and value of aluminum delivered to a particular place at a particular time.  (*See* FLP Compl. ¶¶ 11-12; Commercial Compl. ¶ 56; Mag Compl. ¶ 37; Agfa Compl. ¶ 38.)  This total price for delivered physical aluminum is generally referred to as the "all-in" price.  (FLP Compl. ¶ 11.)

The difference between the "all-in" price and the LME spot price is referred to as the "premium."  A company called Platts calculates something called the Midwest Transaction Price "based upon what is described as 'a daily survey of spot buyers and sellers, using a representative sample of producers, traders and different types of end users.'"  (Commercial Compl. ¶ 57 (quoting Platts, *Methodology and Specifications Guide:  Metals* (Pepperman Decl. Ex. 10)); *see also* FLP Compl. ¶ 11; Mag Compl. ¶ 41; Agfa Compl. ¶ 42.)  According to plaintiffs, "[u]sing this survey information, Platts calculates a single price for the metal"—an "all-in" price.  (Commercial Compl. ¶ 57.)  "The difference between this single, all-in spot price and the LME price is the premium, which Platts then publishes."  (*Id*.)  Plaintiffs allege that through this subtraction exercise ("all-in" price minus LME spot price), Platts "derive[s] premiums for different markets.  The U.S. premium is referred to as the Platts MW or Midwest Premium."  (*Id*.)

Over the last several years, the LME spot price for aluminum has declined relative to the "all-in" price causing the two prices to diverge.  As plaintiffs observe, "[s]tarting in February 2011, . . . the LME Cash Price began a decline from $2,600 to a recent low of $1,730."  (Mag Compl. ¶ 71; Agfa Compl. ¶ 72.)  These prices are down from a peak of "about $3,000 per tonne" before 2008.  (Mag Compl. ¶ 70; Agfa Compl. ¶ 71.)  Because the Midwest Premium is the difference between the all-in price and the LME spot price, this sharp decline of the LME

spot price relative to the all-in price has caused the Midwest Premium to "move[] in the opposite direction." (Mag Compl. ¶ 71; Agfa Compl. ¶ 72.)

Some have argued that queues for aluminum in Detroit have depressed the LME spot price, causing it to diverge from the all-in price for aluminum and thus producing the increase in the Midwest Premium about which plaintiffs complain. As the LME explained in its November 2013 public report on its warehousing consultation, "the impact of queues and incentives has been *not* to change the absolute price of metal, but rather to depress the LME price relative to the absolute price, and consequently to increase the contribution of the premium to the absolute price." (LME, *Summary Public Report of the LME Warehousing Consultation* at 43 (Nov. 2013) (Pepperman Decl. Ex. 11) (cited by FLP Compl. ¶ 263) (emphasis added).) To the extent that warehouse queues have allegedly affected the LME spot price for aluminum and thus increased the amount of the premium, the all-in price of aluminum has remained substantially lower than it was before the financial crisis. In fact, the all-in price for aluminum is nearly 30% lower than its 2006 peak. (*See* Jack Farchy, *Aluminum Producers Vent Fury at LME Changes to Warehousing Rules*, FINANCIAL TIMES, Oct. 10, 2013 (Pepperman Decl. Ex. 12) (quoted in Commercial Compl. ¶ 179).)[7]

## H.    Plaintiffs' Antitrust Claims

Plaintiffs assert antitrust claims under Sections 1 and 2 of the Sherman Act and various state-law equivalents. The complaints attempt to plead a horizontal conspiracy among the

---

[7] Plaintiffs note that "[t]wo aluminum producers—Alcoa Inc. and Rusal—have made statements that changes in the minimum load-out rule would reduce aluminum prices." (FLP ¶ 238.) In fact, those producers have expressed concern that an accelerated release of the aluminum stored in LME warehouses that has accumulated since the financial crisis into an oversupplied market could result in a short-term, but potentially significant, decline in already-low aluminum prices. (Pepperman Decl. Ex. 8, ¶ 47.) Quoting the LME, the High Court of Justice referred to this anticipated discharge of aluminum from warehouses as a "wall of supply." (*Id.* ¶ 56.)

warehouse defendants (Metro, Pacorini and Henry Bath) to treat the LME's minimum load-out requirement as a maximum and to engage in or permit other conduct attributed to Metro in Detroit.  Plaintiffs vaguely assert that the financial-firm defendants may have facilitated this horizontal conspiracy by buying and canceling LME warrants for aluminum stored in Detroit.  In addition to their claim of a horizontal agreement, plaintiffs appear to challenge two vertical relationships:  (i) starting in 2010, the LME's imposition and interpretation of its minimum load-out requirement (first 1,500 MT a day and then 3,000 MT a day) and the warehouse defendants' agreements to comply with those rules, and (ii) Metro's payment of incentives to producers and others in an effort to attract new metal into its Detroit warehouses.  Plaintiffs argue that these alternative and overlapping agreements are *per se* unlawful under Section 1 and its state-law equivalents.

Moreover, plaintiffs contend that Metro "abused" a supposed monopoly in various markets and that "LME Detroit Warehousing is an essential facility."  (FLP Compl. ¶ 303.) Plaintiffs argue that Metro violated Section 2 of the Sherman Act and its state-law equivalents by making non-predatory incentive payments to attract new aluminum and increase its storage revenues, loading out metal from its Detroit warehouses at the LME's required minimum rate, and allowing aluminum exiting its warehouses sometimes to be shipped (at the owner's direction) to other storage facilities.

## ARGUMENT

A motion to dismiss under Rule 12(b)(6) should be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To satisfy this standard, the complaint "must do more than offer 'naked assertions devoid of further factual enhancement,'" *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 195 (S.D.N.Y. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), and

-17-

the Court "need not credit legal conclusions couched as factual statements," *MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 651 F.3d 268, 270 (2d Cir. 2011).  The complaints here fail to meet these pleading requirements and thus should be dismissed.

## I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1.  Despite this broad language, the Supreme Court has made clear that Section 1 "prohibits only agreements that *unreasonably* restrain trade."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (emphasis in original).  Plaintiffs do not even attempt to state a claim under the rule of reason.  The complaints instead plead only *per se* violations of Section 1.

Plaintiffs' allegations of a horizontal conspiracy fail because the complaints do not come close to adequately alleging an "agreement" under the *Twombly* standard.  Plaintiffs do not plead any direct evidence of an agreement among competitors (the specific time, place or person involved in the alleged conspiracies), and their allegations of parallel conduct (all of which are equally consistent with each firm's individual self-interest) are insufficient to create a plausible inference of an agreement.  Although the complaints include lengthy discussions of the purported effect of the supposed conspiracy on the Midwest Premium, they plead no facts in support of the alleged horizontal agreements, relying instead on allegations purporting to describe the unilateral conduct of one defendant (Metro) at one location (Detroit) and conclusory assertions that defendants entered into various agreements.  Plaintiffs' allegations are insufficient to plead a horizontal agreement, whether they are viewed individually or collectively.

Without an adequately alleged horizontal agreement among competitors, plaintiffs' remaining challenges to what are vertical arrangements also fail under Section 1.  Plaintiffs cannot plead that the LME's minimum load-out requirement itself (and the warehouse

-18-

defendants' individual agreements to comply with it) or Metro's payment of incentives to aluminum producers falls within the narrow set of naked restraints that the courts have classified as *per se* violations of the antitrust laws.  Plaintiffs have not even attempted to plead the facts necessary to challenge those vertical arrangements under the rule of reason, and such a challenge would be futile in any event.

### A.    The Complaints Do Not Adequately Allege a Plausible Horizontal Conspiracy.

In a Section 1 case, "[t]he crucial question" is "whether the challenged conduct stems from independent decision or from an agreement, tacit or express."  *Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) ("*Citigroup*") (internal quotation marks omitted). "To survive a motion to dismiss under *Twombly*, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (alterations in original) (internal quotation marks omitted).  A complaint must allege sufficient facts to "nudge [] [plaintiffs'] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *id.* at 556.

Under *Twombly*, the "wholly conclusory statement" that defendants entered into an "agreement" is a legal conclusion, not a factual allegation.  *Citigroup*, 709 F.3d at 135-36.  Accordingly, "[w]ithout more, . . . a conclusory allegation of agreement at some unidentified point does not supply facts adequate" to state a Section 1 claim.  *Twombly*, 550 U.S. at 556-57.  "A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."  *Citigroup*, 709 F.3d at 136.  "[T]here are two ways to do this."  *Id*.  First, a plaintiff may "assert direct evidence that the

-19-

defendants entered into an agreement in violation of the antitrust laws." *Id.*  Second, "a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* (emphasis in original).  A horizontal agreement "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).  The complaints here fall well short of pleading a plausible horizontal conspiracy.

### 1.    Plaintiffs' Conclusory Allegations of Agreement Are Insufficient.

In attempting to plead a horizontal conspiracy, plaintiffs rely largely on conclusory assertions that defendants entered into various agreements without any allegations of fact to support those assertions.  For example, plaintiffs assert that the warehouse defendants "agree[d] to treat certain LME rules requiring warehouses to deliver a minimum specified quantity of aluminum daily as a rule setting a maximum, rather than a minimum, quantity to be released." (Consumer Compl. ¶ 4.)  A variant of that conclusory assertion is found in all of the complaints. (*See*, *e.g.*, Consumer Compl. ¶¶ 94, 200(a); FLP Compl. ¶ 32(f); Commercial Compl. ¶ 78; Mag Compl. ¶ 66; Agfa Compl. ¶ 67.)  Plaintiffs similarly assert, without any supporting facts, that the warehouse defendants also agreed to "permit metal shuttled between various LME-approved warehouses to count towards the daily minimum (actually maximum) load-out figure." (Consumer Compl. ¶ 139; *see also* Commercial Compl. ¶ 80.)  Plaintiffs' suggestion that the financial-firm defendants may have facilitated the horizontal conspiracy among the warehouse defendants in an effort to create or exploit the contango in the aluminum market is, if anything, even more conclusory and devoid of factual support.   Plaintiffs assert, for instance, that defendants "created conditions that allowed a wide contango to persist and/or increase during the Class Period."  (Commercial Compl. ¶ 119.)  They also allege, "[o]n information and belief," that "this contango was an intended result of Defendants' coordinated effort to provide profitable

-20-

financing opportunities to their Trading Desks."  (Commercial Compl. ¶ 124; *see also* FLP Compl. ¶¶ 380, 391; Consumer Compl. ¶ 200(c).)

