**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION** | 13 MD 2481 (KBF) |
| | Hon. Katherine B. Forrest |
| This Document Relates To: | |
| | **REDACTED** |
| Direct Purchaser Plaintiffs (14 Civ. 3116) | |
| | **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' JOINT MOTION FOR RECONSIDERATION OF DISMISSAL OF THE LONDON METAL EXCHANGE ON FOREIGN SOVEREIGN IMMUNITY GROUNDS WITHOUT LEAVE TO REPLEAD (ECF 564)** |
| AGFA Corporation, et al. v. The Goldman Sachs Group, Inc., et al. (14 Civ. 0211) | |
| Mag Instrument Inc. v. The Goldman Sachs Group Inc., et al. (14 Civ. 0217) | |

| | | |
|---|---|---|
| Linda P. Nussbaum | Christopher Lovell | Bonny E. Sweeney |
| Peter A. Barile III | Gary S. Jacobson | Carmen Medici |
| GRANT & EISENHOFER, P.A. | LOVELL STEWART HALEBIAN | ROBBINS GELLER RUDMAN |
| 485 Lexington Avenue | JACOBSON LLP | & DOWD LLP |
| New York, NY 10017 | 61 Broadway | 655 West Broadway |
| | New York, NY 10006 | San Diego, CA 92101 |

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the*
*Proposed Direct Purchaser Plaintiff Class*

| | | |
|---|---|---|
| Derek Y. Brandt | Christopher M. Burke | Garrett W. Wotkyns |
| John R. Phillips | Walter W. Noss | SCHNEIDER WALLACE |
| SIMMONS HANLY CONROY | SCOTT+SCOTT, ATTORNEYS AT | COTTRELL KONECKY |
| LLC | LAW, LLP | WOTKYNS LLP |
| One Court Street | 707 Broadway | 8501 North Scottsdale Road |
| Alton, IL 62002 | San Diego, CA 92101 | Scottsdale, AZ 85253 |

*Counsel for Plaintiffs Mag Instrument, Inc., Agfa Corporation, and AGFA Graphics, N.V.*

(Additional counsel on signature page.)

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  SECOND CIRCUIT AUTHORITY DIRECTS THAT *NML CAPITAL* BE APPLIED
HERE ....................................................................................................................... 2

III.  THE CFTC'S FOREIGN BOARD OF TRADE APPLICATION IS DIRECTLY
RELEVANT TO ITS NON-SOVEREIGN AND COMMERCIAL ROLE IN THE
ALUMINUM WAREHOUSING CONSPIRACY ........................................................... 5

IV.  THE COURT SHOULD NOT TAKE THE LME'S WORD THAT THE FACTUAL
RECORD IS OTHERWISE "INDISPUTABLE" OR COMPLETE—THERE ARE
NUMEROUS DISPUTED ISSUES OF FACT THAT SHOULD BE RESOLVED IN
THE LME'S FAVOR ABSENT DISCOVERY .............................................................. 9

   A.  The FCA letter procured by the LME for submission to this Court is free from
       ambiguity and outright conflicts with a prior FCA letter that the LME submitted
       to the CFTC ..................................................................................................... 9

       1.  The text of the FCA letter submitted to the Court by the LME presents
           factual issues ......................................................................................... 10

       2.  The conflict between a FCA letter on file with the CFTC and the FCA
           letter submitted to the Court by the LME presents factual issues ............. 10

   B.  The LME admits in its corporate disclosures (to the JPML) that it is "non-
       governmental" ................................................................................................. 11

   C.  The LME downplays the role of LMEsword® in contrast to its representations to
       this Court in the tutorial and otherwise ............................................................ 12

V.  IN LIEU OF DISMISSAL, THE COURT SHOULD LIFT THE DISCOVERY STAY
AND ALLOW PLAINTIFFS TO TAKE LIMITED DISCOVERY OF THE LME........ 16

   A.  There should be no dismissal without discovery ................................................. 16

   B.  There are numerous relevant topics on which to take discovery ......................... 16

   C.  The meaning of "public body" and the tactical decision of the LME not to
       challenge it being a "public body" for purposes of judicial review in the *Rusal*
       case presents a specific factual issue ripe for discovery ..................................... 17

VI.  CONCLUSION.................................................................................................... 19

# TABLE OF AUTHORITIES

CASES                                                                                              Page(s)

*Bormes v. United States*,
   759 F.3d 793 (7th Cir.  2014) ................................................................................12

*Export-Import Bank of the Republic of China v. Grenada*,
   2014 U.S. App. LEXIS 17943 (2d Cir. Sept. 12, 2014) ........................................3

*In re Vitamin C Antitrust Litig.*,
   810 F. Supp. 2d 522 (E.D.N.Y. 2011) ..................................................................20

*Mare Shipping Inc. v. Squire Sanders (US) LLP*,
   2014 U.S. App. LEXIS 14525 (2d Cir. July 30, 2014)...........................................2

*Republic of Argentina v. NML Capital, Ltd.*,
   134 S. Ct. 2250 (June 16, 2014)...................................................................*passim*

*Vishipco Line v. Chase Manhattan Bank, N.A.*,
   660 F.2d 854 (2d Cir. 1981).....................................................................................5

