

**Grant & Eisenhofer P.A.**

485 Lexington Avenue   New York, NY 10017   Tel: 646-722-8500   Fax: 646-722-8501

123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100

1747 Pennsylvania Avenue, N.W., Suite 875
Washington, DC 20006
Tel: 202-386-9500
Fax: 202-386-9505

30 N. LaSalle Street, Suite 1200
Chicago, IL 60602
Tel: 312-214-0000
Fax: 312-214-0001

Linda P. Nussbaum
Director
Tel: 646-722-8504
lnussbaum@gelaw.com

VIA ECF

October 20, 2014

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street, Room 1950
New York, New York 10007

Re:   In re Aluminum Warehousing Antitrust Litigation (13-md-2481 (KBF)), Direct Purchaser Plaintiffs (14 Civ. 3116 (KBF)); AGFA Corporation, et al. v. The Goldman Sachs Group, Inc., et al. (14 Civ. 0211 (KBF)); Mag Instrument Inc. v. The Goldman Sachs Group Inc., et al. (14 Civ. 0217 (KBF))

Dear Judge Forrest:

I write in further response to the LME's asserted Notice of Supplemental Authority, (ECF 606), in which it offered, hot off the press, the latest ruling from the U.K. in the *Rusal* saga to this Court as "authority." As it turns out, when LME's counsel was writing this Court from Washington trying to get the LME out from under the authority of the Judicial Branch, the LME was in Washington, lobbying Congress yet again, in deference to and recognition of the authority held over it by the Legislative and Executive Branches. The timing is exquisite; as reported by Reuters on Friday:

> When Britain's Court of Appeal handed a victory to the LME last week, knocking out a challenge to the reforms by Russian aluminum giant Rusal last week, the LME's head of business development, Matt Chamberlain, was in Washington, a source familiar with the matter said.
>
> Chamberlain was there to plead the exchange's case with lawmakers who have been pushing for even greater change to the LME's warehouse policy.
>
> Senator Sherrod Brown was among the people the LME visited, a spokeswoman for the Senator said. The Ohio Democrat has been a fierce critic of the LME, urging U.S. regulators to crack down on the 137-year old exchange, and threatening to write rules that would compel regulators to intensify oversight of the exchange on U.S. turf.

Douwe Miede, *LME takes battle to Washington after London warehouses win*, REUTERS (Oct. 17, 2014) (Exhibit A.)

Hon. Katherine B. Forrest<br>
October 20, 2014<br>
Page 2 of 2

Citing sources close to Congress and to the LME, the article continues:

Chamberlain's trip to the U.S. capital illustrates the pressure on the LME as it tries to fend off criticism over its handling of the years-long crisis. "They (the LME) are saying 'we've done everything we can'. This (trip) was to convince senators and regulators that they've done a good job," said the source familiar with the situation.

But U.S. politicians, who have led the effort for change, are still holding out for even tougher oversight. "It is not an argument (where) the LME does not agree with U.S. Congress, but (about) what ... can practically be delivered," said the source close to the LME.

*Id*.

This news further supports reconsideration of the LME's asserted sovereign immunity:

1. The LME acknowledges it is no sovereign organ by deigning to lobby Congress like the private commercial entity that it really is. If it were the sovereign that it claims to be, why would it be visiting Senator Brown rather than Secretary Kerry or President Obama?

2. The LME acknowledges its conduct is commercial in nature. Congress's CFTC-related power is limited by the scope of the Commerce Clause. If its acts were not commercial as they claim them to be, why would it care what laws or regulations were enacted by Congress or the CFTC relating to warehousing if they don't apply to the LME?

Moreover, this episode shows that Plaintiffs' request for leave to take jurisdictional discovery has merit. Plaintiffs identified Mr. Chamberlain as a potential deponent. This further shows that he has knowledge going to the heart of the FSIA dispute (making his testimony likely highly relevant), and further shows that he is in the United States regularly (assuring any burden would be decidedly light).

Plaintiffs continue to respectfully request that the Court reconsider its dismissal of the LME without to leave to replead and without jurisdictional discovery.