Such conclusory assertions of an agreement are not assumed true on a motion to dismiss because "[t]he ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation."  *Citigroup*, 709 F.3d at 135-36.  The various agreements suggested by plaintiffs are "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever."  *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (internal quotation marks omitted).  In fact, plaintiffs' allegations of a conspiracy among the warehouse defendants really describe only unilateral conduct by one company (Metro) in one city (Detroit). The complaints allege, for example, that Metro offered aluminum producers "financial incentives" to store their aluminum in its Detroit warehouses (FLP Compl. ¶ 37; Consumer Compl. ¶ 5(g); Commercial Compl. ¶ 71) and that Metro counted towards the LME's load-out requirement aluminum that was transferred to another warehouse (FLP Compl. ¶ 177; Consumer Compl. ¶ 98).  Plaintiffs cannot plead a horizontal conspiracy simply by asserting that Metro engaged in such unilateral conduct pursuant to an unparticularized agreement with other warehouse companies.  "Such conclusory allegation[s] of agreement at some unidentified point do[] not supply facts adequate to show illegality."  *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (alterations in original) (internal quotation marks omitted).

### 2.  Plaintiffs Allege No Direct Evidence of a Horizontal Conspiracy.

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" under *Twombly*.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010).  But plaintiffs do not even attempt to plead such evidence here.  The complaints "mention[] no specific time, place, or person involved in the alleged conspiracies." *Twombly*, 550 U.S. at 565 n.10.  Indeed, they are utterly devoid of such specifics.

> 3.      **Plaintiffs' Allegations of Supposed Parallel Conduct Are Insufficient.**

With no direct evidence of a horizontal conspiracy, plaintiffs attempt to plead agreements based on allegations of parallel conduct.  Plaintiffs allege that the warehouse defendants "agreed to treat the minimum load-out rule as a *de facto* maximum load-out rule" by "releasing no more aluminum from their warehouses than required by the rule."  (Consumer Compl. ¶ 92.)  Plaintiffs also argue that certain defendants supposedly changed their conduct in 2013 in response to negative press articles.  (Consumer Compl. ¶¶ 146-49.)  And plaintiffs contend that the financial-firm defendants, "[w]ithin a few months of each other in 2010," purchased the warehouse defendants.  (FLP Compl. ¶ 355.)

But "alleging parallel conduct alone is insufficient, even at the pleading stage," to plead a conspiracy.  *Citigroup*, 709 F.3d at 136.  Parallel conduct allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 557.  None of plaintiffs' allegations of parallel conduct supports an inference of a conspiracy.  Instead, the alleged conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Id*. at 554.

As an initial matter, plaintiffs' allegations of parallel conduct are themselves implausible.  Plaintiffs do not allege that aluminum queues existed at any LME warehouse in the United States other than at Metro's Detroit warehouses, and thus they do not contend that the load-out rate was ever an issue at any other defendant's U.S. warehouses.  In fact, Henry Bath is not alleged ever to have had an aluminum queue at any of its warehouses anywhere in the world.  Plaintiffs thus do not allege that Henry Bath ever had occasion to load out aluminum at a rate that exceeded the LME minimum.  Similarly, Pacorini is not alleged ever to have had an aluminum queue at any of its warehouses in the United States.  *See Precision Assocs., Inc. v. Panalpina World Transp.*

*(Holding) Ltd.*, No. CV-08-42, 2013 WL 6481195, at \*23 (E.D.N.Y. Sept. 20, 2013) ("[T]he naked allegation that a defendant joined a conspiracy whose goal was to pass on all future surcharges without at least the allegation that it imposed those surcharges is implausible.").  Nor is parallel conduct pleaded by allegations that (i) Metro stopped paying incentives to attract new aluminum in July 2013 after the LME announced its plan to link the minimum load-out rate to the amount of new aluminum loaded into a warehouse (FLP Compl. ¶ 80), (ii) JPMorgan announced on July 26, 2013 its intention to exit the physical commodity business altogether (FLP Compl. ¶ 275), and (iii) Goldman Sachs offered on July 31, 2013 to provide aluminum immediately to any user that owned aluminum that was in Metro's Detroit queue—an offer no one accepted (FLP Compl. ¶ 81).  And plaintiffs' allegations of parallel conduct by the financial-firm defendants do not withstand scrutiny:  Goldman Sachs acquired Metro in February 2010 (FLP Compl. ¶ 122); although JPMorgan acquired Henry Bath near that time, that acquisition was part of the purchase of RBS Sempra, a much larger company (Commercial Compl. ¶¶ 32, 59); and Glencore did not acquire Pacorini until September 2010 (FLP Compl. ¶ 134).

Even assuming that plaintiffs have adequately alleged parallel conduct by defendants, to plead a horizontal conspiracy, "such interdependent conduct [must be] accompanied by circumstantial evidence and plus factors." *Citigroup*, 709 F.3d at 136 (internal quotation marks omitted).  "These 'plus factors' may include:  a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (internal quotation marks omitted).  Plaintiffs have not adequately alleged sufficient circumstantial evidence and plus factors to plead a plausible horizontal conspiracy, and their "bare allegation of parallel conduct is not enough to survive a motion to dismiss." *Id*. at 137.

### a.   Defendants Did Not Act Against Their
###        Individual Economic Self-Interest.

Plaintiffs "have not alleged behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (internal quotation marks omitted).

The complaints acknowledge that "[a]luminum storage facilities, such as those owned by Defendants, have an interest in keeping aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum stored within their warehouses." (Consumer Compl. ¶ 45.)  In addition, increasing the load-out rate involves additional costs for a warehouse for both labor and equipment such as forklifts.  To maximize their profitability, warehouse operators thus have a strong economic incentive to load out aluminum at the minimum rate required by the LME and no faster.  Although they assert a conspiracy beginning in 2009 or 2010, plaintiffs do not allege that warehouse operators generally loaded out aluminum faster than the required minimum rate before the alleged conspiracy began, nor do they explain why it would be economically rational to do so absent a conspiracy.  *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 683-84 (S.D.N.Y. 2012) (plaintiffs alleged "a rapid and simultaneous switch" by defendants to pricing model "heretofore unknown in the publishing industry" and "collective action problem" that purportedly could not have been solved absent conspiracy).  Accordingly, plaintiffs have not alleged that the warehouse defendants acted against their individual economic self-interest by loading out aluminum only at the LME's required rate.  *See Citigroup*, 709 F.3d at 138 (conspiracy could not be inferred by parallel conduct where "*en masse* flight from a collapsing market in which they had significant downside exposure . . . made perfect business sense" because "abandoning bad investments" was the "*only* rational business decision"); *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011) ("The Complaint presents no allegations that the Appellees' decision to limit or refuse credit to

Factory 2-U was against each company's interest rather than a natural response to Factory 2-U's declining financial situation."); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963 (N.D. Cal. 2007) ("[I]t would have been entirely rational for each defendant *independently* to decide to increase late fees as a way to raise revenue, expecting [its] neighbors to do the same thing.") (alteration in original) (quotation marks omitted).

Plaintiffs speculate that "[a]bsent the Defendants' illegal agreements, LME-approved warehouse firms would have competed on delivery and service terms" and thus would have attempted to attract new aluminum by loading out metal as quickly as possible.  (Commercial Compl. ¶ 85.)   That speculation ignores that a warehouse company could logically—and unilaterally—determine that it could maximize its rental income by loading out aluminum at the rate required by LME rules and no faster.  Moreover, plaintiffs nowhere allege that the entity that deposits aluminum into an LME-approved warehouse (often a producer) is also the same entity that later seeks to withdraw it, and that it therefore selects a warehouse based on how quickly it can obtain its metal upon cancellation of the warrant.  In fact, the complaints allege otherwise.  Plaintiffs acknowledge that producers of aluminum (or traders that purchase aluminum from them) typically deposit aluminum into LME warehouses and then dispose of the warrant they receive in a transaction on the LME rather than continue to own that aluminum and pay daily rent while it is in storage.  (*See* FLP Compl. ¶ 396; Commercial Compl. ¶ 139.)  That is how producers are able to "convert[] inventories of aluminum into cash."  (Mag Compl. ¶ 52; Agfa Compl. ¶ 53.)  Indeed, an owner of aluminum that intends to store its metal and later withdraw it likely would choose much cheaper off-warrant storage over on-warrant storage in an LME warehouse.  Because the entity that deposits aluminum into an LME warehouse typically sells the warrant, that entity is not likely to select an LME warehouse based on its load-out rate.

Plaintiffs do not even attempt to allege that any acts by the financial-firm defendants (their purchases of warehouse companies, the sale of the LME, their alleged cancellation of LME warrants or their supposed trades of aluminum futures contracts) were against their individual economic self-interest.  Given the global oversupply of aluminum that has existed since 2008, Goldman Sachs and Glencore could have independently concluded at different points in 2010 that it was an opportune time to purchase a warehouse company, and JPMorgan acquired Henry Bath as part of its purchase of a much larger company.  And plaintiffs do not suggest that any purported actions by the financial-firm defendants to create or exploit the "contango" in the aluminum market by cancelling LME warrants they owned or taking advantage of attractive trading opportunities were unique to them (to the contrary, it was a strategy followed by numerous financial players) or against their individual economic self-interest.  In short, any supposed parallel conduct by the financial-firm defendants is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S at 554.