STATUTES/RULES

Fed. R. Civ. P. 44.1.....................................................................................................5

Direct Purchaser Class Plaintiffs and Direct Action Plaintiffs ("Plaintiffs") respectfully submit this reply memorandum in further support of their Joint Motion for Reconsideration of the dismissal of The London Metal Exchange ("the LME") without leave to replead and without the opportunity for discovery.  Plaintiffs ask that the Court reconsider its decision at least until after having reviewed Plaintiffs' forthcoming proposed amended complaint, which is to be filed in accordance with the Court's procedures on October 7, 2014.[1]

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

The LME presents an opposition that ignores the reality there is new law and additional facts to consider on this motion.  In light of this—including new law and new facts that have emerged since Plaintiffs' motion for reconsideration was filed on September 8th—Plaintiffs respectfully request that the Court reconsider: (i) dismissal of the LME; (ii) denial of leave to replead as against the LME; and (iii) denial of the opportunity to take limited discovery of the LME prior to dismissal.  There is good reason to do so.

*First*, the relevant law changed between the time that the motion was argued and the time that the motion was decided and this current law precludes dismissal.  The Second Circuit agrees.

*Second*, the LME Foreign Board of Trade application and the alleged conspiracy share a direct connection and preclude immunity.  United States Senators agree.

*Third*, Plaintiffs are pleased to answer a key question posed by the LME:

---

[1] All "Ex." references are to the exhibits attached to the Second Declaration of Peter A. Barile III in Further Support of Plaintiffs' Joint Motion for Reconsideration of Dismissal of The London Metal Exchange on Foreign Sovereign Immunity Grounds Without Leave to Replead, filed concurrently herewith.

> "What facts could plaintiffs possibly produce that can contradict the text of the Financial Services & Markets Act, the Recognition Requirements, the Rusal and Albatros decisions, the public record evidence of the LME's consultation with the market on warehouse issues, and the FCA letter describing its supervision of the LME?"

Plaintiffs, if allowed, could provide the Court with numerous additional facts, including in an amended pleading showing that the LME is not immune under the Foreign Sovereign Immunities Act ("FSIA"), and, regardless, it is subject to the commercial exception in FSIA.

*Finally*, even if the Court were not satisfied with Plaintiffs' showing to grant Plaintiffs' motion in full and deny the LME's motion outright, there is enough on the factual record to warrant allowing Plaintiffs to take limited discovery, particularly in light of the "altered legal landscape" ushered in by *NML Capital* and its recent Second Circuit progeny.

## II.   SECOND CIRCUIT AUTHORITY DIRECTS THAT *NML CAPITAL* BE APPLIED HERE

Despite the LME's portrayal to the contrary, in *Republic of Argentina v. NML Capital, Ltd.*,[2] the Supreme Court admonished that federal courts are not in the "immunity-by-factor-balancing business,"[3] because federal courts must adhere faithfully to the text of the FSIA. Further, following *NML Capital*, the Second Circuit, in *Mare Shipping Inc. v. Squire Sanders (US) LLP*, recognized: "The Supreme Court recently underscored that . . . 'any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall.'"[4]

On September 12, 2014, after Plaintiffs had filed their motion for reconsideration, but before the LME filed its opposition with this Court, the Second Circuit issued another on-point

---

[2] 134 S. Ct. 2250 (June 16, 2014).

[3] 134 S. Ct. at 2258.

[4] 2014 U.S. App. LEXIS 14525, *8-9 (2d Cir. July 30, 2014) (quoting *NML Capital*, 134 S. Ct. at 2256).

opinion interpreting *NML Capital*.  In *Export-Import Bank of the Republic of China v. Grenada*,[5] the Second Circuit reversed an FSIA immunity decision made without an adequate discovery record and explained that *NML Capital* has left in its wake an "altered legal landscape."[6]

The Second Circuit explained in *Export-Import Bank of the Republic of China* that the "disposition and tenor" of *NML Capital* is decidedly pro-discovery in the FSIA context, and, therefore, it overturned a district court order denying FSIA-related discovery:

> In light of the Supreme Court's decision, and given the circumstances before us, we think it prudent to vacate the District Court's decision denying discovery, and remand for the District Court's reconsideration in light of the altered legal landscape.
>
> As explained above, Ex-Im Bank has had no opportunity to examine the circumstances relevant to the FSIA's application . . . any lingering concern that the FSIA alone might presumptively bar further discovery has been eliminated by the Supreme Court in NML Capital.[7]

More particularly, the Second Circuit determined that *NML Capital* bore directly on the "*Weltover*" argument made here by Plaintiffs.  The plaintiff in *Export-Import Bank* argued that certain funds paid to bondholders were attachable because the bonds were issued as a "commercial activity" by the Grenada Airports Authority under the doctrine of *Republic of Argentina v. Weltover, Inc.*[8]  The Second Circuit found that "the record does not disclose many facts that would bear on a careful determination of immunity from attachment" under the "*Weltover* doctrine," and vacated and remanded for reconsideration in light of the "altered legal landscape" post-*NML Capital*.[9]

---

[5] 2014 U.S. App. LEXIS 17943 (2d Cir. Sept. 12, 2014).