Respectfully submitted,

*/s/ Linda P. Nussbaum*

Linda P. Nussbaum

cc: Counsel of Record via ECF

# EXHIBIT A

Business & Financial News, Breaking US & International News | Reuters.com



**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# LME takes battle to Washington after London warehouses win

Fri, Oct 17 2014

By Douwe Miedema



WASHINGTON (Reuters) - Fresh from a court win in Britain, the London Metal Exchange now faces one of its biggest hurdles yet in its years-long crisis over its warehousing policy that consumers say has inflated prices: convincing U.S. lawmakers its reforms are enough.

When Britain's Court of Appeal handed a victory to the LME last week, knocking out a challenge to the reforms by Russian aluminum giant Rusal last week, the LME's head of business development, Matt Chamberlain, was in Washington, a source familiar with the matter said.

Chamberlain was there to plead the exchange's case with lawmakers who have been pushing for even greater change to the LME's warehouse policy.

Senator Sherrod Brown was among the people the LME visited, a spokeswoman for the Senator said. The Ohio Democrat has been a fierce critic of the LME, urging U.S. regulators to crack down on the 137-year old exchange, and threatening to write rules that would compel regulators to intensify oversight of the exchange on U.S. turf.

Brewers like MillerCoors, which uses aluminum for beer cans, have complained that the LME hasn't done enough over the past four years to tackle excessive stockpiling by warehouses owned by Wall Street banks. They say this has distorted supplies and driven up prices.

Now, sources say Brown is pushing for the world's oldest and biggest metals market and its warehousing network to take its most drastic step yet: cap rent that warehouse operators can charge on metal stored in their sheds, discouraging stockpiling by putting a limit on the money to be made from storing.

The lawsuit had forced the LME to halt its reforms, but last week's Court of Appeal decision means it can press ahead with the plan announced last year, telling warehouses they must ship out at least as much metal as they are taking in.

The so-called load-in/load-out (LILO) rule is only one of many planned changes to the rulebook of the LME, which is owned by Hong Kong Exchanges and Clearing Ltd, to help cut down waiting times to 50 days at most.

It also said it will study limiting rents, but experts and the LME have previously said such a far-reaching measure could be deemed anti-competitive.

A source close to the LME said such a measure could present legal difficulties abroad.

"I'd caution that without going into whether a rent cap is legally defensible, it would take the LME into uncharted territory," the source said. "For that reason, among others, it would make the LME vulnerable to challenge from those who may not find a rent cap an attractive proposition."

Still, the IntercontinentalExchange may have shown the way last year for the LME, capping rents charged by coffee and cocoa warehouses in an effort to stop hoarding.

Many metal market participants say the LME may have reached the limit of what it can do: it is caught between producers such as Rusal who fear rule changes could lower aluminum prices, and industrial users who have long complained that prices have been propped up artificially.

PRESSURE FROM THE HILL

Chamberlain's trip to the U.S. capital illustrates the pressure on the LME as it tries to fend off criticism over its handling of the years-long crisis.

"They (the LME) are saying 'we've done everything we can'. This (trip) was to convince senators and regulators that they've done a good job," said the source familiar with the situation.

But U.S. politicians, who have led the effort for change, are still holding out for even tougher oversight.

"It is not an argument (where) the LME does not agree with U.S. Congress, but (about) what ... can practically be delivered," said the source close to the LME.

In Britain, the Financial Conduct Authority, which regulates the LME, has said it will keep a close watch on commodities warehousing to ensure reforms are carried out effectively, but there has been no suggestion of legislative changes.

In the United States, the Commodity Futures Trading Commission holds sway over its business, and the 2010 Dodd-Frank law adopted after the financial crisis requires the agency to renew the LME's U.S. license.

Conflicts between U.S. regulators and U.S. units of global firms are not uncommon. And the CFTC is no stranger to cross-border clashes - after

years of talks it is still at odds with European regulators on how to apply a raft of new rules on derivatives.

"The markets don't know the same borders, while regulation ... almost by its very nature, is done locally," said Dan Waldman, a partner at law firm Arnold & Porter, and a former general counsel at the CFTC.

Congress is in the process of reauthorizing the CFTC's mandate and could in principle order the agency to clamp down on the LME by law. Yet while negotiations between the exchange and lawmakers continue behind closed doors, both sides may be closer than they appear in public.

"(The LME has) got to accept that (it's) going to get flak in public," the source close to the LME said. "The real view will be made (known) in private."

(Reporting by Douwe Miedema, additional reporting by Josephine Mason in New York; Editing by Frances Kerry)

© Thomson Reuters 2014. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.