> **b.    Defendants' Participation in Certain LME Committees and Minority Ownership Interest in the LME Are Insufficient.**

Plaintiffs allege that the warehouse defendants each had a representative on the LME's Warehousing Committee (FLP Compl. ¶ 360; Consumer Compl. ¶ 57; Commercial Compl. ¶ 40; Mag Compl. ¶ 24(c); Agfa Compl. ¶ 25(c)), which is responsible for "'[m]aking recommendations to EXCOM [the LME Executive Committee] on warehousing related policy issues.'"  (FLP Compl. ¶ 361 (quoting LME website); *see also* Commercial Compl. ¶ 40; Consumer Compl. ¶ 57.)  Nine other companies were represented on the LME's Warehousing Committee, none of which is alleged to be a conspirator.  One complaint further alleges that Goldman Sachs and JPMorgan also had representatives on other LME committees.  (Commercial Compl. ¶¶ 42-43.)  These committee meetings are the only inter-firm interactions that plaintiffs

identify in their complaints.   Finally, plaintiffs note that JPMorgan, Goldman Sachs and

Glencore each were shareholders of the LME before it was acquired by Hong Kong Exchanges

& Clearing Ltd. in December 2012, owning 10.9%, 9.5% and 0.4% of the LME, respectively.

(Commercial Compl. ¶ 78; FLP Compl. ¶ 27; Consumer Compl. ¶ 5(p).)   These allegations are

insufficient to create a plausible inference of a conspiracy.

Plaintiffs do not allege that the warehouse defendants—through their representatives on

the LME Warehousing Committee—themselves conspired to establish the LME's minimum

load-out rules.   Rather, plaintiffs concede that the LME Warehousing Committee only makes

"recommendations to EXCOM [the LME's Executive Committee] on warehousing related policy

issues."   (FLP Compl. ¶ 361; *see also* Commercial Compl. ¶ 40; Consumer Compl. ¶ 57.)

Plaintiffs also acknowledge that the warehouse operators represented on the LME Warehousing

Committee had different views on the issue of warehouse queues.   (FLP ¶ 5(a)-(b).)   Thus, at

best, plaintiffs claim that the warehouse defendants—which themselves were differently situated

and collectively were only a small minority of the LME Warehousing Committee—made

"recommendations to EXCOM" concerning the minimum load-out rules, but it was then the

LME's Executive Committee (of which no defendant is alleged to have been a member) that

made the final decision.   Plaintiffs allege no facts to support a contention that the LME conspired

with the warehouse defendants to establish inadequate minimum load-out requirements.

Given the limited advisory role of the LME committees, plaintiffs instead posit that "all

Defendants had *opportunities to conspire*" at the committee meetings, "most notably through

having representatives sit as LME Warehousing Committee members."   (Consumer Compl.

¶ 5(m) (emphasis added).)   But the "mere opportunity to conspire" at such meetings "does not by

itself support the inference that . . . an illegal combination actually occurred."   *Capital Imaging*

*Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).   As a

result, courts routinely hold that membership in trade associations and participation on boards of directors alone are insufficient to create a plausible inference of conspiracy. *Twombly*, 550 U.S. at 567 n.12 (merely "belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013) ("[M]erely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of Section 1."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (membership in association and participation on its board do not establish a horizontal agreement in violation of Section 1); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (finding that "mere presence at industry associations and meetings" is insufficient to state a Section 1 claim). Plaintiffs' allegations that various defendants participated in different LME committees establish nothing more than that they "are *capable* of conspiring," not that they in fact conspired. *Vedder Software Grp. Ltd. v. Ins. Servs. Office, Inc.*, 545 F. App'x 30, 32 (2d Cir. 2013) (emphasis in original).

More fundamentally, the participation of representatives of the warehouse defendants, together with the many other committee members, in meetings of the LME Warehousing Committee does not by itself raise competitive concerns. In formulating rules and regulations pertaining to warehouses, the LME is entitled to seek input from the owners of LME-approved warehouses, while reserving for the LME Executive Committee (of which no defendant is a member) the ultimate authority to approve any such rules and regulations. (*See* Consumer Compl. ¶ 57.) The operators of LME-approved warehouses similarly are entitled to submit their views "on warehousing related policy issues" to the LME. (FLP Compl. ¶ 361; Commercial Compl. ¶ 40; Consumer Compl. ¶ 57) Such discussions at Warehousing Committee meetings alone do not suggest unlawful collusion. *See In re Travel Agent Comm'n Antitrust Litig.*, 583

F.3d 896, 910-11 (6th Cir. 2009) ("The fact that American and Continental gathered at industry trade association meetings during the seven-year period when defendants reduced commission rates should not weigh heavily in favor of suspecting collusion . . . . [A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because American's and Continental's presence at such trade meetings is more likely explained by their lawful, free-market behavior.").  That is particularly true given that the warehouse defendants are not similarly situated:  Metro is the only warehouse defendant alleged to have an aluminum queue in the United States; Pacorini is alleged to have an aluminum queue only in Europe; and Henry Bath is not alleged to have an aluminum queue anywhere.

Nor do the financial-firm defendants' prior ownership interests in the LME create a plausible inference of a conspiracy.  In *Vedder Software Group*, plaintiff attempted to plead a conspiracy based on parallel conduct, alleging that "several large insurance companies, accounting for the vast majority of insurance business in the United States," controlled the ultimate parent of a corporation that sold a competing software product.  545 F. App'x at 32 (internal quotation marks omitted).  In affirming the dismissal of the complaint, the Second Circuit stated that "the complaint identifies only Liberty Mutual and its affiliates as members of the conspiracy" and that "[n]o other insurance company is named."  *Id*.  The court reasoned that "[t]he insurers' alleged control" over the corporation is "a legal conclusion" that need not be accepted as true and that the common ownership stake of Liberty Mutual and its affiliates in the corporation "is not conclusive of a conspiracy."  *Id*. at 32-33.  Likewise here, plaintiffs do not allege that the other large financial institutions such as UBS, Citigroup, Merrill Lynch and Morgan Stanley that were shareholders of the LME (Commercial Compl. ¶ 78) were part of any supposed conspiracy, and the minority ownership interests of JPMorgan, Goldman Sachs and

Glencore (collectively 20.8%, of which Glencore owns only 0.4% in the form of "B shares") do not create an inference of a conspiracy.

> **c.**      **Plaintiffs Have Not Alleged a Common Motive to Conspire.**

The various motives to conspire suggested by plaintiffs do not withstand scrutiny. Plaintiffs note that "[t]he LME reportedly receives approximately 1.0% of the total storage fees charged by LME warehouses."  (FLP Compl. ¶ 68.)  But the LME's alleged financial interest in warehouse storage revenues does not provide a common motivation for a conspiracy among the warehouse defendants.  It also makes no economic sense for the LME to encourage practices by warehouse operators that could cause the LME spot price to diverge from the "all-in" price of aluminum.  Such divergence undercuts the LME's price discovery function and makes LME futures contracts a less efficient hedge, which is why the LME has increased the minimum load-out rate multiple times over the last several years.  (*See* LME Mem. dated Nov. 7, 2013 ¶ 7 (Pepperman Decl. Ex. 7) ("[T]he Consultation has clearly indicated that the existence of the increased premium that excessive queues cause creates significant difficulties for the metals community in respect of both discovery of the 'all-in' price, and effective hedging of that price.") (cited by FLP Compl. ¶ 263).)  Plaintiffs have not explained how these alleged injuries to the LME's overall function as a futures exchange are outweighed by the supposed incremental income the LME earned based on the additional rent collected by Metro's Detroit warehouses.

Plaintiffs also have not adequately alleged that the warehouse defendants shared a common motive to conspire.  The complaints nowhere explain why Henry Bath—which is not alleged to have a queue at any of its warehouses—supposedly shared a motivation to oppose changes to the LME's minimum load-out requirement that could have had the effect of reducing queues at Metro's warehouses.  Plaintiffs similarly do not explain why Henry Bath and Pacorini supposedly were motivated to support Metro's payment of large incentives to attract metal into

its Detroit warehouses or Metro's counting of metal transferred to another warehouse towards the LME's minimum load-out requirement.  If anything, those practices by a competitor arguably led to aluminum being stored at Metro warehouses in Detroit rather than at Henry Bath and Pacorini warehouses in the United States.

Plaintiffs' allegations of the financial-firm defendants' supposed motivation to conspire are even weaker.  Plaintiffs assert that the financial-firm defendants shared a motivation to pursue attractive trading opportunities (Commercial Compl. ¶¶ 122-24), but those allegations describe a common motivation to pursue conduct that is in each firm's individual self-interest, not a motivation to conspire.  There is also no suggestion that the financial-firm defendants' alleged cancellation of LME warrants—which enabled them to take possession of their aluminum—made sense only as part of a conspiracy.  Moreover, plaintiffs do not plead facts plausibly alleging that the aluminum queues are responsible for the contango in the massive global aluminum marketplace, which arose years before lengthy queues developed.  Plaintiffs also do not adequately explain how the conduct at issue here supposedly inflated the ultimate sale price of the LME, relying instead on pure speculation.  (*See* FLP Compl. ¶ 197.)

### d.     Plaintiffs Cannot Salvage Their Conspiracy Claim by Pointing to Press Reports of Government Investigations.

All of the complaints refer to press reports of governmental investigations, including subpoenas from the Commodity Futures Trading Commission ("CFTC") and a "preliminary investigation" by the Department of Justice ("DOJ").  (*See* FLP ¶¶ 271-73; Commercial Compl. ¶¶ 161-62; Consumer Compl. ¶¶ 5(i), 127-29, 131; Mag Compl. ¶¶ 97, 99; Agfa Compl. ¶¶ 98, 100.)  Such allegations, however, do not bolster the plausibility of an inadequately pled conspiracy and therefore cannot cure plaintiffs' pleading deficiencies.  *See Hinds*, 708 F. Supp. 2d at 361 (granting motion to dismiss even where plaintiffs alleged that defendant received Wells notice from SEC and was subpoenaed by DOJ); *LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d

136, 154 (E.D.N.Y. 2010) ("[V]ague allegations regarding pending investigations . . . are not probative of the Sherman Act Section 1 violations alleged here because neither mere participation in an investigatory interview nor the receipt of a subpoena is necessarily probative of conspiracy."); *Superior Offshore Int'l, Inc. v. Bristow Grp.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) ("[P]roof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence" and "not probative of the existence of an illegal agreement."); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010) ("[D]ecision by the Florida Attorney General to investigate one Defendant and one executive of that Defendant does not make the conspiracy alleged in this case more plausible because the outcome of the investigation cannot be predicted."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (DOJ investigation "carries no weight in pleading an antitrust conspiracy claim" because, without more, "[i]t is unknown whether the investigation will result in indictments or nothing at all").