[6] *Id*. at *47.

[7] *Id*. at *46-47.

[8] 504 U.S. 607 (1992) (cited in *Export-Import Bank*, 2014 U.S. App. LEXIS 17943, at *43-47).

[9] *Id*.

3

Further to this point, the LME's statement in its opposition brief that "of course, the LME has never argued that the Immunities Act precluded discovery," is contrary to the record.  When the LME sought (and obtained) a discovery stay back in April, the LME argued that "plaintiffs are not entitled to any merits discovery (even limited discovery) from the LME or Holdings until, at a bare minimum, the Court concludes that it has jurisdiction over them."[10]  This was no stray sentence; the LME clearly made its position known in open court:

> MS. ZWISLER: I hate to say this because I have the sense that I may be falling on my own sword. In light of the sovereign immunity defense that we have, given the production or collection of documents, first of all, our production is to an agency of the United Kingdom. In a civil case the court doesn't have jurisdiction beyond the domestic confines of the United States. So we didn't produce anything to the CFTC.[11] In light of the immunity defense and in light of the fact that, as you know from reading our papers, we have statutory immunity in the United Kingdom for the conduct that is the subject of this lawsuit, we are not willing to agree voluntarily to produce the documents that we provided to the FSIA.  A related issue is what can we do between now and when you decide the motions to dismiss to move the process along. We are willing to meet and confer on the search terms, identify the custodians, the organizational charts. This is not a big issue for the LME, because we have less than 200 employees and only about 50 probably would be classified as anything other than IT employees and admin. So it is not a big number of people. But the institution is small. The idea that we would have to go and start a collection while we are standing on the sovereign immunity defense, I'm not at liberty to agree to that voluntarily.[12]

The Court went on to grant the discovery stay that the LME sought, and no discovery of the LME has been allowed in this case.  Dismissal without any discovery is contrary to *NML Capital*, *Mare Shipping* and the recent Second Circuit decision, *Export-Import,* Plaintiffs' claims

---

[10] *Compare* Opposition Brief, ECF 587, at 9 (Sept. 23, 2014), *with* Letter Motion to Stay Discovery, ECF 277, at 4 (Apr. 14, 2014).

[11] By this time, the LME had produced voluminous materials to the CFTC in the context of its FBOT application and had made submissions to the US PTO in acquiring trademarks to use in U.S. commerce.

[12] Ex. B Hearing Tr., 25:12 – 26:4 (Apr. 25, 2014).

against the LME should not be dismissed on FSIA grounds, where Plaintiffs have been denied the opportunity to take any discovery.

## III.   THE CFTC'S FOREIGN BOARD OF TRADE APPLICATION IS DIRECTLY RELEVANT TO ITS NON-SOVEREIGN AND COMMERCIAL ROLE IN THE ALUMINUM WAREHOUSING CONSPIRACY

In its opposition brief, the LME argues that the Court should ignore the CFTC Foreign Board of Trade ("FBOT") proceedings because they are "not relevant"; U.S. Senators charged with CFTC oversight disagree.  Regardless of whether the *Albatros* and *Rusal* rulings from the U.K. show that the LME is a "public body" as a matter of law under Rule 44.1,[13] prominent United States Senators are of the view that the LME is subject to U.S. regulation, including in particular with respect to the alleged conspiracy and overt acts by the LME taken in furtherance of that conspiracy.

On September 26, 2014, United States Senators Elizabeth Warren, Sherrod Brown, and Tammy Baldwin sent a letter to the CFTC expressing "deep concern" with the ongoing irregularities in trading and delivery of aluminum and asking the CFTC to thoroughly investigate the LME and its role in the aluminum warehousing conspiracy prior to approving the LME's application as a foreign board of trade—the same application that Plaintiffs have brought to the Court's attention and the LME has said is irrelevant—demanding that the CFTC "us[e] their authority to conduct a thorough review of the ongoing issues destabilizing the aluminum market

---

[13] *See* Fed R. Civ. P. 44.1 ("Determining Foreign Law") ("A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 860 n. 2 (2d Cir. 1981) (interpretation of foreign law is question of law reviewed *de novo*).

and ensure that the London Metal Exchange is operating above board before finalizing the LME's authority as a foreign board of trade."[14]

At a minimum, the FBOT proceeding and this letter present a disputed issue of fact and undercut the LME's arguments in favor of dismissal as a matter of law as to both organ status and the commercial exception.  The Senators' letter to the CFTC provides:

> We write to express our deep concern with the ongoing irregularities in trading of aluminum contracts and the warehousing and physical delivery of aluminum to end users.  While we have raised aluminum market issues with you and your staff during hearings before the U.S. Senate Committee on Banking, Housing, and Urban Affairs and the Committee on Agriculture, Nutrition, and Forestry; in letters; and throughout the confirmation process for the newest Commissioners, our many concerns remain unresolved.  We urge you to immediately use the Commodity Futures Trading Commission's (CFTC) existing oversight tools to thoroughly examine aluminum markets used by U.S. participants and to allow sufficient time for Congress to make any necessary legislative fixes through the reauthorization of the Commodity Exchange Act (CEA) before authorizing foreign boards of trade (FBOT) through the CFTC's FBOT registration process.
>
> First, we urge the Commission to ensure that the London Metal Exchange (LME), the largest exchange for aluminum futures, is operating in compliance with the CFTC's standards before approving its application for registration as an FBOT.  We have serious concerns that aluminum contracts' storage and delivery provisions, as implemented and overseen by the LME, are vulnerable to manipulation and have resulted in an inefficient physical delivery settlement process which raises costs for consumers and erodes confidence in the LME.  Problematic LME rules include:
>
> - Insufficient warehouse load-out rules and practices for LME aluminum contracts that have resulted in end users waiting in queues for as many as 683 days to take delivery of aluminum, despite high levels of production and large amounts of aluminum waiting in storage for delivery;
>
> - Inadequate rules requiring the institution of "Chinese walls" between their warehouse companies and trading operations to prevent conflicts of interest between their commercial investments and other financial activities - such measures may be useful in theory, but ineffective in practice;

---

[14] Ex. A, *available at* http://www.brown.senate.gov/newsroom/press/release/in-letter-to-cftc-senators-call-for-investigation-of-aluminum-warehousing-practices

- Rules preventing warehouse owners from storing their own metals in their warehouses, but allowing the parent company of a warehouse owner to store metals in a warehouse owned by one of its subsidiaries; and

- Overly restrictive LME rules that prohibit only "unreasonable" incentive payments, a vague term that is open to abuse. As the LME itself acknowledges, warehouse competition is conducted on the basis of high incentive payments, and such payments are "significantly . . . linked to the existence of [aluminum] queues[,]" yet it has taken no steps to address this structure.

We remain extremely concerned that these conditions are adversely affecting the ready supply and pricing of aluminum and threaten the entire aluminum market.

The FBOT registration process, as allowed by the Dodd-Frank Wall Street Reform and Consumer Protection (Dodd-Frank) Act and defined by the Commission's regulations, provides an opportunity for meaningful market oversight that protects U.S. end-users and consumers.  It is critical that the CFTC use this opportunity to examine the LME's practices and to work with the United Kingdom's Financial Conduct Authority (FCA), other regulatory authorities, and the LME to ensure that the LME meets the standards the CFTC set forth in its FBOT registration rule.

Second, if the CFTC is unable to work with the LME and the FCA to come to a resolution that fully addresses the delivery issues facing end users, Congress may be forced to legislate in this area.  In that event, we request that the CFTC refrain from approving LME's application for registration as an FBOT until Congress has had the opportunity to address distortions in aluminum futures trading and delivery by taking appropriate legislative action through the CEA reauthorization process.  It would also be useful for CFTC to suggest any legislative changes to the CEA that might improve the CFTC's authority and oversight concerning the LME and other FBOTs.

Finally, market observers and end users have reported that record queues and large stockpiles of aluminum built up in LME-approved warehouses have distorted the market and hurt end-users' and consumers' bottom lines.  These serious concerns deserve a full investigation by the CFTC to determine the full effects of the current load-out delays and storage fees and to determine whether the sometimes mutual interests of futures traders and LME warehouse owners resulted in any activities that would be inappropriate under the CEA.

We ask that the CFTC immediately examine the effects that the current warehousing system - including its structure, regulation, and fee system - have on futures trading, U.S. manufacturers, and U.S. consumers in order to determine whether the LME and its U.S.-based warehouses are in compliance with all applicable U.S. trading laws.

> The CEA and Dodd-Frank gave the CFTC important tools to ensure that commodity markets operated at home and abroad provide a safe and level playing field for U.S. traders and end users. The CFTC should use all available tools to ensure that the aluminum market is once again an efficient place for price discovery that serves businesses and consumers.
>
> Thank you for your attention to this important matter.[15]

Further context for this letter is found in the Goldman Defendants' document production, which reveals that [redacted]

[redacted]

[redacted]

[15] *Id*.

[16] GS-METRO-00028294.

The LME's interactions with and oversight by the federal government outside this Court are demonstrative of both the commercial and non-sovereign nature of LME's activity in the United States, including specifically with respect to the aluminum warehousing conspiracy alleged herein and the LME's overt acts taken in furtherance of the conspiracy.[17]

## IV.   THE COURT SHOULD NOT TAKE THE LME'S WORD THAT THE FACTUAL RECORD IS OTHERWISE "INDISPUTABLE" OR COMPLETE—THERE ARE NUMEROUS DISPUTED ISSUES OF FACT THAT SHOULD BE RESOLVED IN THE LME'S FAVOR ABSENT DISCOVERY

The LME asks:

"What facts could plaintiffs possibly produce that can contradict the text of the Financial Services & Markets Act, the Recognition Requirements, the Rusal and Albatros decisions, the public record evidence of the LME's consultation with the market on warehouse issues, and the FCA letter describing its supervision of the LME?"

(ECF 587 at 6.)

Plaintiffs' answer:

Plenty.   Several examples have been presented to the Court by way of letter and otherwise, as is reflected on the docket.  (See, e.g., ECF 415, 434, and 470.)  Others examples are set forth below.