### 4. Plaintiffs Do Not Adequately Allege a Hub-and-Spoke Conspiracy.

Plaintiffs also do not come close to pleading a *per se* unlawful hub-and-spoke conspiracy with the LME as the hub and the warehouse defendants as spokes.  To plead such a claim, plaintiffs must adequately allege a horizontal agreement that connects the spokes.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (rejecting claim because "evidence of a horizontal conspiracy is lacking").  As one court stated, "a wheel without a rim is not a single conspiracy," but rather a series of separate vertical agreements.  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002).  Plaintiffs have not alleged conduct by the warehouse defendants that was inconsistent with each firm's unilateral self-interest, which is fatal to any claim of a horizontal agreement connecting the spokes.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 328-35 (affirming dismissal of alleged hub-and-spoke conspiracies because

challenged practices were consistent with defendants' unilateral self-interest).  Plaintiffs have not

even attempted to challenge the separate vertical agreements under the rule of reason.

> **B.     The Complaints Do Not Adequately Plead a Section 1 Violation Based
> on the LME's Minimum Load-Out Requirement Itself and on Metro's
> Incentive Payments.**

In addition to their allegations of a horizontal conspiracy, plaintiffs appear to challenge

two vertical arrangements.  *First*, they contend that the LME's minimum load-out requirement as

embodied in the warehouse defendants' warehousing agreements with the LME itself violated

Section 1.  Although the LME announced its initial load-out requirement of 1,500 MT per day in

2003 and that requirement became effective in April 2004, plaintiffs do not contend that this

requirement violated Section 1 when adopted, but rather assert that the requirement somehow

became illegal years later in 2009.   (*See* FLP Compl. ¶ 31; Consumer Compl. ¶¶ 87-91.)

Plaintiffs also argue that the LME's doubling of its load-out requirement (and the warehouse

defendants' agreement to that new rule) in 2012 was an inadequate response to complaints about

warehouse queues.  (*See* FLP Compl. ¶¶ 46, 48; Mag Compl. ¶¶ 84-85; Agfa Compl. ¶¶ 85-86.)

*Second*, the first-level purchaser plaintiffs challenge Metro's agreements with unnamed Jane Doe

defendants (presumably aluminum producers) to pay incentives for new metal deposited into its

Detroit warehouses, claiming that this "second level of agreements" provided producers with an

economic incentive to deposit their aluminum into Metro's Detroit warehouses rather than sell

their metal to users of aluminum.  (FLP Compl. ¶¶ 35-40, 224-28.)

Plaintiffs assert that these agreements are *per se* unlawful under Section 1.  In fact, the

complaints make clear that plaintiffs allege only *per se* violations.  (*See* FLP Compl. ¶ 302;

Commercial Compl. ¶ 196; Consumer Compl. ¶ 157.)[8]   Because they allege only *per se*

violations, plaintiffs disclaim any need to plead a relevant market, and they make no attempt to

state a claim under the rule of reason.  (*See* FLP Compl. ¶ 302 ("Plaintiffs disclaim any need to

plead a relevant market on the Section 1 or Section 2 claims in the complaint."); Commercial

Compl. ¶ 196 ("Plaintiffs disclaim the need to plead a relevant market on its Sherman Act,

Section 1 claim (and the equivalent State law claims)."); Consumer Compl. ¶ 157 ("Defendants

committed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and its state

analogs.  Accordingly, Plaintiffs are not required to allege a relevant market for those claims.").)

As explained below, the complaints fail to establish that the conduct at issue falls within the

narrow set of "naked restraints" that are *per se* unlawful, and also fail to plead an antitrust

violation under the rule of reason.

      **1.**    **The *Per Se* Rule Does Not Apply to the LME's Minimum Load-Out Rule and Its Vertical Agreements with Warehouse Operators.**

"[T]he *per se* rule should be 'carefully limited to "naked" restraints, which are restraints

that lack redeeming social benefits.'"  *Freedom Holdings, Inc. v. Spitzer*, 447 F. Supp. 2d 230,

249 (S.D.N.Y. 2004) (quoting VII PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST

LAW ¶ 1509c, at 403 (2d ed. 2003)).  "*Per se* treatment is appropriate once experience with a

particular kind of restraint enables the Court to predict with confidence that the rule of reason

will condemn it."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (internal quotation marks

omitted).  "It is only after considerable experience with certain business relationships that courts

classify them as *per se* violations of the Sherman Act."  *United States v. Topco Assocs.*, 405 U.S.

---

      [8] The individual plaintiffs allege that "[d]efendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade."  (Mag Compl. ¶ 115; Agfa Compl. ¶ 125.)  They cannot state a claim under the rule of reason simply by reciting the elements of such a claim.  *Twombly*, 550 U.S. at 555.

596, 607-08 (1972).   A court therefore "presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

Without an adequately alleged horizontal agreement among the warehouse defendants, the LME's minimum load-out requirement itself is not a "naked restraint" of trade that should be condemned by the *per se* rule.   The agreements between the LME and the warehouses it certifies are not horizontal:   the LME is not alleged to compete with those warehouses.   Instead, the agreements between the LME and its warehouses are analogous to those between a franchisor and its franchisees, classic vertical arrangements that are judged under the rule of reason.   *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988).

The LME's promulgation and interpretation of its minimum load-out requirement thus do not "fall within the narrow range of behavior that is considered so plainly anti-competitive and so lacking in redeeming pro-competitive value that it is presumed illegal without further examination." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 420 F. Supp. 2d 212, 219 (S.D.N.Y. 2005) (internal quotation marks omitted).   To the contrary, the LME rule at issue here is pro-competitive.   The minimum load-out requirement ensures that each warehouse location loads out a *minimum* amount of aluminum each day if a sufficient number of warrants is cancelled and places no limits on the quantity of aluminum any warehouse loads out.   Without such a *minimum* load-out requirement, a warehouse operator would have an economic incentive to load out metal as slowly as possible in order to maximize the rent it collects and minimize its costs.   (*See* Consumer Compl. ¶ 45 ("Aluminum storage facilities . . . have an interest in keeping

aluminum within the warehouses for as long as possible, as they charge a daily rental rate for each ton of aluminum within their warehouses.").)

Moreover, courts have rejected application of the *per se* rule in the context of self-regulatory organizations such as securities exchanges.  In *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963), the Supreme Court held that the *per se* rule did not apply to collective action of the New York Stock Exchange ("NYSE") and its members that otherwise would constitute a *per se* unlawful group boycott, reasoning that "under the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act." *Id.* at 360.  Since *Silver*, the Second Circuit has held that "within the area of supervised self-regulation contemplated by the Securities Exchange Act, *per se* concepts are generally displaced and the courts are to examine whether the particular restraint . . . was reasonable." *Jacobi v. Bache & Co.*, 520 F.2d 1231, 1238 (2d Cir. 1975).  As the Second Circuit explained, "[n]one of the[] policies" that support application of the *per se* rule "has great force in relation to rules of securities exchanges which are 'germane' to performance of the duty of self-regulation and are under constant SEC oversight.  Rather the rule of reason provides the 'breathing space' necessary for the process of supervised self-regulation to work." *Id.* at 1239 (citation omitted).[9]

---

[9] *See also United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781, 789 (7th Cir. 1981) (en banc) ("There is now a considerable body of law, derived more or less proximately from *Silver*, recognizing that in certain self-regulatory contexts binding rules must be developed to safeguard the enterprise's viability, and that application of a *per se* standard of illegality to such endeavors is improper."); *Gunter Harz Sports, Inc. v. United States Tennis Ass'n*, 511 F. Supp. 1103, 1116 (D. Neb. 1981) ("Courts have extended the reasoning of *Silver* beyond situations involving statutorily created duties of self-regulation to areas where a need for self-regulation is inherent in an industry."); *Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F. Supp. 356, 380 (D. Ariz. 1983) ("Courts have extended the reasoning of *Silver* to situations in which there is a need for self-regulating inherent in an industry, and professional and amateur sports organizations have been included in this exception.").

The LME is a Recognised Investment Exchange subject to the supervision of the U.K. Financial Conduct Authority ("FCA"). It similarly requires the "breathing space" that the rule of reason provides to function as a futures exchange. The LME facilitates the cooperation among market participants that is necessary to operate an exchange, and its essential interactions with firms such as warehouse operators that are integral parts of the LME system should be assessed under the flexible rule of reason. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010) ("When restraints on competition are essential if the product is to be available at all, *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason.") (internal quotation marks omitted); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. Okla.*, 468 U.S. 85, 117 (1984) ("Our decision not to apply a *per se* rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved.").[10] In fact, the case for application of the rule of reason is even stronger here than in the *Silver* line of cases. Whereas the conduct at issue in *Silver* was the collective action of the NYSE and its member firms, the minimum load-out rules at issue here were adopted by the LME Executive Committee after soliciting input from various affected parties.

### 2.   The *Per Se* Rule Also Does Not Apply to Metro's Payment of Incentives to Producers and Other Owners of Aluminum.

The first-level purchaser plaintiffs challenge Metro's agreements with the Jane Doe defendants to pay incentives for new metal deposited into Metro's Detroit warehouses. (FLP Compl. ¶ 224.) Although incentives are a way for warehouses to compete for storage business,

---

[10] The complaints do not suggest that the LME is a sham or contend that its load-out rules are not germane to the LME's core function as a futures exchange. Plaintiffs instead simply argue that the minimum load-out requirement should be different. *See Dagher*, 547 U.S. at 6-8 (applying rule of reason where challenged conduct "involves the core activity of the joint venture" not alleged to be a sham).

plaintiffs argue that this "second level of agreements" improperly induces producers "to divert aluminum from productive uses to long term storage."  (*Id.* ¶¶ 36, 213.)