### A.   The FCA letter procured by the LME for submission to this Court is free from ambiguity and outright conflicts with a prior FCA letter that the LME submitted to the CFTC

---

[17] The publicly available portions of the LME's application to the CFTC may be found on the CFTC website.  *See* Ex. C, *available at* http://sirt.cftc.gov/sirt/sirt.aspx?Topic=ForeignBoardsofTradeAD&Key=23619.  *The application and other docket materials on the CFTC website are so voluminous that Plaintiffs have made the decision to cite it and incorporate it all by reference herein for the Court's convenience.  Plaintiffs believe they have downloaded all publicly available material and would be pleased to furnish it to the Court electronically or in hard copy, should the Court desire.

The LME trumpets as "indisputable" a letter it submitted to this Court on June 10, 2014, from the FCA to the LME..[18]

Hardly.

### 1.   The text of the FCA letter submitted to the Court by the LME presents factual issues

The text of the June 10 letter is, at a minimum, subject to interpretation; the LME's spin notwithstanding.   In the letter, the FCA states that "the operation of the RIE-approved warehouses is not, by itself, a FCA regulated activity."[19]  If the FCA doesn't regulate warehouse operations, then how can it be that the FCA has delegated or otherwise authorized the LME to regulate warehouse operations as its agent, instrumentality, or organ?  An agency relationship presupposes that the principal, (here, purportedly, the FCA), has a power or right or duty in the first instance.   Without it, there is nothing for the principal to delegate or authorize.   But, regardless of all the other verbiage surrounding it, the plain statement of the FCA in the letter furnished to this Court is that "the operation of the RIE-approved warehouses is not, by itself, a FCA regulated activity."[20]

### 2.   The conflict between a FCA letter on file with the CFTC and the FCA letter submitted to the Court by the LME presents factual issues

There is another FCA letter submitted by the LME to the federal government, dated August 3, 2012.[21]  And it is at odds with the June 10 FCA letter submitted to the Court, or at least the interpretation advanced by the LME.  The LME submitted the June 10 letter from the

---

[18] ECF 432 at 69-70 of 87.

[19] Ex. D, ECF 431-1 at 2.

[20] *Id*.

[21] Ex. E, FSA letter to CFTC (Aug. 3, 2012), *available at* http://www.cftc.gov/ucm/groups/public/@otherif/documents/ifdocs/lmetab18.pdf  (the FCA was, until recently, called the FSA)

FCA as part of its application to the CFTC FBOT.  The August 3 FCA letter to the CFTC did not mention in words or in substance that: (i) the FCA delegated regulatory power to the LME; (ii) the LME was an agent, instrumentality, or organ of the UK government; or (iii) the LME was not subject to U.S. regulation or jurisdiction.  If the interpretation of the June 10 FCA letter advanced by the LME were reliable, then the Aug 3 FCA letter submitted to the CFTC would have at least mentioned something going to organ status or delegated powers.  The absence of it is telling.

At a minimum, the June 10 FCA letter on this Court's docket should be read with its August 3 counterpart written to the CFTC beside it.  So reviewed, the letter previously furnished to the Court is not indisputable evidence of anything.

### B.     The LME admits in its corporate disclosures (to the JPML) that it is "non-governmental"

Unlike its co-defendants, the LME failed to file a Rule 7.1 corporate disclosure statement with this Court.  But the LME <u>did</u> file a corporate disclosure statement with the Judicial Panel on Multidistrict Litigation in the proceedings giving rise to this MDL.  In the LME's JPML corporate disclosure statement in this very case, counsel for the LME certified that the LME is a "non-governmental corporate party."[22]  That should end the question of whether it is or could ever be immune.  An entity cannot be non-governmental and governmental simultaneously.

The LME disclosed in its statement filed with the JPML by the same counsel who are now before this Court that the LME is "non-governmental".  Agents, instrumentalities or organs within the meaning of the FSIA are not "non-governmental", they are, by virtue of their status, governmental in nature and cannot be an agent, instrumentality or organ of the UK government.

---

[22] Ex. F, Corporate Disclosure Statement, Case MDL No. 2481 (ECF 22) (Aug. 21, 2013).

By definition, therefore, the LME cannot be governmental, ."  Had the LME filed  a Rule 7.1 corporate disclosure statement with this Court, as it should have and as its co-defendants have done, the Court would have seen this same admission.  The LME's admission to the JPML shows that it is not entitled to sovereign immunity.

The Court took notice of the other defendants' Rule 7.1 statements in its dismissal order of August 29, 2014.[23]  The LME's JPML disclosure should be taken into account as well, if not treated as the law of the case.

### C.   The LME downplays the role of LMEsword® in contrast to its representations to this Court in the tutorial and otherwise

The LME also argues relevancy in response to its LMEsword® trademark problem.[24]

Wrong.  "Foreign governments that engage in commerce in the United States cannot invoke immunity under the Foreign Sovereign Immunities Act."[25]  Since the LME cannot dispute that its trademark of LMEsword® means that its use of LMEsword® system for warrants and warehousing is "in commerce," the LME is forced to backpedal once again.