Metro's incentive agreements are indisputably vertical and thus should be judged under the rule of reason.  Courts repeatedly have held that restraints in vertical arrangements, even if related to price, are governed by the rule of reason.  *See Leegin*, 551 U.S. at 907 ("Vertical price restraints are to be judged according to the rule of reason."); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 F. App'x 29, 29 (2d Cir. 2002) (mixed vertical and horizontal relationship "subject to scrutiny under the 'rule of reason'"); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 243 (2d Cir. 1997) ("vertical restraints are generally subject to 'rule of reason' analysis"); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, No. 10 Civ. 8, 2011 WL 1044898, at *2 (S.D.N.Y. Mar. 10, 2011) ("[C]laims alleging a vertical relationship or mixed vertical and horizontal relationships must be evaluated under the rule of reason."), *aff'd on other grounds*, 711 F.3d 68 (2d Cir. 2013).  It is hard to imagine the basis for the first-level purchaser plaintiffs' contention that Metro's payment of incentives to its customers as an inducement to deposit aluminum into its Detroit warehouses (effectively providing those customers with free storage for a period of time) is *per se* unlawful under Section 1.[11]

---

[11] Plaintiffs' assertion (FLP Compl. ¶ 215) that Metro's payments of incentives are responsible for the increase in the Midwest Premium is belied by other allegations of their complaints.  Plaintiffs note that the Midwest Premium "increased dramatically at year end 2013 and in early 2014."  (*Id.* ¶ 59(h).)  In fact, "during the first two weeks of January 2014 the Midwest Premium spiked to a record high of 20.5 cents per pound."  (Consumer Compl. ¶ 5(c).)  Yet Metro stopped paying new incentives in July 2013 in response to the LME's announcement that it intended to link the required load-out rate to a warehouse's load-in rate.  (*See* FLP Compl. ¶¶ 80, 253; Consumer Compl. ¶¶ 5(l), 149.)  Metro's payments of incentives thus could not have been responsible for the subsequent dramatic increase in the Midwest Premium.  Nor are Metro's incentive payments responsible for the subsequent increase in "the amount of aluminum in Detroit . . . in late 2013."  (FLP Compl. ¶ 85.)

### 3. Plaintiffs Do Not Even Try to State a Claim Under the Rule of Reason.

"In order to plead an antitrust violation under the rule of reason, a plaintiff must allege a relevant market, including both a product market and a geographic market." *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010). "Dismissal is appropriate where the alleged product market is defined without 'reference to the rule of reasonable interchangeability and cross-elasticity of demand' or where it 'clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor.'" *Id.* (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)). As explained below in discussing plaintiffs' monopolization claim, the complaints utterly fail to allege the existence of plausible product and geographic markets.

To state a rule of reason claim, a plaintiff also must plead "an adverse effect on competition, not merely injury to itself." *Id.* at 299. Although they argue that the challenged conduct harmed them by supposedly increasing the Midwest Premium, plaintiffs do not allege an adverse effect on *competition* in any relevant market. The LME's promulgation of *minimum* load-out requirements does not harm competition, but rather leaves warehouse operators (including the many that are not defendants here) free to exceed the required rate if doing so is in their individual economic interest. And, in challenging Metro's incentive payments, plaintiffs complain that Metro in effect competes for metal with users of aluminum (and other storage options) by offering producers and other aluminum owners a financial inducement to dispose of their inventory through the LME system instead of selling it to users in an already-oversupplied physical market. Plaintiffs never explain how such incentive payments harmed or foreclosed (rather than created) competition in any relevant market.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT.

Plaintiffs allege that Metro has "a monopoly over LME-approved warehousing space for deliveries on LME aluminum and other metals contracts in LME warehouses located in LME Detroit Warehousing."  (Commercial Compl. ¶ 191; *see also* FLP Compl. ¶ 287; FLP Compl. ¶ 287; Consumer Compl. ¶ 166.)[12]   Plaintiffs do not contend that Metro acquired its alleged monopoly illegally, or that Metro unlawfully maintained its purported monopoly in the face of actual or potential competitive threats.   They instead assert that Metro "abused" a supposed monopoly by paying financial incentives to attract aluminum into its Detroit warehouses and by "shuttling" aluminum between warehouses in Detroit.   (FLP Compl. ¶¶ 295-96; Commercial Compl. ¶ 193.)  Simply parroting the elements of the offenses, plaintiffs also generally contend that all defendants violated Section 2 by monopolizing, attempting to monopolize and/or conspiring to monopolize various relevant markets.  (FLP Compl. ¶¶ 232-36; Consumer Compl. ¶¶ 205-10, 212-16.)

Plaintiffs' monopolization claims suffer from multiple fatal pleading defects.  *First*, although plaintiffs propose multiple alternative relevant markets, they plead *no* facts in support of any of those markets.  The complaints say nothing about interchangeability of use, cross-elasticity of demand or the area of effective competition, and their attempts to define the geographic market narrowly and to exclude non-LME warehouses from any purported warehousing market are contradicted by other allegations of their own complaints.  *Second*, plaintiffs do not allege that Metro unlawfully acquired or maintained its supposed monopoly.  In fact, plaintiffs do not identify a single actual or potential competitor in any of their proposed

---

[12] The Mag and Agfa plaintiffs do not assert a monopolization claim.

relevant markets that supposedly was excluded or otherwise foreclosed from competing as a result of Metro's alleged conduct.  *Third*, plaintiffs fail adequately to plead anticompetitive conduct.  They do not allege that Metro's payment of incentives was predatory—to the contrary, they admit that such incentives were highly profitable because they generated substantial rental income for Metro.  And plaintiffs nowhere explain why Metro's transfers of aluminum to other warehouses in Detroit harmed the competitive process.  *Fourth*, plaintiffs' reliance on the essential facility doctrine is entirely misplaced.  And *fifth*, plaintiffs cannot state a claim under Section 2 against all defendants simply by reciting the elements of such a violation.

### A.   Plaintiffs Do Not Adequately Allege a Relevant Market That Could Be Monopolized.

"[A] plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006). "The relevant market consists of a relevant product market and a relevant geographic market." *Id.* at 227.  "To survive a Rule 12(b) motion to dismiss, an alleged product market must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes— analysis of the interchangeability of use or the cross-elasticity of demand,' and it must be 'plausible.'"  *Todd*, 275 F.3d at 200 (citations omitted).  "Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."  *Heerwagen*, 435 F.3d at 227.  Where, as here, plaintiffs fail "even to attempt a plausible explanation as to why a market should be limited in a particular way," dismissal on the pleadings is appropriate.  *Todd*, 275 F.3d at 200.

Plaintiffs propose the following alternative "relevant markets" related to aluminum warehousing, but they allege no facts in support of any of them:

- "The market for warehousing LME aluminum in the Detroit, Michigan area or, in the alternative, for warehousing all LME and non-LME aluminum in the Detroit area or, in the alternative, for warehousing aluminum in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which aluminum is purchased and sold based on the Midwest Premium or the Platts MW Premium. The alternative geographic markets are the same as those contained in the alternative definitions of the product market."  (FLP Compl. ¶ 307.)

- "The Relevant Markets of the Goldman Defendants include, in the alternative: (a) the market for aluminum in the United States; (b) the market for warehousing all LME and non-LME aluminum in the United States; or (c) the market for warehousing LME aluminum in the United States and other areas in which aluminum is purchased and sold based on the Midwest Premium Price or any price based on or derived therefrom.  The alternative geographic markets are the same as those contained in the alternative definitions of the product market." (Commercial Compl. ¶ 198.)

- "[T]he market in the Detroit, Michigan area, or, in the alternative, in other areas of the United States in which aluminum is bought and sold based on the Midwest Premium or Platts MW Premium, for storing aluminum in, and delivering aluminum from, warehouses . . . (the 'aluminum warehousing market'); . . . the market in the United States for the purchase of aluminum, directly or indirectly, at prices based on, related to, or influenced by the Midwest Premium or Platts MW Premium, by manufacturers of Aluminum Consumer Products for resale (the 'aluminum manufacturers market'); and . . . the market in the United States for the sale of Aluminum Consumer Products to consumers for end-use and not for resale . . . (the 'aluminum consumer end-user market')."  (Consumer Compl. ¶ 158.)

Simply stated, none of the complaints alleges, as they must, facts supporting a "theoretically rational explanation for why the boundaries of the market are defined as they are." *IDI Design Inc. v. A.O.D. Jewelry Co.*, No. 1:13 Civ. 08266, 2014 WL 661355, at *2 (S.D.N.Y. Feb. 19, 2014) (internal quotation marks omitted).  Because "[n]o allegations of fact about a relevant market appear" in the complaints, plaintiffs' monopolization claims should be dismissed.  *Id.*

### 1.    Plaintiffs Fail to Allege a Proper Product Market.

To state a monopolization claim, a complaint must define its proposed product market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Chapman*, 546 F.3d at 238 (internal quotation marks omitted).  The complaints here fail to do so.

With respect to warehousing, the complaints do not allege facts establishing that on-warrant storage at LME-approved warehouses is a distinct product market, particularly given that most aluminum in storage today is off-warrant in non-LME warehouses and that aluminum can be stored essentially anywhere, including outside in a vacant lot.  Although the consumer plaintiffs assert that there are "no close substitutes for storing aluminum in the United States in LME-approved warehouses" (Consumer Compl. ¶ 160), they also acknowledge that "non-LME warehouses . . . provide high quality warehouse load-out and other services" (*id*. ¶ 179(viii)). Plaintiffs say nothing about other storage options that potentially compete with LME warehouses or why those other options should be excluded from the proposed product market.  In fact, the complaints recognize that owners of aluminum have a range of storage options, including on-warrant-storage at LME-approved warehouses, off-warrant storage at non-LME warehouses and self-storage.  (*See*, *e.g*., Commercial Compl. ¶¶ 132, 141 (noting ability of aluminum owner to store aluminum either on-warrant or off-warrant).)

Absent such allegations of fact, the complaints have not adequately alleged a product market limited to LME warehouses, much less LME warehouses in the Detroit area.  *See Affinity LLC v. GFK Mediamark Research & Intelligence, LLC*, No. 12 Civ. 1728, 2013 WL 1189317, at *6 (S.D.N.Y. Mar. 25, 2013) (dismissing Section 2 claims where "Plaintiff offers no facts supporting why consumers could not seek out substitute products"); *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc*., 812 F. Supp. 387, 391-92 (S.D.N.Y. 1993) (granting motion to dismiss where "complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand"); *Theatre Party Assocs. v. Shubert Org.*, 695 F. Supp. 150, 153-55 (S.D.N.Y. 1988) (rejecting market definition that "does not include alternative sources of, and substitutes for, defendant's product"); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 679 (S.D.N.