The LME says that the LMEsword® system has nothing to do with the claims alleged, but this is contrary to the record.  According to LME executive Mark Bradley, LMEsword® is integral to LME aluminum warehousing load-in, load-out, and warranting.  By way of example, in a June 10, 2014 declaration, Mr. Bradley swears:

> 11. The LME's regulation of warehouses is necessary in order to meet these and other Recognition Requirements. The metal traded on the LME is represented by a warrant; a warrant is what passes between buyer and seller when a transaction goes to physical settlement on the LME. The metal that is the subject of that

---

[23] ECF 571 at 67 & n.35.

[24] Ex. G, LMEsword®, United States Patent & Trademark Office Reg. No.4,520,912 (registered Apr. 29, 2014).

[25] *Bormes v. United States*, 759 F.3d 793 (7th Cir.  2014) (citing *Argentina v. NML Capital, Ltd*., 134 S. Ct. 2250 (2014)).

warrant is specifically identified in the approved warehouses. Everything that the LME does in relation to warehouses is for the sole purpose of ensuring that, when a buyer takes delivery of a warrant on the LME, he knows exactly what he is getting, and he gets it. This is what is meant in the Recognition Requirements by the "safeguarding and administration of assets belonging to users of the exchange's facilities", and "satisfactory arrangements are made for securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange." Ex. D, Recognition Requirements, sch., ¶¶ 4(2)(d), (g); id. sch. ¶ 3(2)(e). The requirements of the Warehouse Agreement are designed around this purpose, e.g., to take the first few requirements set out in the agreement by way of example:

***

b. the requirements related to having a London Agent and LMEsword (clauses 1.3 and 1.4) are to ensure that the warehouse has satisfactory arrangements in place for creating warrants in respect of parcels of metal, for lodging warrants in the LMEsword Depository, and for withdrawing them when required;[26]

Mr. Bradley also talked about LMEsword® at length at the tutorial as well, explaining

the central role of LMEsword®.  For instance, Mr. Bradley spoke to how key LMEsword® is to

the LME's function with regard to loading-in or placing aluminum on warrant:

So technically in a storage facility, where you have LME approved warehouses and LME nonapproved warehouses, you can deliver the metal in, store it in a nonLME approved part, and then that can then be -- you can then move it within that facility to an LME approved part facility by lodging it in the sword system. So when you see 50,000 tons in any one day, that's logistically impossible to actually ship in that much in one day. That purely reflects the electronic process of putting it on the LME warrants.[27]

Mr. Bradley continued with regard to loading-out or taking aluminum off warrant:

Then taking metal off warrant, when there are triggers, when there are financial triggers to move your LME warrant, they only would advise the member who has access to LMEsword, and they would put a withdrawal instruction into the electronic system. . . . What happens then is reflected in the LME stock figures. . . . [A]fter a warrant becomes cancelled, is the owner and warehouse will agree to transport scheduling. So what that means is if the warrant holder wants to take out 20 trucks' worth, say, he has to say to the warehouse, well, I can get 20 trucks by this date. When is my next available date? And then they will agree a date that

---

[26] ECF 432 at 4-5 (June 10, 2014).

[27] Tutorial Hearing Tr., Ex. H, 44:10-456:3.

can feasibly work for both of them. Eventually then the warehouse removes and loads the metal. The agent tells and puts the instruction to LMEsword, and that warrant is delivered out within in terms of the LME stock figures. The difference between cancellation, scheduling and delivery out obviously has increased as the queues have increased, the timing there. What the LME does as part of the supervisory role is that we ensure that as quickly as possible cancelled stock gets a time slot to be delivered out. That has impacts on our market. What we can't have is somebody canceling lots of stocks with no intention of delivering it out, to send them a signal to the market or an inaccurate signal to the market. So cancelled warrants, as quickly as possible we monitor that the agreement happens between those wanting to take it out and the warehouse for a scheduled slot.[28]

Numerous LME documents submitted to the Court further demonstrate the importance of LMEsword.[29]

Also relevant to the LMEsword® system is the "London Agent."  Since filing the operative complaint, Plaintiffs have discovered an additional conspiratorial link both among all defendants and between the physical and financial markets.  Metro, Pacorini, and Henry Bath share a common London Agent – International Commodity Services, Ltd. or ICS.  The London Agent is in control of all Defendants' LMEsword® data for Defendants, spanning both warehousing and trading, and more.  It even has a list of domestic and international bank account numbers and routing codes for Metro, Pacorini, and Henry Bath.[30]

At the tutorial, Mr. Bradley spoke about the participation of the "London Agent":

What happens then is that the warehouse company will instruct the London agent, and the London agent is simply a separate entity that exists in London who has relationships with the warehouses, contractual relationships with the warehouses to act on their behalf within London, using the LMEsword system. So the warehouse will tell the agent the details, and the agent then has to create the warrant in sword.

---

[28] Tutorial Hearing Tr., Ex. H, 47:21-49:11.

[29] *E.g.*, ECF 432, *passim* (Warehouse Terms & Conditions).

[30] Ex. I, *available at*
http://www.lme.com/~/media/Files/Warehousing/Rent%20and%20FOT/Warehouse%20compan y%20bank%20details%202013.pdf (last visited September 30, 2014, 4:35 pm ET).