1987) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces.  Since plaintiff has not alleged a plausible product market, his § 2 claims are dismissed.").[13]

Nor can plaintiffs state a monopolization claim against Metro by proposing a product market for all aluminum in the United States.  (*See* Commercial Compl. ¶ 198; Consumer Compl. ¶ 158.)  Plaintiffs plead no facts suggesting that any warehouse defendant—none of which is alleged to produce aluminum—has a monopoly over all aluminum in the United States.  Plaintiffs cannot salvage their monopolization claim by claiming that "[a]luminum has no close substitutes in the manufacture or sale of consumer aluminum products."  (Consumer Compl. ¶ 160.)  Those looking to purchase aluminum have a wide range of options, including aluminum smelters and various intermediaries.  (*See* Mag Compl. ¶ 32; Agfa Compl. ¶ 33.)  Purchasing an LME warrant is only one option, and not one that is frequently used by purchasers seeking to acquire physical aluminum to manufacture products.  Indeed, plaintiffs acknowledge that LME warehouses are not a primary source of aluminum for manufacturers.  (Mag Compl. ¶ 45 (LME warehouses "represent the supplier of last resort for consumers who need to keep their plants operating"); Agfa Compl. ¶ 46 (same).)  As the LME explained, "physical users are unlikely to make significant direct use of LME warrants as a direct avenue of metal sourcing, even in a non-queue environment."  (LME Mem. dated Nov. 7, 2013 ¶ 13 (Pepperman Decl. Ex. 7).)

### 2.      Plaintiffs Fail to Allege a Proper Geographic Market.

Plaintiffs likewise fail to allege facts that support their proposed alternative geographic markets.  Although they suggest warehousing markets limited to the Detroit area, the Midwest or

---

[13]  Although plaintiffs alternatively allege a product market that also includes non-LME warehouses (*e.g.*, Commercial Compl. ¶ 198; FLP Compl. ¶ 307), they allege no facts relating to any defendants' ownership of such warehouses or their shares of that much broader proposed market.

the United States, plaintiffs do not address whether warehouses in those geographic regions also might compete with warehouses in other U.S. cities or even cities abroad.  The complaints allege no facts that establish the "area of effective competition" by identifying the regions and countries in which warehouse companies operate and the choices aluminum owners have for storage both in the United States and abroad.  The narrow geographic markets that plaintiffs propose for their monopoly claims also are contrary to some of their other allegations.  In attempting to plead a conspiracy claim, plaintiffs state:

> [I]f Metro or Pacorini were acting alone, rival warehouse owners in other parts of the United States and the rest of the world (absent a conspiracy) would take business away from their warehouses.  Other aluminum warehouses are located by design at major transportation hubs.  *Although shipping from overseas warehouses would entail additional costs, such costs are negligible compared to the current cost of aluminum and the ever-increasing Midwest Premium.*

(FLP Compl. ¶ 370 (emphasis added); *see also* Mag Compl. ¶ 105 (same); Agfa Compl. ¶ 106 (same).)  Plaintiffs further note that "the logistical cost of sourcing aluminum from Russia or the United Arab Emirates has actually decreased."  (Commercial Compl. ¶ 93; *see also* FLP Compl. ¶ 87; Consumer Compl. ¶ 41; Mag Compl. ¶ 41; Agfa Compl. ¶ 42.)

Because plaintiffs fail to allege proper geographic markets, their monopolization claims should be dismissed.  *See*, *e.g.*, *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744-46 (5th Cir. 2010) (rejecting as "too narrowly drawn" geographic market that ignored "the broader economic market" in which defendants competed); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598-601 (8th Cir. 2009) (dismissal appropriate where plaintiff seeks "to gerrymander the relevant market to an artificially narrow location"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 106 (9th Cir. 2001) (dismissal appropriate where complaint fails to allege that local market encompasses "'area of effective competition'"); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480-81 (S.D.N.Y. 2001) (motion to dismiss granted where plaintiff failed to allege a relevant market, including both a "relevant product market and a relevant geographic market").

### 3.     This Failure to Plead a Relevant Market Is Not Excused.

The first-level purchaser plaintiffs "disclaim any need to plead a relevant market on [their] Section 2 claims" because "monopoly power is adequately alleged through the powers to control prices, or control output, or otherwise." (FLP Compl. ¶ 302.) They argue that Metro has the "power to set prices, set storage rates and control output in its LME warehouses." (*Id.* ¶ 291.) In particular, the first-level plaintiffs assert that Metro controls "the rate at which [it] loads out aluminum above the agreed upon minimum load-out rate." (*Id.* ¶ 292.)

The complaints do not allege direct evidence of monopoly power—*i.e.*, that Metro has the ability to control prices or exclude competition. Every warehouse operator has the ability to control the rate at which it loads out aluminum from its warehouses and to set its own storage rates. If plaintiffs' analysis were correct, then every warehouse operator in the world would have a monopoly. Plaintiffs do not allege that Metro has the ability to exclude competition from any market, and they ignore Metro's competition for new metal by paying incentives, effectively discounting its storage rate. More fundamentally, plaintiffs have identified the wrong output. In assessing whether Metro has the power to control prices or exclude competition in any market for warehousing, the question is whether Metro can control the supply of available warehouse space. There is no allegation that it can do so. Nor is there any allegation that Metro can control the output of aluminum from smelters around the world.

### 4.     Plaintiffs Do Not Allege Any Barriers to Entry.

Plaintiffs also fail to plead any barriers to entry into their proposed relevant markets, which are essential to alleging a market capable of being monopolized. *See*, *e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001) ("a firm cannot possess monopoly power in a market unless that market is also protected by significant barriers to entry"); *Emigra Grp. v. Fragomen, Del Rey, Bernsen & Loewy, L.L.P.*, 612 F. Supp. 2d 330, 362 (S.D.N.Y. 2009)

("Market power can persist only when entry barriers . . . block rivals' entry or expansion"). Plaintiffs do not plead any barriers to entering the supposed market for LME warehouses. Indeed, they do not allege a single instance in which the LME ever has rejected a warehouse company's request to become an LME-approved warehouse in any city.   There also are no barriers to offering off-warrant storage of aluminum:   all that is required is a vacant lot or building, a chain-linked fence and a watchman.   Plaintiffs' monopolization claims thus fail for this additional reason as well.

### B.   Plaintiffs Do Not Allege That Metro Unlawfully Acquired or Maintained Its Supposed Monopoly.

"It is settled law that th[e] offense [of monopolization] requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power. . . ." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (internal quotation marks omitted).   "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."   *Id*.   A plaintiff thus "has the burden of pleading . . . that anticompetitive behavior contributed significantly to the achievement or maintenance of the monopoly."   III PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 650c, at 92-93 (3d ed. 2008).   Plaintiffs have not pled facts that satisfy this causation element.

Plaintiffs do not contend that Metro acquired its supposed monopoly unlawfully.   Indeed, they do not deny that Metro's leading position in warehousing in Detroit was "a consequence of a superior product, business acumen, or historic accident."   *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966).   Plaintiffs also do not assert that Metro unlawfully maintained its alleged monopoly in the face of some actual or potential competitive threat.   To the contrary, the

complaints do not mention any competitive threats to Metro's warehouse business in Detroit that supposedly were excluded or foreclosed by virtue of Metro's alleged conduct.[14]   Thus, even assuming that Metro possesses monopoly power in a properly defined relevant market, the complaints do not allege that Metro engaged in anticompetitive conduct that contributed significantly to the achievement or maintenance of that monopoly.

### C. Plaintiffs Fail to Allege Any Anticompetitive Conduct.

"To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Trinko*, 540 U.S. at 407 (emphasis in original).  To be anticompetitive, the conduct must not only impair the opportunities of rivals, but also "impair[] competition" in the relevant market "in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985); *see also Microsoft*, 253 F.3d at 58 (anticompetitive conduct "must harm the competitive *process*") (emphasis in original).  Plaintiffs have not alleged either here:  that the opportunities of competitors were impaired or that competition on the merits was limited in an unnecessarily restrictive way. *See Tese-Milner v. Diamond Trading Co.*, No. 04 Civ. 5203, 2014 WL 43365, at *4 (S.D.N.Y. Jan. 6, 2014) (dismissing monopolization claim because "[n]o assertion is made . . . that . . . [defendant] excluded potential competitors or impaired the opportunities of rival firms").

The complaints allege that Metro "abused" its monopoly by paying large incentives to producers to deposit their aluminum in its Detroit warehouses rather than sell the metal to users. (FLP Compl. ¶ 297; Commercial Compl. ¶ 194.)   According to plaintiffs, these incentive

---

[14] The consumer plaintiffs assert that defendants have made "it difficult or impossible for others to enter these relevant markets or increase their market shares."  (Consumer Compl. ¶ 214).  Under *Twombly*, the Court need not accept as true this conclusory assertion.

payments "divert[ed] aluminum into LME Detroit Warehousing."   (FLP Compl. ¶ 297.)
Plaintiffs also allege that Metro "abused" its monopoly by transferring aluminum from one
warehouse to another within Detroit "without actually causing any output of aluminum from the
warehouses to the public" (FLP Compl. ¶ 295; *see also* Commercial Compl. ¶ 194), and by
loading out aluminum from its Detroit warehouses at the LME-required minimum rate (FLP
Compl. ¶ 293; Commercial Compl. ¶ 194).

Plaintiffs' monopolization claims are predicated on the assumption that anything that
diverts aluminum from consumption by users is inherently improper.  They complain that users
potentially have to compete for aluminum with (i) warehouse operators such as Metro that earn
rent for its storage and thus are willing to pay incentives to attract aluminum, and (ii) financial
firms that trade aluminum futures and that may choose, after waiting in the queue at Metro's
Detroit warehouses, to transfer their metal to another warehouse (potentially at much cheaper
off-warrant rates) in anticipation of future price increases.  Leaving aside the merits of plaintiffs'
assumption, the conduct they challenge is not anticompetitive within the meaning of Section 2.