So they will input the details into LMEsword. They then print a physical warrant so every one electronic record in the LMEsword database is backed by a physical paper document. The printed warrant then goes to the LME member that has the sword account, and the LME member will then take that warrant. Once they've checked it, they'll check the details. They'll take it to the central depository where the paper warrants are held; a bit like a bank vault, if you will. And then the depository will -- once it's delivered to depository, it will then be lodged actually fully into the LMEsword system. So it becomes what we call a live LME warrant. It exists as an LME warrant now, and it is lodged within that system to that member's account.

Now, if the LME member is the person who owns that metal, it doesn't go any further. But if it's a customer of that member, then it will then be allocated to a subaccount, customer account. So the LME, as part of its oversight of the LMEsword system and the warehousing network, we can see at any given time where all of these warrants are -- A, where they are in the world, but also, then, who they are and how they are allocated within the sword system.[31]

This means that one party, ICS, was retained by Defendants to be in control of all LMEsword® warrant and warehousing transaction data for Metro, Pacorini, and Henry Bath, with the blessing of the LME, during the conspiracy period.

And ICS is no mere clerical service. ████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████

As shown by the LMEsword® trademark taken in its proper context, not to mention the London Metal Exchange® trademark that the LME swears is used in commerce, Plaintiffs do allege that the LME violated the law and their claims are based upon the LME's commercial

---

[31] Tutorial Hearing Tr., Ex. H, at 41:22-42:24.

[32] GS-METRO-00020901.

[33] *See, e.g.*, GS-METRO-00019182, Ex. N ██████████████████████████
GS-METRO-00033241. ██████████████████████████████████████████
██████████████████████████████████████████████████████████████

activity.  Lest there be any doubt, the mere fact that the LME disputes the role of LMEsword® in the alleged conspiracy show factual issues than should not be resolved in the LME's favor on motion.

## V.    IN LIEU OF DISMISSAL, THE COURT SHOULD LIFT THE DISCOVERY STAY AND ALLOW PLAINTIFFS TO TAKE LIMITED DISCOVERY OF THE LME

### A.    There should be no dismissal without discovery

As discussed above, *NML Capital*, as recognized by the Second Circuit, has altered the legal landscape.  The law now mandates jurisdictional discovery in the FSIA context where in the past such discovery might have been denied.[34]

### B.    There are numerous relevant topics on which to take discovery

If allowed, Plaintiffs would seek document discovery, written discovery, and deposition discovery, on a number of topics going to FSIA immunity.  Specific examples include:

- Meetings with U.S. government officials during the conspiracy period;

- Meetings with U.K. government officials during the conspiracy period;

- FBOT application work during the conspiracy period;

- Trademark work during the conspiracy period;

- Use of LMEsword® in the U.S. during the conspiracy period;

- HKEx's takeover of the LME during the conspiracy period;

- Plans to open a U.S. office "to get closer to the clients";

- *Albatros* and *Rusal* case files;

- Depositions of LME declarants, particularly LME Head of Market Surveillance, Mark Bradley;

---

[34] *See* Part II, *supra*.

- Depositions of the LME "Head of Business Development," Matt Chamberlain, and the LME "Head of Sales," Paul MacGregor;

- Adoption and application of, failures to adopt and apply certain rules and practices, including load-out rules, conflicts of interest rules, and rules concerning incentive payments, including, without limitation, the LME's "decision not to pursue changes to rental rates or regulations, which was a key point to UC Rusal's legal challenge to its proposal to alter warehouse loan in/load out rules."[35].

Discovery on the above topics and other relevant topics may overlap with merits discovery, however, he LME's denial that the commercial activity exception applies all but requires that this be so.  While the LME argues that some of the information Plaintiffs would seek is relevant only to personal jurisdiction; it is not.  Rather, the evidence of domestic contacts plaintiffs seek is evidence of domestic commercial activity concerning the acts and practices giving rise to this case.  Moreover, counsel's statements about the relatively small internal structure of the LME, compared to the exceedingly large volume of commerce it handles, indicate that even full merits discovery should present no undue burden.

**C.    The meaning of "public body" and the tactical decision of the LME not to challenge it being a "public body" for purposes of judicial review in the *Rusal* case presents a specific factual issue ripe for discovery**

Other than the written opinions, the LME has produced no discovery pertaining to the U.K. proceedings in *Albatros* and *Rusal*, which it says proves (again, indisputably) that the LME is entitled to immunity under U.S. law.  Yet, the term "public body" is not a defined term under

---

[35] Ex.  J, Metal Bulletin Aluminum Conference: *Chamberlain defends LME's decision on rents* (September 23, 2014), *available at* http://www.metalbulletin.com/Article/3383184/Search/MB-ALUMINIUM-CONF-Chamberlain-defends-LMEs-decision.html?PageId=196010&Keywords=aluminum+conference&OrderType=1&PageMove=2#axzz3EvY2JvaN

the FSIA.  In construing the FSIA, *NML Capital* teaches that the FSIA is limited by the text of the statute.  Even if the LME were a "public body" under U.K. law, it would not follow automatically that it is an "agent," "instrumentality," or "organ," within the meaning of the FSIA.  There is no indisputable evidence of whether and if so how "public body" is a defined term under English law.