*First*, Metro's payments of incentives are evidence of competition, not harm to the
competitive process.  Metro competes for aluminum with other warehouses—particularly off-
warrant storage at lower daily rents and not subject to LME regulation—and with other
alternative uses of the metal by offering up-front payments as an inducement to store aluminum
in its Detroit warehouses.  (*See* FLP Compl. ¶ 37 (Metro "outbid others and attract[ed] and
divert[ed] aluminum into the LME Detroit Warehousing").)   These incentives (a form of
discounting) are analogous to a landlord's offering one month of free rent to a tenant in
competing with other apartments that offer cheaper monthly rent or with other housing options
(such as buying)—in this context, amidst a housing glut.

Plaintiffs do not allege that any incentive payment was predatory—*i.e.*, that it resulted in Metro's pricing its warehouse services "below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117 (1986); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993); *Irvin Indus. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244-45 (2d Cir. 1992). To the contrary, plaintiffs allege that "[t]he incentive payments allowed the Warehousing Defendants, in particular Metro, to amass a huge stockpile of aluminum, *from which it derived substantial income from storage fees*." (Commercial Compl. ¶ 70 (emphasis added); *see also* FLP Compl. ¶ 219 ("Goldman's payments of these incentives has [sic] benefitted the LME financially by increasing the storage revenues of Goldman and the LME . . . .").) Nor do plaintiffs assert that Metro's incentive payments eliminated competitors or reduced competition. As the Second Circuit has stated, "the decision to offer incentives was nothing more than an attempt to generate increased business on the whole by limiting profitability on selected sales. We must be mindful that low prices are a positive aspect of a competitive marketplace and are encouraged by the antitrust laws." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001).

*Second*, plaintiffs allege that aluminum loaded out of Metro's Detroit warehouses sometimes was shipped to other Metro warehouses for storage either on-warrant or off-warrant rather than sold to users of physical aluminum. After an aluminum owner cancels its warrants and waits in the queue, the owner has many options: it can (i) sell the metal to a user of aluminum in the physical market if the spot price is attractive, (ii) store the metal off-warrant at a reduced rental rate and sell it at a future date if it believes that the price of aluminum will increase in the future, or (iii) continue to store the aluminum at a higher rental rate in an LME-approved warehouse for the same reason but with the liquidity provided by LME warrants.

An owner that decides to continue to store its aluminum might elect to ship it to a non-LME warehouse for off-warrant storage at "significantly cheaper" rent (FLP Compl. ¶ 398) because lower rent would make any trades based on the contango in the aluminum market more profitable.  (*See* Commercial Compl. ¶¶ 132, 135; FLP Compl. ¶ 393.)  To compete with off-warrant storage at non-LME warehouses, Metro has offered owners of aluminum scheduled to leave a Metro warehouse reduced off-warrant storage rates at other Metro warehouses, as well as incentives if the owner later elects to re-warrant its metal.  Far from being anticompetitive conduct that harms the competitive process, this offer promotes competition by providing owners of aluminum with another option.  If the owner can earn more money by selling its aluminum to a user in the physical market or can reduce its storage charges by shipping its aluminum to a non-Metro warehouse, the owner is free to pursue those options.  Plaintiffs do not allege that Metro's offer of an additional option "impair[s] competition" in any relevant market "in an unnecessarily restrictive way."  *Aspen Skiing*, 472 U.S. at 605.  The antitrust laws do not prevent Metro from competing to offer storage services for aluminum that is being shipped out of its warehouses, just as it competes to provide warehousing services for new aluminum from producers.

*Third*, plaintiffs cannot plead anticompetitive conduct by claiming that Metro loads out aluminum from its Detroit warehouses at the LME-required minimum rate.  Plaintiffs fail to explain how Metro's adherence to the LME's rule—which the LME publishes and is well-known to all industry participants—at its Detroit warehouses harms the competitive process or otherwise impairs competition in a relevant market.

### D.    Plaintiffs' Reliance on the Essential Facilities Doctrine Is Misplaced.

Plaintiffs improperly invoke the "essential facilities" doctrine in support of their monopolization claim.  (*See* FLP Compl. ¶ 303 ("LME Detroit Warehousing is an essential facility."); Commercial Compl. ¶ 12 ("Goldman and the LME were monopolists.  Each held an

essential facility . . . .").)  They argue that "[a]ccess by the market to aluminum stored in LME Detroit Warehousing is essential to the ability of the market, Plaintiffs and Class members to conduct business successfully in the United States."  (FLP Compl. ¶ 303.)  Leaving aside that ample supply of physical aluminum can be obtained directly from producers by anyone wanting to take delivery, plaintiffs cannot state a Section 2 claim based on the essential facilities doctrine.

To the extent it is even viable, *see Trinko*, 540 U.S. at 411, the "essential facilities" doctrine has no application here.  Under that doctrine, a monopolist engages in anticompetitive conduct if it refuses to grant a *competitor* access to a facility that (i) the monopolist controls, (ii) is essential to the competitor's ability to compete, and (iii) cannot be duplicated by the competitor.  *See MCI Commc'ns v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983).  Plaintiffs do not allege that Metro denied a *competitor* access to such a facility.

### E.   Plaintiffs Cannot State a Section 2 Claim Against All Defendants by Reciting the Elements of Different Causes of Action.

The first-level purchaser plaintiffs attempt to assert claims for monopolization, attempted monopolization and/or conspiracy to monopolize against all defendants simply by repeating the elements of those claims.  (*See* FLP Compl. ¶¶ 408-13.)  The consumer plaintiffs also rely on similarly perfunctory allegations to assert monopolization and attempted monopolization claims against all defendants.  (*See* Consumer Compl. ¶¶ 157-69, 205-10, 218-223.)  Plaintiffs do not even attempt to allege *facts* that satisfy the elements of those offenses.  Indeed, the complaints' failure adequately to allege a relevant market is alone fatal to plaintiffs' generalized Section 2 claims against all defendants.  As the Supreme Court held in *Twombly*, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  550 U.S. at 555.

### III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER STATE ANTITRUST LAW.

The Court should dismiss plaintiffs' state-law antitrust claims for the same reasons. Plaintiffs assert claims under the antitrust laws of 32 different States.  (FP Compl. ¶¶ 414-28; Commercial Compl. ¶¶ 236-71, 297-309; Consumer Compl. ¶¶ 217-37, 244-67, 293-322; Mag Compl. ¶¶ 120-26; Agfa Compl. ¶¶ 130-36.)  In 18 of those States—(1) Arizona, (2) District of Columbia,  (3) Florida,  (4) Hawaii,  (5) Illinois,  (6) Iowa,  (7) Massachusetts,  (8) Michigan, (9) Nebraska, (10) Nevada, (11) New Hampshire, (12) New Mexico, (13) Oregon, (14) Rhode Island, (15) South Dakota, (16) Utah, (17) Vermont, and (18) West Virginia—statutes require courts to construe state antitrust law harmoniously with federal law.   In 13 other States— (1) Alabama, (2) Arkansas, (3) California, (4) Kansas, (5) Maine, (6) Minnesota, (7) Mississippi, (8) New York, (9) North Carolina, (10) North Dakota, (11) South Carolina, (12) Tennessee, and (13) Wisconsin—courts have held (in the absence of a similar statutory provision) that state law should be interpreted consistently with federal antitrust law.  The relevant state-law citations are set forth in Appendix 1 hereto.[15]

---

[15] The one remaining state is Wyoming.  (FP Compl. ¶ 427(aa).)  The relevant Wyoming statute applies only to a "person, firm, corporation, foreign or domestic, or other entity doing business in the state of Wyoming."  WYO. STAT. ANN. § 40-4-101(a).  The complaints do not allege that any defendant is doing business in Wyoming, and the Court should look to federal precedent in any event.

## CONCLUSION

For the foregoing reasons, the Court should dismiss with prejudice all of the antitrust

claims asserted in the complaints for failure to state a claim upon which relief can be granted.

Dated:   New York, New York
         April 23, 2014

John M. Nannes (john.nannes@skadden.com)
John H. Lyons (admitted pro hac vice)
(john.lyons@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendant Pacorini Metals USA,
LLC*

Respectfully submitted,

/s/  Richard C. Pepperman II
Richard C. Pepperman II (peppermanr@sullcrom.com)
Suhana S. Han (hans@sullcrom.com)
Joseph J. Matelis (matelisj@sullcrom.com)
Yavar Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants The Goldman Sachs Group,
Inc., GS Power Holdings LLC, MCEPF Metro I, Inc.,
Mitsi Holdings LLC and Metro International Trade
Services LLC*

Eliot Lauer (elauer@curtis.com)
Jacques Semmelman (jsemmelman@curtis.com)
Chelsea McLean (chelsea.mclean@curtis.com)
CURTIS, MALLET-PREVOST, COLT & MOSLE
LLP
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*

**Appendix 1**

| State | Harmonization statutes | Examples of judicially recognized harmonization |
|---|---|---|
| AL | | *McCluney v. Zap Prof'l Photography, Inc.*, 663 So. 2d 922, 926 (Ala. 1995) ("[F]ederal law relating to monopolization governs Alabama antitrust actions."); *City of Tuscaloosa v. Harcos Chems.*, 158 F.3d 548, 555 n.8 (11th Cir. 1998) ("Our discussion of the relevant federal law … applies to and controls our disposition of the plaintiffs' state-law antitrust claims as well as their federal antitrust claims."). |
| AZ | ARIZ. REV. STAT. ANN. § 44-1412 ("It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."). | *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) (en banc) (acknowledging harmonization requirements of ARIZ. REV. STAT. ANN. § 44-1412). |
| AR | | *Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*, 891 S.W.2d 30, 35 (Ark. 1995) (construing Arkansas Unfair Practices Act in light of Sherman Act precedent). |
| CA | | *In re Copper Antitrust Litig.*, 436 F.3d 782, 802 (7th Cir. 2006) ("'[F]ederal cases interpreting the Sherman Act are applicable in construing the Cartwright Act.'" (quoting *Oakland-Alameda Cnty. Builders' Exch. v. F.P. Lathrop Constr. Co.*, 482 P.2d 226, 231 n.3 (Cal. 1971)); *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 131 Cal. Rptr. 3d 519, 525 (Cal. Ct. App. 2011) ("[F]ederal case law interpreting the Sherman Act is often a useful aid in interpreting the Cartwright Act." (internal citations omitted)). |
| DC | D.C. CODE § 28-4515 ("[I]n construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."). | |
| FL | FLA. STAT. § 542.32 ("It is the intent of the Legislature that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."). | *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law."). |
| HI | HAW. REV. STAT. § 480-3 ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes . . . ."). | *Rundgren v. Bank of New York Mellon*, 777 F. Supp. 2d 1224, 1228 (D. Haw. 2011) (recognizing that "reliance on federal [antitrust] caselaw is expressly sanctioned by [HAW. REV. STAT. § 480-3]"). |
| IL | 740 ILL. COMP. STAT 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."). | *Gunayer v. Cendant Corp.*, 116 F. App'x 758, 761 (7th Cir. 2004) (per curiam) ("The Illinois Antitrust Act is modeled on the Sherman Act, and Illinois courts interpret the state antitrust act in accordance with federal law.") (per curiam); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 990 (Ill. 1990) (acknowledging harmonization requirements of 740 ILL. COMP. STAT 10/11). |