There is discovery to take on this.  The LME has offered as part of its "indisputable" evidence that it made a tactical decision in the *Rusal* proceeding to not dispute it was a "public body."  Counsel for the LME stated at oral argument that this decision rendered "implausible" any factual suggestion that the LME is not immune:

> MS. ZWISLER: . . . So it's not in dispute that the LME is subject to the principles of public law and amenable to judicial review.  If the LME thought that it could have just said to Rusal, go away you can't stop this rule just because you think it is procedurally unfair.  It is implausible that it would not have made that point. It's so settled in the United Kingdom that the LME's regulation of its warehouses is regulatory, that it is not worth trying to change the law that was developed in Albatros, and that the FCA has mandated through the last years of this load-out issue, be an aspect of the regulatory function.  That's really the answer to that.[36]

The decision by the LME not to have "made that point," (i.e., whether or not to challenge the ability of Rusal to seek judicial review in the first instance), is a fact on which plaintiffs are entitled to take discovery.

Factual questions that could be investigated include:

- Was the decision not to challenge based on concerns other than the strict legal question under U.K. law?

- Were there public relations concerns animating the decision?  Was the tactical decision made by the LME to admit being a public body in the U.K. *Rusal*

---

[36] Hearing Tr., Ex. K, at 25:19 – 26:8 (June 3, 2014).

proceeding (to enjoin proposed rule changes) made in order strengthen the LME's

immunity argument in this U.S. antitrust case (for treble damages)?

*Cf. In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 538 (E.D.N.Y. 2011) ("Plaintiffs

suggest that a fact-finder could conclude that the post-filing documents were crafted (or, at the

very least, that the actions described in the documents were taken) to support defendants'

litigation position.  Both the timing of these documents and the substance of certain documents

could support such an inference.").

There should be discoverable facts under the LME's control explaining this tactical

decision.  Maybe it was solely a decision on the merits.  *Vitamin C* presents another explanation.

We won't know why the LME did not challenge "public body" status until there is opportunity

for discovery.  Counsel's observation, that "It is implausible that it would not have made that

point," is not evidence of any fact, much less any indisputable fact, which supports dismissal of

the LME.

## VI.    CONCLUSION

For the foregoing reasons and the reasons stated in its moving papers and declarations in

support, Plaintiffs respectfully request that their Motion for Reconsideration be GRANTED.

Dated:  October 2, 2014.

Respectfully submitted.

  s/ Linda P. Nussbaum
Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER  P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
Email: lnussbaum@gelaw.com
       pbarile@gelaw.com

Christopher Lovell
Gary S. Jacobson
LOVELL STEWART HALEBIAN JACOBSON
LLP
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
        gsjacobson@lshllp.com


Bonny E. Sweeney
Carmen Medici
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel.: (619) 231-1058
Fax: (619) 231-7423
Email: bonnys@rgrdlaw.com
        cmedici@rgrdlaw.com

***Interim Co-Lead Counsel for Direct
Purchaser Plaintiffs and the Proposed
Direct Purchaser Plaintiff Class***


  s/ Derek Y. Brandt
Derek Y. Brandt
John R. Phillips
SIMMONS HANLY CONROY LLC
One Court Street
Alton, IL  62002
Tel.: 618-259-2222

Andrea Bierstein
SIMMONS HANLY CONROY
112 MADISON AVE., 7TH FLOOR
New York, New York 10016
Tel.: (212) 784-6400

David R. Scott
Sylvia M. Sokol
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building

20

405 Lexington Avenue, 40th Floor
New York, NY 10174
Tel.: (212) 223-6444

Christopher M. Burke
Walter W. Noss
Kristen M. Anderson
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA  92101
Tel.: (619) 233-4565

Todd M. Schneider
Jason H. Kim
SCHNEIDER WALLACE COTTRELL KONECKY
WOTKYNS LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Tel.: (415) 421-7100

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL KONECKY
WOTKYNS LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Tel.: (480) 428-0144

Christopher M. Santomassimo
NICOLL DAVIS & SPINELLA LLP
95 Route 17 South, Suite 316
Paramus, NJ  07652
Tel.: (201) 712-1616

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92124
Tel.:  (619) 687-6611

Joseph C. Peiffer
PEIFFER ROSCA ABDULLAH & CARR, L.L.P.
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Tel.:  (505) 586-5259

21

*Counsel for Plaintiffs Mag Instrument, Inc., Agfa Corporation, and AGFA Graphics, N.V.*

**ECF CERTIFICATION**

The filing attorney attests to having obtained concurrence regarding the filing of this document from the signatories to this document.

Dated: October 2, 2014

Respectfully Submitted.

  s/ Peter A. Barile III
Peter A. Barile III
Grant & Eisenhofer P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
Email: pbarile@gelaw.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Plaintiff Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2014, I caused a redacted copy of the foregoing document to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access redacted copies of the forgoing through the Court's system, and notice will be sent to these parties by operation of the Court's electronic filing system.

I FURTHER CERTIFY that on October 2, 2014, I caused an unredacted copy of the foregoing document to be filed under seal and to be served via electronic mail upon counsel of record.

Dated: October 2, 2014

Respectfully Submitted.

_s/ Peter A. Barile III_____

Peter A. Barile III
Grant & Eisenhofer P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
Email: pbarile@gelaw.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Plaintiff Class*