**Appendix 1**

| State | Harmonization statutes | Examples of judicially recognized harmonization |
|---|---|---|
| IA | Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."). | |
| KS | | *Folkers v. Am. Massage Therapy Ass'n, Inc.*, No. Civ.A. 03-2399-KHV, 2004 WL 306913, at *8 (D. Kan. Feb. 10, 2004); ("Although cases which address federal antitrust statutes are not binding, they are persuasive in this undeveloped area of state law."); *see also O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1087 (Kan. 2012) (construing Kansas Restraint of Trade Act in view of Sherman Act precedent). |
| ME | | *Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have analyzed claims thereunder according to the doctrines developed in relation to federal law." (quoting *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993))); *Envtl. Exch., Inc. v. Casella Waste Sys., Inc.*, No. CV-05-25, 2005 WL 3340068, at *3 (Me. Super. Oct. 24, 2005) ("Section 1102 is materially identical to section 2 of the federal Sherman Act. Thus, the court draws on federal interpretive authority in construing the Maine statute." (internal citation omitted)). |
| MA | Mass. Gen. Laws ch. 93, § 1 (Massachusetts Antitrust Act "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable"). | *Ciardi v. F. Hoffman-La Roche, Ltd.*, 762 N.E.2d 303, 319 (Mass. 2002) (acknowledging harmonization requirements of Mass. Gen. Laws ch. 93, § 1). |
| MI | Mich. Comp. Laws § 445.784(2) ("[I]n construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes . . . ."). | *Salmon v. City of Cadillac*, No. 263586, 2005 WL 3416119, at *5 (Mich. Ct. App. Dec. 13, 2005) ("[B]ecause Michigan's antitrust legislation is patterned after federal antitrust legislation, federal court decisions applying the Sherman Act are persuasive authority in interpreting the [Michigan Antitrust Reform Act]."). |
| MN | | *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law. As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently." (internal citation omitted)); *Minnesota Twins P'Ship v. State ex rel. Hatch*, 592 N.W.2d 847, 851 (Minn. 1999) ("Minnesota's antitrust laws are generally interpreted consistently with federal courts' construction of federal antitrust laws."). |

**Appendix 1**

| State | Harmonization statutes | Examples of judicially recognized harmonization |
|---|---|---|
| MS | | *NAACP v. Claiborne Hardware Co.*, 393 So. 2d 1290, 1301 (Miss. 1980) (noting that the Mississippi statute is patterned after the Sherman Act, and stating that the Mississippi Supreme Court has "been influenced by the decisions of [the Supreme] Court in interpreting and applying it"), *rev'd on other grounds*, 458 U.S. 886 (1982). |
| NE | NEB. REV. STAT. § 59-829 (where the Nebraska act's language is "same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts"). | *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 297 (Neb. 2006) (acknowledging that NEB. REV. STAT. § 59-829 requires adherence to applicable federal antitrust precedent). |
| NV | NEV. REV. STAT. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."). | |
| NH | N.H. REV. STAT. ANN. § 356:14 ("In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws."). | *Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 786 (D.N.H. 1994) (applying federal antitrust standing requirements to dismiss state antitrust claim "as this promotes the uniform construction of antitrust laws as contemplated by [N.H. REV. STAT. ANN. § 356:14]"). |
| NM | N.M. STAT. ANN. § 57-1-15 ("[T]he Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws."). | *Romero v. Philip Morris Inc.*, 242 P.3d 280, 291 (N.M. 2010) (acknowledging that N.M. STAT. ANN. § 57-1-15 requires harmonization with federal antitrust law and stating that "[i]t is therefore the duty of courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law"). |
| NY | | *Gatt Commc'ns, Inc. v. PMC Assoc., L.L.C.*, 711 F.3d 68, 81(2d Cir. 2013) (noting that "[t]he New York Court of Appeals has held that the Donnelly Act, which was modeled on the Sherman Act, 'should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language of the legislative history justify such a result.'" (quoting *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158 (N.Y. 1994))). |
| NC | | *N.C. Steel, Inc. v. Nat'l Council on Compensation Ins.*, 472 S.E.2d 578, 582-83 (N.C. Ct. App. 1996) ("Our Supreme Court has held that federal precedent is instructive in interpreting Chapter 75 due to the similarity between provisions of Chapter 75 and the federal antitrust laws."") (collecting cases), *aff'd in part and rev'd in part on other grounds*, 496 S.E.2d 369 (N.C. 1998). |
| ND | | *Beckler v. Visa U.S.A. Inc.*, No. 09-04-C-00030, 2004 WL 2115144, at *2-3 (N.D. Dist. Ct. Aug. 23, 2004) (referencing federal case law in assessing standing of plaintiffs to bring state antitrust claim). |

## Appendix 1

| State | Harmonization statutes | Examples of judicially recognized harmonization |
|---|---|---|
| OR | OR. REV. STAT. § 646.715(2) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of [OR. REV. STAT. § 646.725] . . . ."). | *N.W. Med. Labs., Inc. v. Blue Cross & Blue Shield of Or., Inc.,* 794 P.2d 428, 433 (Or. 1990) (acknowledging that OR. REV. STAT. § 646.715(2) requires Oregon courts to review federal case law when interpreting OR. REV. STAT. § 646.725). |
| RI | R.I. GEN LAWS § 6-36-2(b) ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable . . . ."). | *EMI Max Entm't, Inc. v. Streisand,* 690 A.2d 1351, 1353 n.1 (R.I. 1997) ("[F]ederal cases interpreting parallel federal provisions are appropriately consulted in interpreting state antitrust laws."). |
| SC |  | *In re Microsoft Corp. Antitrust Litig.,* No. Civ. JFM-05-1277, 2005 WL 363679S, at *3 (D. Md. Dec. 29, 2005) ("South Carolina courts follow federal law in [state] antitrust matters."); *see also Drs. Steur & Latham, P.A. v. Nat'l Med. Enters., Inc.,* 672 F. Supp. 1489, 1521 (D.S.C. 1987) ("South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement." (internal quotation marks omitted)). |
| SD | S.D. CODIFIED LAWS § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."). | *In re S.D. Microsoft Antitrust Litig.,* 707 N.W.2d 85, 99 (S.D. 2005) ("[B]ecause of the similarity of language between federal and state antitrust statues . . . great weight should be given to the federal cases interpreting the federal statute." (citing *Byre v. City of Chamberlain,* 362 N.W.2d 69, 74 (S.D. 1985))). |
| TN |  | *Rockholt Furniture, Inc. v. Kincaid Furniture Co., Inc.,* No. 1:96CV00588, 1998 WL 1661384, at *7 (E.D. Tenn. July 6, 1998) ("'The State [of Tennessee] anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890. Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive.'" (quoting *State of Tenn. v. Levi Strauss & Co.,* No. 79-722-III, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Ct. Sept. 25, 1980))). |
| UT | UTAH CODE ANN. § 76-10-3118 ("[T]he courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes . . . ."). | *Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 805 (D. Utah 1988) (noting that the Utah Antitrust Act "is modeled after and closely resembles the federal antitrust statue" and that it "expressly provides that it is to be applied and interpreted consistently with federal counterpart"). |
| VT | VT. STAT. ANN. tit. 9, § 2453(b) ("It is the intent of the Legislature that in construing subsection (a) of this section, the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act . . . ."). | *Fucile v. Visa U.S.A., Inc.,* No. S1560-03 CNC, 2004 WL 3030037, at *2-3 (Vt. Super. Ct. Dec. 27, 2004) (following Sherman Act precedent in construing Vermont statute); *see also In re Magnesium Oxide Antitrust Litig.,* Civ. No. 10-5943 (DRD), 2011 WL 5008090, at *7, n.9 (D.N.J. Oct. 20, 2011) (same). |

**Appendix 1**

| State | Harmonization statutes | Examples of judicially recognized harmonization |
|---|---|---|
| WV | W. VA. CODE § 47-18-16 ("This article shall be construed . . . in harmony with ruling judicial interpretations of comparable federal antitrust statutes."). | *Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 648 S.E.2d 366, 375 (W. Va. 2007) ("The courts of this state are directed by the legislature in W.Va. Code § 47-18-16 to apply the federal decisional law interpreting the Sherman Act, 15 U.S.C. § 1, to our own parallel antitrust statute . . . .") (internal quotation marks omitted). |
| WI | | *Eichenseer v. Madison-Dane Cnty. Tavern League, Inc.*, 748 N.W.2d 154, 174 (Wis. 2008) ("Federal precedents are often instructive and persuasive in analyzing Wisconsin antitrust law."); *Conley Pub. Grp., Ltd. v. Journal Commc'n, Inc.*, 665 N.W.2d 879, 885-86 (Wis. 2003) ("Recognizing the relative infrequency of actions under Chapter 133, Wisconsin courts have followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations. This is longstanding policy."), *abrogated on other grounds by Olstad v. Microsoft Corp.*, 700 N.W.2d 139 (Wis. 2005). |