EXHIBIT 3

## <u>Expert Report of J. Douglas Zona, Ph.D.</u>

## I. INTRODUCTION

1. My name is J. Douglas Zona. I am an applied economist specializing in the application of economics and econometrics to issues that arise in the context of litigation. I received a Ph.D. in economics from the State University of New York in Stony Brook. I have published articles in which I applied economic theory and statistical and econometric tools in a variety of applications in the areas of antitrust economics and industrial organization.

2. I have testified in federal and state courts and filed testimony in United States federal regulatory proceedings. I have provided testimony related to antitrust issues in a variety of cases, for both plaintiffs and defendants. A copy of my CV, which includes my list of prior testimony, is attached hereto as **Appendix A**. My CV includes the cases in which I have submitted an expert report and/or testified as an expert witness at deposition or trial.

3. I am being compensated for work on this matter at a rate of $650 per hour, plus reimbursement of expenses. I have no financial interest in the outcome of this litigation.

4. I have been engaged by the First Level Purchaser Plaintiffs ("Plaintiffs") to investigate the economic evidence in this case to determine whether that evidence is consistent with Plaintiffs' allegations of collusion among defendants to elevate prices, and if so, whether the effect of that collusion was sufficiently widespread to impact all or nearly all class members.

5. I have reached the following conclusions based on my training and professional experience working on matters such as this, the relevant economic literature, my investigation into the economic evidence relevant to Plaintiffs' claims, and my analyses to date:

   - LME warehouse services are a relevant antitrust product market; there are relevant geographic markets covering the United States, Europe and Asia (excluding China).

   - Defendants collectively have market power in the markets for LME warehouse services.

- The economic evidence supports the conclusion that Defendants used their collective market power, in ways contrary to their individual incentives but for coordination, to increase warehouse rents, decrease quality of services (e.g., through longer queues), and lock-in customers.

- The economic evidence supports the conclusion that Defendants' coordinated conduct reduced competition in the markets for LME warehouse services, which had the effect of increasing the price of aluminum purchased by Plaintiffs and members of the proposed class.

- Defendants' conduct led to increases in prices paid for aluminum by all or substantially all class members.

6. In reaching these conclusions I have relied on the materials cited herein and/or listed in **Appendix B**.

7. Defendants in this case fall into the following groups: (1) Goldman, Sachs & Co., Goldman Sachs International, Metro International Trade Services LLC, J. Aron and Company, Mitsi Holdings LLC, Burgess-Allen Partnership Ltd., and Robert Burgess-Allen (collectively, "GS Group"); (2) JPMorgan Chase Bank, N.A., JPMorgan Securities plc, and Henry Bath LLC (collectively, "JPM Group"); and (3) Glencore AG, Glencore Ltd., Pacorini Metals USA, LLC, and Pacorini Metals Vlissingen BV (collectively, "Glencore Group").[1] I refer to each of these groups of defendants as a Defendant Group. During the relevant period, Defendant Groups were integrated entities including commodities trading and commodities warehousing, as well as other businesses.[2]

8. The aluminum-related products relevant to this case include physical aluminum products as well as certain financial products (or rights) based on underlying physical aluminum (which are traded on financial exchanges), including rights to spot aluminum (delivery arranged immediately), rights to aluminum for delivery at particular future dates, and

---

[1] Certain of these entities are subject to a pending motion for leave to amend: JPMorgan Chase Bank, N.A., Glencore International AG, and Pacorini Metals Vlissingen BV.

[2] See generally http://www.goldmansachs.com/who-we-are/at-a-glance/index.html (GS Group); JP Morgan Chase & Co. Form 10-K, For the fiscal year ended December 31, 2011 http://investor.shareholder.com/jpmorganchase/secfiling.cfm?filingID=19617-12-163 (JPM Group); and http://www.glencore.com/assets/investors/doc/reports_and_results/2014/GLEN-2014-Annual-Report.pdf (Glencore Group).

financial products linked to various prices of aluminum and the aluminum premiums (described below).[3]

9. The proposed class in this case consists of direct purchasers of aluminum (which the court has referred to as "first level purchasers"[4]) from February 2010 through March 25, 2016, where the price is (or was) based on certain reference prices.[5] I understand that nearly all class member transactions involving the purchase or sale of physical aluminum in the U.S. are done under long term contract with a reference pricing formula.  There are two primary sources of information for the reference prices: Platts[6], an industry consultant, and the London Metal Exchange ("LME")[7], which is the primary global marketplace for financial aluminum transactions.

10. The relevant aluminum reference prices include the Midwest Premium ("MWP") and the London Metal Exchange cash price ("LME Price"), which together constitute the Midwest Transaction Reference Price ("MW-TRP").  The LME Price is an exchange-listed price for aluminum available for pickup at an LME warehouse. The MW-TRP, which is developed and reported by Platts, is a measure of actual spot transaction prices for aluminum delivered to plants in the Midwest.[8] The ultimate price paid by consumers of aluminum (sometimes referred to as the "all-in price") will reflect not only the MWP

---

[3] Aluminum is a lightweight, strong, corrosion resistant, conductive, and durable non-ferrous metal.  Its unique properties result in its use in the manufacture of a wide array of products, such as vehicles (e.g., airplanes and automobiles), packaging materials (e.g., beverage cans), construction materials (e.g., window frames and siding), and consumer products (e.g., iPads and flashlights).

[4] Opinion and Order, dated March 26, 2015, Case 1:14 -cv-00211-KBF document 138 filed 032615, p. 1.

[5] Specifically, the proposed class definition is: "All persons who from February 2010 to March 25, 2016: (a) made a first level direct purchase of a primary aluminum product with a price term based, in any part, on the Midwest Transaction Price, the Platts Metals Week US Transaction Price or other "all in" price used in the United States, or the Midwest Premium, the Platts MW Premium or similar terminology or other regional premium used in the U.S., including but not limited to an averaging over a period of days of any such premium or adjusting for a grade or type of primary aluminum product; or (b) purchased a primary aluminum product directly from a Defendant."  Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.  As used in this definition, "primary aluminum product" means (1) T-bar, sow, standard ingot, foundry alloy T-bar or ingot, extrusion billet, slabs, sheet ingot, molten metal, rod, or any other product which contains at least 93% primary aluminum, or (2) aluminum can sheet or aluminum automotive sheet which contain primary aluminum.

[6] http://www.platts.com/about.

[7] http://www.lme.com/about-us/.

[8] From http://www.platts.com/price-assessments/metals/aluminum-transaction: "The Platts' MW US Aluminum Transaction price assessment has been a benchmark for 30 years in the North American aluminum market. The assessment reflects the spot physical value of 99.7% P1020 high-grade aluminum, in ingots, sows or T-bars, delivered, duty-paid plants in the US Midwest. The price assessment is available in the longtime flagship Platts Metals Week, as well as in Platts Metals Daily and Platts Metals Alert services."

and the LME Price but will often include an additional premium that reflects any particular product quality or delivery requirements.

11. Plaintiffs allege a horizontal conspiracy that had the effect of inflating the price of aluminum in the U.S.  Plaintiffs' allege that Defendants' coordinated actions altered the normal competitive price dynamic for aluminum, resulting in a supracompetitively high Midwest Premium, an inflated MW-TRP, as well as inflated all-in prices.[9]  Plaintiffs allege that through control of LME warehouse facilities, Defendants, collusively, were able to raise reference prices.  By raising reference prices, transactions under contracts specifying these reference prices (virtually all contracts entered into by members of the proposed class) were also impacted by Defendants' alleged collusion. More specifically, I understand that Plaintiffs make the following allegations:

- Defendants recognized an opportunity to take control of LME warehouses in late 2009 and early 2010 and conspired to use those warehouses to trap large amounts of aluminum behind long warehouse exit queues.

- With aluminum stored in LME warehouses unable to reach the market in a timely manner, Defendants were able to inflate the price paid by purchasers of aluminum in the U.S.

- By extending the warehouse queues and inflating the price of aluminum, the conspiracy inflated the profits of the warehousing defendants (in the form of artificially inflated rent revenues) and the financial defendants (in the form of artificially inflated profits from trading aluminum).

- Plaintiffs paid higher, supra-competitive prices for aluminum as a direct consequence of the conspiracy.

- The Defendants engaged in a number of activities in furtherance of their conspiracy to inflate the price of aluminum and blockade LME aluminum behind warehouse queues.

- Defendants coordinated to orchestrate a number of transactions that involved the cancellation of LME aluminum warrants at

---

[9] Opinion and Order, dated March 26, 2015, Case 1:14 -cv-00211-KBF document 138 filed 032615. p.31

unprecedented levels, which in turn created unprecedented demand to load out aluminum from the LME warehouses in Detroit, Michigan and Vlissingen, The Netherlands. The primary purpose of these coordinated actions was to cause—and which did cause—unprecedented growth in the length of queues at Detroit and Vlissingen LME warehouses.

- Defendants also agreed to reduce competition in the LME warehousing market by dividing the market, by agreeing not to remove aluminum from each other's warehouses, by not competing for new business, and by reducing the rate at which aluminum was loaded and removed from LME warehouses.

- This conduct furthered the purpose of the conspiracy by enabling extraordinary amounts of aluminum to be amassed and trapped in LME warehouses behind historically anomalous queues and thereby directly caused the MWP to reach unparalleled heights and to inflate the MW-TRP.

12. I understand that fact discovery in this case is ongoing, as is my review of the materials produced in this case.[10] Consequently, all of the opinions I express in this report are subject to revision once this further fact discovery and review has been completed.

13. The remainder of my report is organized by my analyses of the following issues:

(a) Competitive conditions in the markets for LME warehouse services;

(b) The economic evidence relevant to Defendants' conduct in relation to those markets;

(c) The effect of that conduct on local premiums (e.g., the MWP);

(d) The effect of that conduct on reference prices (e.g. the MW-TRP); and

(e) The impact on aluminum prices paid by all or substantially all class members.

---

[10] For instance, I understand that JPM Group produced 770,916 pages of additional documents on March 21, 2016. Of the nearly two million pages of documents produced by Defendants to date, the majority was produced in the last month. I also understand that third party productions are ongoing and incomplete.

## II. COMPETITIVE CONDITIONS IN THE MARKETS FOR LME WAREHOUSE SERVICES

### A. Markets for LME Warehouse Services

14. From an economic perspective, the inquiry into whether there is likely collusion among competitors generally starts with an analysis of market power. Market power is often defined as the ability of a firm (or group of firms acting together) to raise price, restrict sales, and/or lower the quality of a product without losing so many of its customers as to make that conduct unprofitable.[11] In order to facilitate the evaluation of market power in this case, I define certain relevant antitrust market(s).

15. A relevant antitrust market is generally defined by the smallest group of products (and locations), including those that are the focus of the inquiry, such that a price above the competitive level by a hypothetical monopolist supplier of the products (at those locations) is profitable. A relevant antitrust market generally has both a product and a geographic dimension. Applying a standard approach for market definition,[12] I conclude that LME warehouse services are a relevant product market and that the geographic markets for LME warehouse services are regional: North America, Europe and Asia (excluding China).[13]

16. Because the production of physical aluminum in any given time period will not necessarily match current demand for aluminum in that time period, there is demand for storage (or warehouse) services from both producers and users of aluminum. There are two basic types of aluminum warehouse services: LME warehouse services and non-

---

[11] The presence of some degree of market power is common in most industries and not particularly notable from an antitrust perspective. Virtually all markets, except theoretical ones (e.g., the canonical "perfectly competitive" market discussed in economics textbooks), are characterized by firms which possess some degree of market power, however slight. For present purposes, when I refer to market power I mean sufficient market power to impact competition in a meaningful way. See, e.g., Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, 2005, Fourth Edition, New York: Pearson Addison Wesley, pp. 642-643.

[12] There are various approaches used by economists to define relevant antitrust markets. The Horizontal Merger Guidelines issued by the U.S. Department of Justice and the Federal Trade Commission set forth one standard approach often used by economists and other analysts. Under the Hypothetical Monopolist test a relevant product market is a product or group of products such that a hypothetical profit-maximizing firm that was the only present and future seller of those products ('monopolist') likely would impose at least a 'small but significant and nontransitory' increase in price.

[13] China's aluminum industry is considered isolated from the rest of the world and typically not included in analyses of the global marketplace for aluminum. It has been said that "China ... exists in a different aluminum universe, one that has little bearing on what happens in the rest of the world". See http://www.scmp.com/business/commodities/article/1582399/china-may-dull-shine-aluminium-profits.

LME warehouse services. For purposes of assessing the definition of the relevant product market in this case, a key question is whether the latter are close substitutes for the former: if non-LME warehouse services are not close substitutes for LME warehouse services, then they properly are not included in the same relevant product market.

17. LME warehousing was developed and exists in part to support the marketplace for financial transactions related to physical aluminum. This financial marketplace is used for hedging risk (and for other purposes) and therefore LME warehouses serve a distinct role in the industry.  Historically, if an aluminum purchaser needed aluminum in a particular period of time, that aluminum purchaser could buy an LME warrant contract, take it to physical delivery, and then take possession of the warranted aluminum. This physical delivery option has been viewed by the LME as an important component of the LME system.[14]

18. An LME aluminum warrant is a standardized document issued by an LME-certified warehouse, upon delivery of a lot (25 metric tons) of aluminum into the LME warehouse. LME warrants are bearer documents vesting in the bearer the right of possession of that particular lot of aluminum, at a specified warehouse location. In part because they are standardized, LME warrants are freely tradable and are the financial instruments that underpin LME aluminum futures transactions. Under LME rules, warranted aluminum must be stored in LME-approved warehouse locations and only warranted aluminum from LME warehouses can be used to settle LME futures contracts.[15]

19. There are three main components of LME warehouse services: load-in (receiving aluminum at the warehouse), storage, and load-out (loading out aluminum from the warehouse). LME warehouse services are priced primarily based on marketing incentives, daily rental rates, and load-out (or "FOT") charges.

20. The price elasticity of demand for aluminum is estimated to be inelastic (meaning the quantity demanded is relatively insensitive to changes in price).[16] Demand for LME

---

[14] https://www.lme.com/en-gb/pricing-and-data/pricing/convergence/.

[15] https://www.lme.com/en-gb/sitecore/content/site/site-global-content/glossary/w/warrant/.

[16] One estimate of the long run "price elasticity is about -0.7 and -0.8 in the case of aluminum demand". See https://www.dallasfed.org/assets/documents/research/papers/2014/wp1413.pdf.

warehouse services is derived from demand for aluminum sold through the LME. Because the LME warehouse services component has generally been a small fraction of the cost to a warrant holder,[17] LME warehouse services will have an even more inelastic price elasticity of demand (with a demand elasticity closer to -0.1 under certain assumptions).[18]  Because demand for LME warehouse services is inelastic, if a hypothetical monopolist supplier of such services were to impose a small, non-transitory increase in the price of those services above the competitive level, that would be unlikely to cause sufficient numbers of buyers to switch away so as to render such a price increase unprofitable.

21. If non-LME warehouses were good substitutes for LME warehouses, then an increase in the price of LME warehouses above the competitive level would be expected to cause substitution to non-LME warehouses in sufficient volumes so as to render the price increase unprofitable. Yet, presumably in part because of the increased value from the tradability of aluminum warranted on the LME system, rental rates for LME warehouses in the U.S. have been about three to five times more expensive than non-LME rental rates during the relevant period.[19] This persistent and substantial differential in rental rates demonstrates that market participants did not find these two different warehousing options to be good substitutes.[20] With such price differences, it is unlikely that a small but

---

[17] During the relevant period, the price of an aluminum warrant generally varied between about $1,500 and $2,000 per metric ton. The cost to load the aluminum for delivery has generally been in the range of $30 to $40 per metric ton. GS-METRO-00029517 2008-2009.xls; GS-METRO-00029575 2009-2010.xls; GS-METRO-00000016 2010-2011.xls; GS-METRO-00000437 2011-2012.xls; GS-METRO-00001883 2012-2013.xls; GS-METRO-00002891 2013-2014.xls; GS-METRO-00635116 2014-2015.xls; and GS-METRO-00693610 2015-2016.xls. LME warehouse rent for a year has been roughly 10 percent of the price of aluminum.  As a result, relatively small changes in the prices of LME warehouse services will have relatively small effects on the costs of holding LME warrants.

[18] A one percent change in the price of LME warehouse services would have a small effect on the overall price of LME aluminum, and roughly equal to the share of the warehouse services price of the whole (less than 10 percent in the case of LME rent for a period of one year). The elasticity of demand for LME warehouse services would be less than one tenth of the elasticity of aluminum. See, e.g., Sec IV.V.5. Pigou, Arthur C. The Economics of Welfare. London: Macmillan and Co. 1932. http://www.econlib.org/library/NPDBooks/Pigou/pgEW58.html.

[19] Off-LME facility rents are substantially lower than LME approved rates.  At a time when LME warranted rates were $0.41 per metric ton per day in 2011 (GS-METRO-00490657), and rising gradually to $0.51 per metric ton per day in 2014 (GS-METRO-534203), Red Kite was offered off-warrant rents of $0.08 per day, per metric ton in 2011 and 2012.  (GS-METRO-00005524).  Glencore appears to have off-warrant rates of $0.06 per MT in 2012.  (GS-METRO-00009828 and GS-METRO-00009810).  In a 6/04/2013 email (GS-METRO-00009385), Metro appears to offer an (unnamed) customer a rate of $0.10 per MT for off-warrant storage.

[20] This comparison is based on the data available given the limited discovery to date.  The LME rental rates are full rates as filed with the LME, while the non-LME rental rates are associated with specific transactions. I understand that warehouse operators sometimes make incentive payments (e.g., "freight allowances") to keep existing business or to obtain new business (see, e.g.,

significant increase in LME warehouse rents above competitive levels would drive enough customers to switch to non-LME warehouses to render such a price increase unprofitable.[21] This supports the conclusion that non-LME warehouse services are not part of the relevant market containing LME warehouse services.

22. Moreover, local competitive conditions are apparently not particularly relevant in pricing LME warehouse services. Defendants' published rental rates have been fairly uniform across warehouse locations around the world. For example, in 2012, Metro charged $0.45 per day per metric ton for LME warehouse rent in nearly every city and country in which it operated.[22] Other Defendants have similar patterns in rents.[23] The fact that published LME rental rates have generally not varied with local conditions implies that the competitive impact of non-LME warehouse alternatives is limited (assuming that non-LME warehouses are not offered on identical terms in every city with LME warehouses). This also supports the conclusion that non-LME warehouse services are not part of the relevant market containing LME warehouse services.

23. As to the geographic dimension of the relevant market for LME warehouse services, there are both global and regional aspects to LME warehouse services. The fact that local competitive conditions are apparently not particularly relevant in pricing LME rents implies that global conditions, such as the profit opportunity between LME spot and future pricing, are more relevant in setting LME rental rates than local geographic conditions.[24] However, LME warehouses in different locations will substitute for one another to some extent. For example, if the price of LME warehouse services in one city were to increase by a not insignificant amount, purchasers of those services may switch to a different (nearby) LME warehouse. In 2009, one estimate of the cost of shipping a metric ton of aluminum 500 miles by truck was about $58 per metric ton, although

---

GS-METRO-00628945). I understand that these payments are often one-time lump sum payments, so on that basis would not affect daily rental rates or the specific comparison I make here.

[21] I do not, at this point, have information on non-LME rents outside the U.S.

[22] GS-METRO-00001882.

[23] GS-METRO-00001882.

[24] For example, in the Knittel and Pindyck model, the rental price reflects the effects of spot and future prices. Christoper R. Knittel and Robert S. Pindyck, The Simple Economics of Commodity Price Speculation, MIT Center for Energy and Environmental Policy Research, April 2013, CEEPR WP 2013-006, p. 13.

shipping via other modalities could be less.[25]  If a local monopolist of LME warehouse services were to raise rental prices substantially, a warehouse customer might reasonably opt to pay to ship to another location depending on how long the aluminum was expected to be stored and other factors.

24. Purchasers of physical aluminum use regional references in their pricing: for North America the MW-TRP or MWP is used in pricing and in Europe the Rotterdam Premium is used.[26]

25. For purposes of analyzing the allegations in this case, I use regional geographic markets, but my key economic conclusions are not sensitive as to whether there are multiple regional relevant geographic markets or a single global market.  As such, I conclude that LME warehouse services are a relevant product market and that the relevant geographic markets are North America, Europe and Asia (excluding China).

## B. Common Economic Evidence Shows that Defendants Had the Ability and Motive to Collude

26. In economics, collusion is an agreement among a group of competitors to limit competition among members of the group.[27]  Because collusion is illegal in many contexts, colluding firms generally have strong economic incentives to hide their collusive activities from detection by outside observers.  As direct observation of collusive activity is therefore often difficult, economists often study characteristics of a market which may indicate that: i) the market is susceptible to collusion; and/or ii) firms are acting in ways that suggest collusion.

27. One necessary element for effective collusion is that the group of firms acting together must have an ability to profitably alter market outcomes away from competitive outcomes.  In other words, the group of conspirators must together have market power in one or more relevant markets in order to implement an effective conspiracy.  The presence of collective market power, then, can be an inducement for firms to collude and

---

[25] See, e.g., GS-METRO-00298894, p. 84.

[26] Gilbert Report, para. 13.

[27] Robert H. Porter & J. Douglas Zona, *Collusion*, in 2 Issues in Competition Law and Policy 1069 (ABA Section of Antitrust Law 2008).

suggests that any collusion would be more likely to succeed in altering the competitive process.

28. Economic theory and the evidence in this case indicate that Defendants collectively had substantial market power.

29. High market share is often an indicator of market power. Related, a "dominant" firm (or a set of firms that together can exercise "dominance") has considerable power over pricing (or other terms of trade) in an industry and therefore has a not insubstantial degree of market power. There is no bright line, but in assessing allegations of collusion a group of firms with more than about 35-40 percent market share should be carefully evaluated in terms of dominance and market power.[28]

30. For purposes of computing market shares, I have used global shares of LME warehouses. For purposes of determining the participants in each of the regional LME warehouse services markets, I consider current LME warehouse operators located throughout the globe. These firms are either currently operating in each of the relevant geographic markets or could fairly easily enter each of those markets.[29] I use warehouse counts to compute market share, in part because each warehouse can be expanded fairly quickly and easily, so that current capacity is not the best measure of competitive significance.[30]

31. The Defendants' collective global market share is well above the 35 to 40 percent level. There are over 600 LME warehouses in 35 cities around the globe,[31] and Defendants collectively own a majority of these facilities. Glencore Group (Pacorini) owned about 23 percent of LME warehouses worldwide in 2013; GS Group (Metro) owned about 15

---

[28] See, e.g., F. Scherer, Industrial Market Structure and Economic Performance, 56 (2d ed. 1980), p. 232, as cited in Richard A. Posner & William M. Landes, "Market Power in Antitrust Cases ," 94 Harvard Law Review 937 (1980), note 15; see also Tenth Report on Competition Policy, Commission of the European Communities, 1980, p. 103.

[29] Horizontal Merger Guidelines, Section 5.1, pp.15-16. https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

[30] Presentation to the Court, E5SMALUF_4pp.pdf, pp. 21-22. (Case 1:13-md-02481-KBF Document 738 Filed 04/09/15).

[31] Note that in references to the world or global, I am generally referring to conditions outside China. In 2013 there were 739 warehouses ( GS-METRO-00345080 ) and in 2016 there were 624 https://www.lme.com/trading/warehousing-and-brands/warehousing/approved-warehouses (as of 1-28-2016).

percent; and JPM Group (Henry Bath) owned about 13 percent.[32]  In the U.S., Defendants
owned over 83 percent of LME warehouses in 2013.[33]  See Table 1 below.

### Table 1: LME Market Share by Number of Approved Warehouses

| | Market Share by Region | | | |
|---|---|---|---|---|
| Company Name | Asia | Europe | USA | World |
| **Defendants** | | | | |
| Pacorini | 28.0% | 18.8% | 29.0% | 23.3% |
| Metro | 16.5% | 2.3% | 45.0% | 15.3% |
| Henry Bath | 10.4% | 15.6% | 9.5% | 13.0% |
| Defendant Total | 54.9% | 36.7% | 83.4% | 51.6% |
| | | | | |
| **Non-Defendants** | | | | |
| Steinweg | 15.9% | 36.4% | 3.6% | 24.1% |
| NEMS | 3.7% | 9.3% | 1.8% | 6.5% |
| CWT | 9.8% | 2.8% | 1.8% | 4.2% |
| All Others (22) | 15.9% | 14.8% | 9.5% | 13.7% |
| Non-defendant Total | 45.1% | 63.3% | 16.6% | 48.4% |

Source:  GS-METRO-00345080

Notes:    1.  "All Others" consists of 22 other non-defendant companies who have less than 3%
                worldwide market share.
          2.  Data consists of "Active Listed Warehouses" by the LME as of 05-31-2013

32. Entry conditions are also relevant in assessing collective market power in the context of
collusion. As a matter of economics, when entry is timely, likely and sufficient in its
magnitude, character and scope, incumbent firms (even if they attempt to act collusively)
typically cannot exercise market power.[34]

33. There are barriers to entry into the market for LME warehouse services.  The LME has an
approval process for new countries, operators, warehouses, and sheds.[35]  The LME
acknowledges that it takes some time for approval of new operations.[36]  Metro
acknowledges that there are "significant barriers to entry for new players"[37] and "as of

---

[32] GS-METRO-00345080.

[33] GS-METRO-00345080.

[34] See, e.g., Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, 2005, Fourth Edition, New York: Pearson
Addison Wesley, p. 76; and J. Church and R. Ware, Industrial Organization: A Strategic Approach, 2000, Irwin, McGraw-
Hill, p. 430.

[35]  https://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/approval-process/.

[36] Presentation to the Court, E5SMALUF_4pp.pdf, pp. 21-22. (Case 1:13-md-02481-KBF Document 738 Filed 04/09/15).

[37] GS-METRO-00298894, p. 4.

today significant impediments to new entrants to the marketplace maintain because of: existing relationships (with producers, traders, financial institutions), logistical and procedural know-how, longstanding-relationship with the LME".[38]

34. While it was generally difficult for new players to enter the market for LME warehouse services, it appears it was generally easier for existing suppliers to expand operations – thus existing suppliers are more competitively significant than their current shares in particular geographic areas might suggest. As displayed in Table 2 below, I observe 18 occasions where a new firm began operating in a new city in the U.S. from 2009 to 2014 (where I have data on the issue). Of those 18 occasions, in all but one, the expansion was from an existing LME warehouse operator. Globally, there was more outside entry, but this is in part explained by the fact that the LME was expanding into Asia and was opening new locations in new countries.

#### Table 2: Entry into LME Warehouse Locations 2009-2014

| | Number of Entries into a New Location from an Established Competitor | Number of Entries into a New Location from a Brand-New Competitor | Total Number of New Entries into a New Location |
|---|---|---|---|
| US | 17 | 1 | 18 |
| Worldwide | 64 | 12 | 76 |

Source: GS-METRO-00029569, GS-METRO-00490655, GS-METRO-00000018, GS-METRO-00490657, GS-METRO-00001882, GS-METRO-00334112, GS-METRO-00534203

Note: An entry into a new location is defined as a company entering a city that it had not previously operated in.

35. Because entry is relatively difficult for new entrants into the LME warehouse services market, this is (all else equal) conducive to the exercise of collective market power, which, in turn, makes collusion more likely to occur and more likely to be effective.

36. High profit rates can be evidence of collective market power. GS Group's documents indicate profit margins of about 60 percent or more on LME warehouse services.[39] GS Group's documents also suggest an average variable cost as low as 0.8 cents per metric

---

[38] GS-METRO-00298894, p. 10.

[39] GS-METRO-00298894, p. 55.

ton per day, for which they charge a price of 35 cents per metric ton per day, consistent with high margins over marginal cost.[40]  These data are in the range which would typically be consistent with the existence of collective market power.

37. Other economic evidence also suggests that Defendants have economic incentives to collude and the ability to further exercise collective market power by acting together.  In the context of merger investigations, U.S. antitrust enforcement agencies often use an index of incentive to raise price with coordinated effort, known as the "GUPPI" (gross upward pricing pressure index).[41]  The GUPPI is an index indicating when two firms apply competitive pressure against one another.  The same economic principles which support the use of the GUPPI in analyzing mergers also apply in evaluating coordinated actions more generally, such as the inquiry here.[42]  A GUPPI of more than 5 percent is generally indicative of a potentially economically important incentive to raise price when acting in a coordinated fashion.[43]  Here the GUPPI for Glencore Group (Pacorini) prices with respect to GS Group (Metro) prices is about 16.2 percent[44] (but varies depending on the specific scenario used).  The GUPPI for JPM Group (Henry Bath) prices with respect to GS Group (Metro) prices is smaller but still above the 5 percent threshold.[45]  These statistics indicate both incentives and ability to collude among the Defendants.

38. For purposes of assessing the alleged misconduct in this case, it is useful to understand where the aluminum used to settle LME futures contracts was stored.  As described above, the LME warehousing system was designed in part to support the trading of

---

[40] GS-METRO-00298894, p. 24.

[41] "GUPPI, the new horizontal merger guidelines and assessing potential competitive effects," J. Douglas Zona and Chris Pleatsikas, *Australian Journal of Competition and Consumer Law*, Vol. 20/2 June 2012.

[42] In this context, I am looking only at the economic incentives within LME warehouse services markets, but as there may be other gains in other markets which are not considered by these statistics, this may make these calculations conservative.

[43] See, e.g., Salop, Moresi and Woodbury, explaining that "a GUPPI of less than 5% would be reasonably treated as evidence that 'the value of diverted sales is proportionately small' and hence that the proposed merger is unlikely to raise unilateral effects concerns" Steven C. Salop, Serge X. Moresi & John Woodbury, CRA Competition Memo, Scoring Unilateral Effects with the GUPPI: The Approach of the New Horizontal Merger Guidelines 2 (Aug. 31, 2010), available at http://crai.com/sites/default/files/publications/Commentary-on-theGUPPI_0.pdf.

[44] The formula is Glencore share (23 percent) divided by one minus GS Group share (85 percent) times Glencore Group gross margin (using 60 percent) times the ratio of prices (which are identical).

[45] The formula is JPM Group share (13 percent) divided by one minus GS Group share (85 percent) times JPM Group gross margin (using 60 percent) times the ratio of prices 43 to 45.

aluminum futures.  And if the parties to such contracts go to physical settlement, aluminum will be delivered from a specific warehouse.

39. During the relevant period, as an LME-commissioned economic study concluded, as substantial queues began to form in certain LME warehouses controlled by Metro and Pacorini, the warrants used to settle LME contracts increasingly became only those for aluminum stored in those warehouses with queues because that aluminum was the least valuable from the perspective of the warrant seller (because it was stuck behind the long queues).[46]  By September 2013, about 99 percent of the warrants used for settlement of aluminum futures contracts were in locations with queues—primarily Metro's Detroit warehouses and Pacorini's Vlissingen warehouses.[47]

40. As a result, any party seeking to acquire aluminum via the use of LME futures contracts would have been almost certain to receive aluminum stored in Metro's Detroit or Pacorini's Vlissingen warehouses. In either instance, because of the long queues at these locations, essentially any purchaser of an LME futures contract would be forced to wait upwards of two years (by the end of the relevant period) to access the aluminum.

41. Metro's Detroit and Pacorini's Vlissingen LME warehouses thus effectively controlled the rate of flow of all aluminum out of the LME warehousing system. As described below, the Defendants apparently coordinated their activities to profit from these positions.

## III. ECONOMIC EVIDENCE SUPPORTS THE CONCLUSION THAT DEFENDANTS ENGAGED IN COLLUSIVE BEHAVIOR IN THE MARKETS FOR LME WAREHOUSE SERVICES

42. Given the incentives and ability to collude described above, the economic evidence indicates that Defendants communicated and reached understandings with one another about LME warehouse services.  I have reviewed Plaintiffs' allegations (outlined above

---

[46] Summary Public Report of the LME Warehousing Consultation Pursuant to LME Notice 13/208:A201:W076 November 2013. Available at https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Public%20Report%20of%20the%20LME%20 Warehousing%20Consultation.pdfPublic report ("LME Public Report"), p. 32.

[47] LME Public Report, Figure 15, p. 22.

in the Introduction) in relation to the economic evidence in this case (some of which I outline below). This evidence supports the conclusion that Defendants worked together to exercise collective market power and reduce competition in the markets for LME warehouse services by increasing queue lengths, as well as through other conduct.[48]

43. Early 2010 was a period of substantial change in the supply of LME warehouse services as three of the largest four firms changed ownership. Metro was acquired by Goldman Sachs in February 2010; JP Morgan bought the metals trading business of RBS Sempra Commodities, which owned Henry Bath, in July 2010; and Glencore acquired the metals warehousing unit of Italy's Pacorini in September 2010.[49]

44. As a result of these transactions, the majority of LME warehouses became controlled by entities that were integrated across both trading and LME warehousing. An integrated firm has economic incentives to maximize total profits across warehousing and trading.

45. As a general matter, these kinds of industry changes would be expected to alter the incentives to compete in the provision of LME warehouse services and therefore could be the impetus to alter the existing competitive processes in the markets for LME warehouse services.[50]

46. The economic cost of storing additional LME aluminum at an existing warehouse that is not fully utilized (or which could be fairly easily expanded) appears to be low (as noted above, e.g., with respect to GS Group). As a consequence, buyers of LME warehouse service who also operate their own LME warehouses will often have strong economic incentives to either move aluminum to their own facilities, or to renegotiate existing rental rates to reflect the availability of low cost alternative storage options.

47. By late 2010, the Defendants had unilateral financial incentives to renegotiate their LME warehouse services purchases to take advantage of lower cost alternative storage

---

[48] Queues are created when more aluminum is ordered to be loaded out than is actually physically out loaded. When more aluminum is requested to be loaded out than will be actually loaded out in a day, a backlog is created. The queue length measures the number of days it would take to clear the backlog.

[49] In addition, commodities trading firm Trafigura acquired UK-based NEMS in March 2010. See http://www.reuters.com/article/us-lme-warehousing-idUSTRE76R3YZ20110729.

[50] See, e.g., Salop, Steven C. and O'Brien, Daniel P., "Competitive Effects of Partial Ownership: Financial Interest and Corporate Control", Antitrust Law Journal, pp. 559-614 (2000). http://ssrn.com/abstract=192629.

options.[51]  If Defendants were not engaged in the alleged conspiracy, from an economic perspective I would have expected Defendants to act on these unilateral incentives to seek lower cost storage options and, as such, to take actions which would have prevented (or at least substantially mitigated the formation of) LME warehouse queues. Put somewhat differently, in a competitive environment I would have expected Defendants to act in various ways to "beat the queue".[52]  Instead, for example, Glencore Group acquiesced in important ways from competing to beat the queue and appeared to help GS Group build the queue in Detroit.  More generally, as I explain below, the Defendants engaged in a series of transactions among themselves and with third parties which were designed and had the effect of building and/or maintaining LME warehouse queues.

48.  By late 2010, the warehouse operators in Detroit and Vlissingen feared a "warehouse war"[53], presumably as a result of the unilateral financial incentives outlined above, which would have required them to "re-compete" to keep their existing business.  But rather than re-compete, the Defendants engaged in communications and conduct that are consistent with an agreement to avoid a "warehouse war" and are inconsistent with these firms acting unilaterally in their own economic interests.  The following exchange reflects that the senior executives of the two Defendants recognized this apparent dynamic:

In August 2010, GS Group (Whelan) said it will have to:

> "[remove aluminum from Glencore Group], compete with [Glencore Group] for premium sales and drive [rates of returns] downward by competing with all warehouses to tie up stock.  Warehouse rents will dwindle … not necessarily

---

[51] See, e.g., email from Mario Casciano, Pacorini, to Michael Whelan, Metro (Aug 12, 2010), GS-METRO-00237899 ("Oh, and let me give you another twist…G, bought some material in our warehouse from another client of ours. That particular client was paying us .12 cents per mt per day, as soon as G bought it, I got a call that said, either you charge us 6c or we move it").

[52] "Beat the queue" is a phrase meant to describe a competitive process where warehouse operators find ways to best serve their customers and in so doing prevent (or defeat) the formation of queues (which, like higher rents or slower loadout rates, are not generally in the customers' interests and represent an avenue for competition on the merits).

[53] See, e.g., email from Barry Feldman, Red Kite, to Michael Whelan, Metro (Aug. 5, 2010), GS-METRO-00049890; or email from Chris Wibbelman, Metro, to Scott Evans, Goldman Sachs (Oct. 6, 2010), GS-METRO-00031544.

profitable to destroy a business model that is going to throw off 150 [million] large this year."[54]

Glencore Group (Casciano) responded two days later:

> "I understand where you are coming from, and believe me nothing personal. The only thing I would say to you, let's talk about and see if I can rise [sic] some awareness and have this stopped. … I think that we are both exposed and going into a bloody war, maybe leaves no winner but few hurt people. Is there another way we can approach?? … I just think it could be messy and we get a bounce [sic] of losers. Let me know if I can do something…."[55]

In response, GS Group (Whalen) stated:

> "I am fine with you taking a stab at convincing Glencore to stop de-stocking us. We have already approached with offers of varying degrees to try and come to an agreement to make things stop. I know this isn't coming to you in Detroit at the moment but what about down the road when they want to re-warrant the material? Clearly they will use the warehouse company they own. It is a shame that things may deteriorate into a situation where nobody—least of us, wins. But I also don't see us sitting back and continuing to let others who now own warehouse companies to destock us without sending some sort of response back. Let's just keep the lines of communication open."[56]

Glencore Group (Casciano) replied that the:

> "Line of communications are wide open, as you know, I regard you as a friend before as a competitor, and when I know something that you should know, I will let you know for sure."[57]

---

[54] Email from Chris Wibbelman, Metro, to Michael Whelan, Metro, (Aug. 4, 2010), GS-METRO-00117770.

[55] Emails from Mario Casciano, Pacorini, to Michael Whelan, Metro, (Aug. 12, 2010), GS-METRO-00237900.

[56] Email from Michael Whelan, Metro, to Mario Casciano, Pacorini, (Aug. 13, 2010), GS-METRO-00237899-900.

[57] Email from Mario Casciano, Pacorini, to Michael Whelan, Metro, (Aug. 13, 2010), GS-METRO-00237899.

49. From an economic perspective, the communications above do not appear to reflect firms competing based on unilateral incentives, but rather appear to reflect invitations to collude rather than compete. Although discovery to date on this point has been limited, within days of this email communication, Glencore Group's conduct changed to be consistent with agreement and not competition. Specifically, Glencore Group apparently agreed to stop its ongoing efforts to remove LME aluminum from storage in GS Group's LME warehouses, by re-warranting its previously cancelled aluminum and halting its removal of aluminum from GS Group's warehouses.[58]

50. Glencore Group's decision to avoid a "warehouse war" and to keep its aluminum stocks in GS Group's warehouses was a major economic concession. Glencore Group gave up increased profits, and acted against their unilateral economic interests, by paying higher prices for LME warehouse services. Thus, by keeping its aluminum stocks at GS Group's LME warehouses, Glencore Group acquiesced in important ways from competing to beat the queue.

51. The economic evidence suggests that GS Group and Glencore Group came to other arrangements to avoid competition and divide the markets for LME warehouse services. For example, in November 2011, GS Group and Glencore Group agreed to swap warehouse buildings, which helped consolidate GS Group's position in Detroit.[59] GS Group's documents indicate an apparent understanding regarding the geographic allocation of GS Group in the U.S. and Glencore Group in Europe: "[Glencore Group (Pacorini)] have maintained all along that they have no desire to nitpick us in Detroit otherwise Glencore would have done this long ago. Besides they know we would retaliate incrementally in some place like Vlissingen. I will call [Glencore Group (Pacorini)] Mario…."[60] These apparent arrangements were not limited to GS and Glencore Group. For example, in August 22, 2010 Metro's CEO explained to Goldman Sachs executives

---

[58] See email from Chris Wibbelman, Metro, to Jacques Gabillon and Greg Agran, Goldman Sachs (Aug. 22, 2010), GS-METRO-00483896-97 (explaining that Metro was then "being destocked currently by Glencore (before they re-issued), JPM/Sempra, and Trafigura.").

[59] GS-METRO-00022433.

[60] GS-METRO-00005231.

that "Metro has a problem if Goldman's physical desk … takes any metal from any of Metro's competitors…Especially ones owned by major traders."[61]

52. At the same time that GS Group reached apparent agreements with Glencore Group, they also appeared to be looking to protect themselves from competition from JPM Group.  By October 2010, GS Group (Metro and Goldman) appeared to have reached an agreement with JPM Group (Henry Bath). JPM Group appears to have conceded certain business to GS Group, apparently counter to its unilateral economic interests, by not competing to retain LME warehouse services business during a period of increasing prices. Specifically, over the next several years, as LME warehouse rents were generally increasing, JPM Group's (Henry Bath) LME aluminum warehouse stocks dwindled,[62] even as its parent company amassed more than 3.3 million metric tons of aluminum (worth around $7 billion).[63]  Traders, whose profit margins are reduced by increased storage costs, have strong economic incentives to obtain the lowest rental costs. And the most likely locations for cheapest rent were their own warehouses. Despite these unilateral economic incentives, JPMorgan Group did not engage in a significant cancellation at GS Group's Detroit warehouses until 2012, well after the queue had already been created.[64]

53. Again, the apparent acquiescence of JPM Group was a major economic concession. Systematic queues for load-out of aluminum from LME warehouses reached unprecedented levels in 2010.[65]  After 2010 it took up to more than 650 days between the time a lot was taken off-warrant and subsequently loaded for delivery.[66]

54. Queues can be lucrative to the warehouse operator, in part because they provide certainty for rental income by "locking in" customers for a period of time. For example, in 2012,

---

[61] Email from Chris Wibbelman, Metro, to Jacques Gabillon and Greg Agran, Goldman Sachs, (Aug. 22, 2010), GS-METRO-0043896-97.

[62] http://www.reuters.com/article/jpmorgan-commodities-henrybath-idUSL2N0J90HZ20131127.

[63] JPMS-ALI-0387656.

[64] However, JPMorgan did remove its materials from Metro's New Orleans warehouse and subsequently engaged in significant cancellations and load outs from Detroit.

[65] GS-METRO-00000817.

[66] http://www.reuters.com/article/lme-warehousing-home-idUSL6N0RG2KQ20140915.

there were over 1.4 million metric tons of aluminum in LME warehouses in Detroit.[67] At that point the queue was about 250 days in Detroit.[68] Holding all else equal, 1.1 million metric tons could not leave the warehouse until after 250 days, even if it were requested to load-out at the beginning of the period. The rent at GS Group's warehouse was 45 cents per day per metric ton. Simple calculations suggest that the rent generated while in the queue would be about $134 million,[69] in addition to any amounts collected before the aluminum is ordered to load out. These simple calculations do not reflect any rent incentives that may have been in effect.

55. As discussed below, the existence of a queue distorts the pricing relationships between the LME price, the various all-in prices in different locations, the MWP and other local premiums, as well as futures prices, which can benefit traders and other entities with long positions in aluminum. More generally, advance knowledge of changes in premiums or prices can also convey other trading advantages. Given my review of the materials produced in this case to date, the full extent of Defendants' aluminum positions during the relevant period is not clear, but it does appear that the Defendants were large holders of aluminum.[70]

56. Along with the apparently coordinated actions described above, GS Group and the other Defendants engaged in various transactions that were designed to prevent aluminum from leaving their LME warehouses by building up the queues of aluminum waiting to be loaded out of the warehouses. Defendants thus worked together to manage and increase the lengths of the queues in both Detroit and Vlissingen.

---

[67] United States Senate, Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs, Majority and Minority Staff Report, 113th Cong., Wall Street Bank Involvement with Physical Commodities (released Nov. 20, 2014), available at http://www.hsgac.senate.gov/download/report-wall-street-involvement-with-physical-commodities ("Senate Report"), p. 187.

[68] Gilbert Report, Appendix A at p. 41 (estimating queue of 253 days as of January 2012).

[69] Of the 1.4 million metric tons in stock in Detroit, about 375,000 metric tons could be off loaded in 250 days. About 1.0 million would pay for the whole 250 days, 1,500 metric tons pay each of 249 days, 248, days, etc. A total number of metric ton days behind the queue is therefore 250 times 1.0 million plus 1,500 times 31,125 (= 249+248+247+ … = (249+1)/(249/2)). Total metric ton days behind the queue is about 300 million. Total value of the queue is then about 45 cents per metric ton day, about $134 million.

[70] GS Group had substantial holdings. GS-METRO-00628944, GS-METRO-00729258, JPM Group [includes HJPM HSempra and "Physicals"] had substantial holdings. JPMS-ALI-0387663. Glencore purchased about 20 million metric tons of aluminum over seven years. http://www.bloomberg.com/news/articles/2012-04-22/rusal-s-43-billion-seven-year-glencore-deal-feeds-investor-feud.

57. The idea behind this so-called "queue management" ("QM")[71] strategy appeared to originate during the middle of 2010 when Robert Burgess-Allen emailed Metro's CEO Chris Wibbelman with a "Smart Ass Plan."[72] Essentially, this plan outlined a profitable way for a metal owner to work with Metro to lock in profits for both, by lengthening the Metro Detroit queue. A prototypical QM transaction places large volumes of aluminum for load-out, establishing or building a queue, and then after some time in the queue brings the aluminum back into the LME warehouse (possibly to run through the queue again at a later time). As explained further below, this initial idea expanded into a coordinated effort by the Defendants to pursue a QM strategy.

58. As this QM strategy was implemented by the Defendants, the impact of these deals on Metro's queue was substantial.  Some of the transactions were between Defendants, and some involved third parties, but again, rather than compete to beat the queue, Defendants apparently acquiesced, cooperated, or participated directly in building the queues at GS Group's LME warehouses in Detroit and/or Glencore Group's LME warehouses in Vlissingen.  The parties to the transactions benefited in numerous ways, including by increased rents for Metro, lower rents for Deutsche Bank, Red Kite, and Glencore (as they were provided inducements to enable GS Group to build the queue in Detroit), but also—and perhaps most importantly—increased values in the Defendants' holdings of aluminum in various forms.  I described some further elements of the QM strategy below.

**GS Group/Deutsche Bank**

59. Metro's first QM deal, with Deutsche Bank, began in September 2010. In seeking authority to enter the deal, Metro's CEO explained: "The big revenue source for us is not the rent we capture or lose on the shipped metal, but the amount of revenue we will earn on the metal that does not ship out as a result."[73]

60. Documents indicate that Deutsche Bank initially cancelled warrants for 100,000 metric tons.[74]  Under the deal, Metro required Deutsche Bank to cancel its warrants, join the

---

[71] GS-METRO-00218707.

[72] GS-METRO-00030837.

[73] GS-METRO-00154643.

[74] Senate Report, pp. 195-198.

queue, load the metal out of the warehouses, move its metal to different Metro warehouses in Detroit, and after a period of free rent, re-warrant the aluminum.[75]  In return, Metro provided the bank with (effective) discounts equal to "roughly 15 cents/ton/day for the period from September 15, 2010 to February 16, 2011."[76]

61. The contract mandated that Deutsche Bank request the "maximum number" of loadout positions, essentially ensuring that the aluminum in the deal would fill Metro's load-out requirement from the day the first lot of Deutsche Bank metal reached the front of the queue until all of its aluminum was loaded out, which would take more than 65 business days at the then-minimum load out rate of 1,500 metric tons per day.[77]  The impact on Metro's Detroit queue was substantial, increasing the queue from zero to about 116 days.[78]

**GS Group/Red Kite**

62. In January 2011, Red Kite (an aluminum trader) contacted GS Group (Metro) seeking cheaper rent.[79]  In contemplating their response, GS Group (Metro) executives proposed that they:

> "approach [Red Kite] with some QM strategy without actually telling them it is a QM strategy? Is there a mechanism we could show them where they would: ship out 75kmt-100kmt over a period of time, booking 1500 mt per day, material would ship to another building in Detroit and stay off warrant, we store for $.10, and they have to put back onto warrant at some point in time?"[80]

63. As part of the deal, Red Kite cancelled LME warrants representing about 100,000 metric tons of aluminum; the first half was cancelled on February 10, 2011 and the second half

---

[75] GS-METRO-00000309.

[76] Senate Report, p. 197.

[77] The Defendants also coordinated on the rate at which they loaded out aluminum from their warehouses. Rather than compete by increasing loadout rates, they coordinated at the focal point of 1,500 metric tons per day.

[78] Harbor Aluminum, "HARBOR's estimated aluminum load-out waiting time in LME D[etroit Warehouses]," PSI-HarborAluminum-03-000004.pdf.

[79] Barry Feldman, Red Kite, to Michael Whelan, Metro, (Jan. 24, 2011), GS-METRO-00218707-708.

[80] Email from Michael Whelan, Metro, to Robert Burgess-Allen, BAP, and Chris Wibbelman, Metro, (Jan. 26, 2011), GS-METRO-00055677; see also Emails between Michael Whelan, Metro, and Robert Burgess-Allen, BAP, and Chris Wibbelman, Metro, (Feb. 3, 2011), GS-METRO-00055975-976.

cancelled the next day.[81]  The impact of the GS Group/Red Kite transaction on the GS Group (Metro) Detroit queue was to increase the queue length to 162 days.[82]

64. This deal was described internally a year later as a deal designed to "Queue Block".[83] Metro's Whelan later asked Metro's CEO, Wibbelman, "Should we be using 'queue block' in email?", to which Metro's CEO replied, "No."[84]

**GS Group/Glencore Group**

65.  The GS Group-Glencore Group QM deal arose from several interconnected agreements. While I understand that discovery on this deal has been limited to date, the deal appears to have involved the following general terms:[85]

- Glencore agreed to warrant 50,000 metric tons of aluminum to be loaded out of a Detroit Metro warehouse in May or June 2013; in exchange for placing that same aluminum back on warrant in another Detroit Metro warehouse, Metro paid Glencore a cash incentive of $198 per metric ton.[86]

- Glencore agreed to place between 25,000 and 75,000 metric tons of new aluminum on warrant in a Detroit Metro warehouse, in exchange for a cash incentive of $198 per metric ton.[87]

---

[81] GS-METRO-00473645 and GS-METRO-00473718; see also GS-METRO-00237065. As part of the deal, GS Group (Metro) — not Red Kite — selected which warrants were to be cancelled and loaded out.  (Email from Gabriella Vagnini, Metro, to Chris Wibbelman, Metro, et al., (Feb. 22, 2012), GS-METRO-00071621, at 622-623.)  I understand that it is unusual for a warehouse operator to make these choices rather than the aluminum owner.  By allowing GS Group (Metro) to select the specific warrants to be cancelled, Red Kite appears to have acknowledged that it had no specific intention to actually take delivery of the aluminum.  In the deals that followed, however, GS Group (Metro) elected to not identify the warrants to be cancelled because "if we choose the lots it could lead back to us that we had a hand in this when in actuality we did a deal on material that was moving off warrant." Email from Michael Whelan, Metro, to Chris Wibbelman, Metro, (Feb. 23, 2012), GS-METRO-00071549.

[82] Harbor Aluminum, "HARBOR's estimated aluminum load-out waiting time in LME D[etroit Warehouses]," PSI-HarborAluminum-03-000004.pdf.

[83] Email from Gabriella Vagnini, Metro, to Chris Wibbelman, Metro, et al., (Feb. 22, 2012), GS-METRO-00071621, at 622-623.

[84] Emails between Michael Whelan, Metro, and Chris Wibbelman, Metro, et al., (Feb. 22, 2012), GS-METRO-00071621.

[85] See GS-METRO-00027606 (deal terms, conditions, and structure); GS-METRO-00009839 at 40 (same); GS-METRO-00009809 (same); GS-METRO-00089383 (same). *See also* GS-METRO-00284561 and GS-METRO-00212888 (E-mail exchange between Whelan and Glencore's Matthew Lucke March 28-31, 2013 tending to confirm that the deal was initiated by Metro); GS-METRO-00090092 (E-mail exchange between Whelan and Wibbelman re same); GS-METRO-00212949 (E-mail from Whelan dated April 2, 2013 re same); GS-METRO-00090225 (internal Metro e-string dated April 19, 2013: "Michael wants to set specific warranting dates for DET-1524S); GS-METRO-00176972 (Internal Metro e-mail exchange summarizing Detroit inbound and outbound traffic as of April 12, 2013). Burgess-Allen was involved in the deal negotiations as well, acting as a "liaison". *See* GS-METRO-00284582; GS-METRO-00214039.

[86] See June 21, 2014 Glencore Ltd. invoice to Metro, GS-METRO-00097728 (reflecting 50,046.872 metric tons at $198 per metric ton). DET 1524.

[87] See GS-METRO-00009809; GS-METRO-00009827. DET 1525.

- Glencore agreed with Metro and DB Energy to swap 41,000 metric tons of aluminum already held by Glencore in the Detroit Metro queue with DB Energy, and DB Energy agreed to re-warrant that same aluminum; as consideration, Glencore received (a) LME warrants for 41,000 metric tons of aluminum held by DB Energy in Metro Mobile and Metro Baltimore, plus (b) cash incentives from Metro of $20 per ton for the Mobile aluminum and $15 per ton for the Baltimore aluminum.[88]

- Glencore swapped 20,000 metric tons of Detroit aluminum for 20,000 metric tons of Mobile aluminum, for which Glencore received a cash incentive of $32 per metric ton.[89]

66. Elements of the agreements described above appear to make little economic sense for Metro other than its effect on the queue. Metro appeared to arrange for Glencore to receive more valuable warrants (in Mobile and Baltimore) in exchange for less valuable Detroit warrants. Metro further agreed to pay cash incentives to Glencore in return for Glencore taking possession of the more valuable warrants.

67. The net result of the deal appears to have been that Glencore received cash incentives totaling several millions of dollars and 86,000 tons of LME warranted aluminum from Metro Mobile and Metro Baltimore. Metro and Goldman received the benefits of having 186,000 tons of aluminum from Glencore—with much of it already in the Detroit Metro queue (but with a promise to re-warrant once it loaded out).

68. The impact on Metro's Detroit warehouse queue was to preserve it at its then-elevated level. Thus, during this period of early and mid-2013, the queue remained in a relatively tight range from about 400 to 460 days.[90]

**Glencore Group/JPM Group**

69. In late 2011, Glencore Group agreed to provide JPM Group with a large number of futures contracts that were set to expire in December.[91] JPM Group held those futures to

---

[88] DET-1524S and DET-1540. *See* GS-METRO-00009839; GS-METRO-00009809. *See also*, June 21, 2013 Glencore Ltd. invoice to Metro, GSPSICOMMODS0004687 (reflecting 19,949.939 metric tons at $20.15 per metric ton); Sept. 24, 2014 Glencore Ltd. invoice to Metro, GSPSICOMMODS00046875 (reflecting 21, 407.022 metric tons at $15 per metric ton).

[89] DET-1540. See GS-METRO-00009839; GS-METRO-00009809.

[90] Harbor Aluminum, "HARBOR's estimated aluminum load-out waiting time in LME D[etroit Warehouses]," PSI-HarborAluminum-03-000004.pdf.

[91] JPMS-ALI-0385694.

physical settlement, obtained the warrants, and then cancelled a large number of the warrants it received.  A large number of the warrants were in Glencore's Pacorini warehouse in Vlissingen.  This is what started the Vlissingen queue, which immediately jumped to 15 months.[92]

70. By 2012, JPM Group briefly held more than 3.0 million metric tons of aluminum, worth more than $7 billion, an amount so large that it got the bank in trouble with its U.S. banking regulators.[93]

**GS Group/JPM Group**

71. In January 2012, JPM Group cancelled warrants for 100,000 metric tons of aluminum in GS Group's Detroit warehouses,[94] increasing that queue from about 115 days to about 216 days.[95]

**Conclusion**

72. Buyers of LME warehouse services have, all else equal, unilateral economic incentives to seek the lowest prices for those services. As a consequence, from an economic perspective, if Defendants were not engaged in the alleged conspiracy I would have expected them to seek lower cost storage options where possible and, more generally, to take actions which would have prevented (or at least substantially mitigated the formation of) LME warehouse queues.  However, as outlined above, contrary to these unilateral incentives, the economic evidence shows that Defendants engaged in a series of transactions among themselves and with third parties that were designed and had the effect of building and/or maintaining LME warehouse queues.

---

[92] GS-METRO-00525635.

[93] JPMS-ALI-0387656, Senate Report, p. 8.

[94] GS-METRO-00237065.

[95] Harbor Aluminum, "HARBOR's estimated aluminum load-out waiting time in LME D[etroit Warehouses]," PSI-HarborAluminum-03-000004.pdf.

## IV. DEFENDANTS' CONDUCT IN THE LME WAREHOUSE SERVICES MARKETS INCREASED LOCAL PREMIUMS

73. LME warehouse queues, which prevent aluminum from being delivered to customers promptly, have a number of economic effects. First, queues "lock in" aluminum and thereby generate increased warehouse rental revenues for warehouse operators. Second, queues decrease the relative value of aluminum stored in LME warehouses as compared to aluminum outside LME warehouses or aluminum in LME warehouses without queues. These changes in relative value impact regional premiums for aluminum, which in turn (as I explain in the next section) impact "all-in" prices for aluminum.

74. The local premium (e.g., MWP in Detroit) which measures the difference in value between the LME Price and the local transaction reference price (e.g., MW-TRP in Detroit), increases with a decrease in value of the stored LME aluminum. Since a local queue decreases the value of the stored LME aluminum (by increasing the cost of taking delivery), a queue increases the local premium. Generally, a queue in a local area distorts the pricing relationship between the LME price and the local transaction reference price. So, for example, a queue in Detroit increases the MWP.

75. Various industry participants have recognized the fact that a queue affects the MWP. As summarized by report from the Senate investigation into the industry.

> "The Subcommittee's investigation found that, while there was disagreement about the impact of the queue on the level of the all-in aluminum price, there was broad consensus that the queue had affected Midwest Premium prices."[96]

> "Jorge Vazquez of Harbor Aluminum Intelligence, a leading industry analyst, has said that the emergence of long queues led directly to higher premiums, commenting that warehouse practices were 'being used as a platform to inorganically inflate aluminum premiums at the expense of some warehouses, banks and trading companies.'"[97]

---

[96] Senate Report, p. 180.

[97] Senate Report, p. 180.

76. Defendants' documents indicate that they were aware that the effect of their conduct would be to raise premiums. GS Group discusses the effect of increases in queue length on premiums: "This is because the LME prices a warrant for delivery, and like any other financial warrant, as the cost of taking delivery of this warrant rises, its value will decline. Rising wait times for warrant withdrawal increase the cost of delivery, which, in turn, increases the [local premium], thereby widening the spread between the physical and exchange markets."[98] GS Group (Metro's Wibbelman) explains that the "physical traders in conjunction with banks and producers hold stock and withhold metal sales to consumers in order to squeeze up the premiums.[99] Glencore Group apparently believes that when it aggressively bid new aluminum in Canada for Vlissingen, the MWP would move.[100]

77. Prof. Gilbert's econometric analysis also supports the conclusion that increases in queue length cause increases in MWP. Prof. Gilbert uses a standard statistical procedure, referred to as Granger Causality Test.[101] This procedure tests whether predictions of MWP are improved by adding prior values of Detroit queue lengths to prior values of MWP as explanatory variables. He finds that predictions of MWP are statistically significantly better when prior values of queue length are added to his model.[102] On this basis he concludes that queue length Granger-caused the Midwest Premium throughout the Class Period.[103]

## V. INCREASES IN LOCAL PREMIUMS INCREASED ALL-IN PRICES PAID BY CLASS MEMBERS

78. Given aluminum's unique properties, other non-aluminum products are not reasonably interchangeable for aluminum for many industrial applications. In other words, for many

---

[98] GS-METRO-00490613.

[99] GS-METRO-00032011.

[100] JPMS-ALI-0309019.

[101] Granger, C. W. J.. "Investigating Causal Relations by Econometric Models and Cross-spectral Methods". *Econometrica* 37.3 (1969): 424–438.

[102] Gilbert Report, Appendix D & Ex. D2 at p. 81.

[103] Gilbert Report, para. 67 at p, 26 & Appendix D at p. 77.

applications there are not close substitutes for aluminum and a hypothetical monopolist in the supply of aluminum would be able to raise prices profitably by a small but significant and non-transitory amount.[104] As such, aluminum is a separate relevant market for antitrust purposes.

79. There are various physical and financial aluminum products and their prices are interrelated. For example, an increase in the demand for spot aluminum in Detroit has a ripple effect across other aluminum products. As the MW-TRP (the current spot price in Detroit) increases (to reflect the increased demand for the product), this puts upward pressure on the price of aluminum for delivery in the near future, as the demand increase may be expected to persist beyond the current period. If, for example, the price for delivery three months out is higher, that puts pressure on further out prices as these are related by storage costs, carrying costs, and other factors. If the price for delivery three months out is higher, that also puts pressure on the current spot price, as the spot price and futures prices are related by storage costs, carrying costs, and other factors.

80. Any pricing distortions between these various aluminum products that arise will present arbitrage opportunities, and when traders take advantage of these arbitrage opportunities, the distortions will tend to be corrected. In financial products, if one price is perturbed, the perturbation often presents an arbitrage opportunity, which, when markets are competitive, is quickly exploited and thereby eliminated. For example, if spot prices are too low compared to prices for delivery three months out, trades which buy spot and store three months out will be profitable. In physical aluminum, the same kinds of forces are at play. If the price in Detroit gets too high, then it may be profitable for sellers to transport aluminum from Los Angeles to Detroit. If prices get really high, then it may make sense for sellers to transport aluminum from even more distant locations. As long as the distortion remains, then the economic incentive remains to take advantage of that distortion and close the gap.

---

[104] Recent academic papers studying demand for aluminum indicate that prices of other metals have no short-run effect on aluminum sales. In other words, changes in the prices of other metals have no short-run effect on aluminum demand, and therefore are not close economic substitutes. See, e.g., https://www.dallasfed.org/assets/documents/research/papers/2014/wp1413.pdf and Sheng-Peng Yang, "Measuring Market Power in the U.S. Aluminum Industry: A Residual Demand Approach", Review of Industrial Organization 19(3):365-380.

81. There are similar arbitrage mechanisms at play linking financial exchange and physical transactions. As mentioned above, the transactions are generally linked through the relationship between spot and futures prices. However, an important linkage arises through the prospect of delivery of aluminum to or from the LME warehouses. When aluminum prices in a local area get too low compared to the LME spot price, then it may make sense for a seller to move aluminum into an LME warehouse so that the aluminum can be sold on the exchange at the higher LME spot price. This additional supply of LME aluminum would put pressure on the LME spot price to go lower too, and converge with the off-exchange price. The converse is also true; if prices in a local area get too high, that puts upward pressure on the LME spot price.

82. I have computed the correlation coefficients between various aluminum product prices. Specifically, I computed correlation coefficients between 1) the LME spot price; 2) the Midwest Transaction Reference Price; 3) the local Rotterdam Reference Price[105]; 4) the local Japan Reference Price[106]; and the LME price for delivery three months out. The figures are reported in Table 3 below. They show substantial correlations. I have also displayed the correlation coefficients computed on the differences (changes) in price from week to week for the series (See Table 4 below.) They also show high correlations.

---

[105] The local Rotterdam All-in price is the LME cash price plus "Rotterdam Premium". The Rotterdam Premium, which is expressed as either "duty paid" or "duty unpaid" depending upon where the metal is designated for delivery, typically applies to aluminum that originates in Europe. The Rotterdam Premium is also reported and published based on a similar survey of producers, traders, and consumers. The Rotterdam Premium is reported in publications such as "Platts Metals Week" or "Platts Metals Daily." For example, see GS-METRO-00512630, p. 19.

[106] The local Japan All-in price is the Japan Premium plus the LME spot price. The Japan Premium typically applies to aluminum delivered CIF Main Japanese Port from sources worldwide. See, e.g., GS-METRO-00512630, p. 19.

**Table 3: Correlations between LME Price, Futures and Regional All-In Prices**

|  | LME Cash Price | 3-Month Future Price | Midwest Transaction Reference Price | Japan (Asia) Reference Price | Europe (Rotterdam) Reference Price |
|---|---|---|---|---|---|
| LME Cash Price | 1.0000 |  |  |  |  |
| 3-Month Future Price | 0.9989 | 1.0000 |  |  |  |
| Midwest Transaction Reference Price | 0.9246 | 0.9198 | 1.0000 |  |  |
| Japan (Asia) Reference Price | 0.9402 | 0.9374 | 0.9923 | 1.0000 |  |
| Europe (Rotterdam) Reference Price | 0.9370 | 0.9331 | 0.9944 | 0.9940 | 1.0000 |

Source:             Price data from Professor Gilbert

Notes:              Weekly data from October 2008 to December 2015

**Table 4: Correlations between differences in LME Price, Futures and Regional All-In Prices**

|  | Change in LME Cash Price | Change in 3-Month Future Price | Change in Midwest Transaction Reference Price | Change in Japan (Asia) Reference Price | Change in Europe (Rotterdam) Reference Price |
|---|---|---|---|---|---|
| Change in LME Cash Price | 1.0000 |  |  |  |  |
| Change in 3-Month Future Price | 0.9912 | 1.0000 |  |  |  |
| Change in Midwest Transaction Reference Price | 0.9922 | 0.9818 | 1.0000 |  |  |
| Change in Japan (Asia) Reference Price | 0.9920 | 0.9836 | 0.9885 | 1.0000 |  |
| Change in Europe (Rotterdam) Reference Price | 0.9952 | 0.9851 | 0.9948 | 0.9908 | 1.0000 |

Source:             Price data from Professor Gilbert

Notes:              Weekly data from October 2008 to December 2015

83. The linkages between LME prices and local reference prices are strong.  Under LME rules, global LME prices are not tied directly to local physical transactions.  LME is a global system, with one set of prices available throughout the world.  Under LME rules, when a trader buys an LME warrant, the trader does not know which location will be specified by the warrant.[107]  In addition, the seller of the warrant chooses the particular warrant to transfer, which will generally be the location that is most advantageous to the seller and often least desirable for the buyer.[108]

---

[107] LME Public Report, p. 14.

[108] LME Public Report, p. 14.

84. So the value of an LME warrant (and the price of the warrant) will be determined by a confluence of factors relating to the minimum value of aluminum in the various locations of LME warehouses and the cost of loading the aluminum out of the LME system at the location.[109] A queue decreases the value of stocks at locations with queues and if the location with the queue represents the worst value of all warehouse locations, then the impact of the queue will ultimately be reflected in the global LME price. Through arbitrage linkages, the other LME (futures) prices would be similarly affected under the effects of any queues in Detroit/Vlissingen/elsewhere.

85. However, if the price difference between the local all-in price and the LME does not properly reflect the actual difference in value *at that location* then an arbitrage opportunity exists and prices should adjust until they do. The global LME price cannot adjust perfectly to local conditions except under unusual conditions, but the all-in-price can adjust to eliminate the arbitrage opportunity. As Prof. Gilbert has concluded, increases in the queue caused increases in the MWP.[110] In other words, the local premium will adjust to account for the queue or other changes in local conditions.

86. Defendants have suggested that any increase in Midwest premium associated with longer queues will be exactly offset by a reduction in LME price, so that the MW-TRP will be unaffected by any exercise of market power in the markets for LME warehouse services.[111] Rather than rely solely on theoretical arguments, there is a simple test of this proposition. If Defendants' claim were true, then changes in LME prices and MWP would be perfectly negatively correlated. This claim is unsupported by the data, as shown in Table 5. LME prices and local premiums are largely uncorrelated with measured correlation coefficients small and positive (i.e., the opposite sign than is predicted by Defendants' theory).

---

[109] LME Public Report, p. 39.

[110] Gilbert Report, para. 67 at p. 26.

[111] Tutorial, Presented by Mark Bradley For Judge Katherine Forrest, United States District Court, Southern District of New York, 28 May 2014, pp. 19-20.

**Table 5: Correlations between difference in LME Price and Premiums**

| | Change in LME Cash Price | Change in Midwest Premium | Change in Japan (Asia) Premium | Change in Europe (Rotterdam) Premium |
|---|---|---|---|---|
| Change in LME Cash Price | 1.0000 | | | |
| Change in Midwest Premium | 0.0208 | 1.0000 | | |
| Change in Japan (Asia) Premium | 0.0331 | 0.2684 | 1.0000 | |
| Change in Europe (Rotterdam) Premium | 0.0276 | 0.6037 | 0.2893 | 1.0000 |

| | |
|---|---|
| Source: | Price data from Professor Gilbert |
| Notes: | Weekly data from October 2008 to December 2015 |

87. Prof. Gilbert performs econometric analysis of the MW-TRP. He finds that queue length is one of the variables which explains the level of the price. His results show that an increase in the length of the longest LME warehouse queue of 100 days would imply about a 2.04 percent increase in MW-TRP. His findings are statistically significant.[112] Thus, application of Prof. Gilbert's model would suggest that the impact of, for example, a QM deal with JPMorgan involving 100,000 metric tons and an increase in queue length of about 100 days would have increased MW-TRP, and all-in prices for class members, by about 2 percent.

## VI. ALL OR SUBSTANTIALLY ALL CLASS MEMBERS WERE IMPACTED BY THE MISCONDUCT

88. The class is defined in terms of customers who buy aluminum subject to a contract based in part on MWP, MW-TRP, or other similar price. I have shown above that an effect on MWP and MW-TRP could be demonstrated on a class-wide basis. Therefore, I can show class-wide impact on all or substantially all class members by showing that they paid higher prices pursuant to a contract based in part on MWP, MW-TRP or similar reference price.[113]

---

[112] Gilbert Report, Appendix E at p. 85 and Exhibit E2 at p.89.

[113] I have reviewed a number of contracts and purchase order transaction records and observe the structures indicated.

89. Various documents support the conclusion that pricing for substantially all aluminum transactions in the U.S. are based in part on MWP or MW-TRP.  For example:

- "All purchases of primary aluminum (P1020 and sheet ingot) are priced on a similar basis. The base price includes the LME official price for high grade aluminum ("the LME price") plus a local market premium ("LMP"), which are published in metal journals. In the United States, the LMP is known as the Midwest premium and is published in Platts' Metals Week. In Europe, the LMP is defined by Metal Bulletins EC Duty Paid and Duty Unpaid indicators. In Asia, the LMP is defined by the Main Japanese Port Premium. In addition, there are often additional costs to cover logistics, payment terms and form. The term of most purchase contracts is at least one year and the prices are normally based on the monthly averages for the shipment month or the month prior to shipment. As a consequence, the purchase prices move almost exactly with changes in the LME price and the [MWP]."[114]

- "For US aluminum, we use the Midwest transaction price that pre-dates the LME contract (1978) and is the cornerstone of nearly all US aluminum physical transactions."[115]

- Prof. Gilbert states that US-based aluminum purchase contracts are conventionally based on formulas with the MW US Transaction Premium (MWP) and/or the MW US Transaction Price (MW-TRP).  He reports that substantially all aluminum contracts in the U.S. are written in this manner.[116]

Thus, an increase in MWP and/or MW-TRP would cause an increase in the price paid. When the MWP is inflated through Defendants' conduct, prices to Plaintiffs accordingly go up.

90. Prof. Gilbert reports results of an empirical analysis of prices paid in aluminum transactions.[117] Changes in MWP were fully reflected in transaction prices for almost all first-level purchasers and were partially reflected in a small (and identifiable) minority.[118]

91. Based on the foregoing, the economic evidence supports a conclusion that Defendants' conduct caused increases in the MWP and the MW-TRP.  Because the pricing formulas

---

[114] Written Statement of Novelis Inc. to the Permanent Subcommittee on Investigations hearing on "Wall Street Bank Involvement With Physical Commodities", Nov. 18, 2014, p. 5.

[115] GS-METRO-00490613, p. 4.

[116] Gilbert Report, paras. 10(a), 47, 48.

[117] Gilbert Report, Appendix C.

[118] Gilbert Report, para. 49 and fn 30.

used for substantially all class members are increasing in MWP and/or MW-TRP, this in turn leads to increases in prices paid for aluminum.

## VII. SUMMARY OF CONCLUSIONS

92. Based on my training and professional experience working on matters such as this, the relevant economic literature, my investigation into the economic evidence relevant to Plaintiffs' claims and my analyses to date, I have reached the following conclusions:

- LME warehouse services are a relevant antitrust product market; there are relevant geographic markets covering the United States, Europe and Asia (excluding China).

- Defendants collectively have market power in the markets for LME warehouse services. Market power of this type is an inducement for firms to collude and suggests that any collusion would be more likely to succeed in altering the competitive process.

- The economic evidence supports the conclusion that Defendants used their collective market power, in ways contrary to their individual incentives but for coordination, to increase warehouse rents, decrease quality of services (e.g., through longer queues), and lock-in customers.

- The economic evidence supports the conclusion that Defendants' coordinated conduct reduced competition in the markets for LME warehouse services, which had the effect of increasing the local premium and the all-in price for aluminum in the relevant geographic areas.

- Defendants' conduct led to increases in prices paid for aluminum by all or substantially all class members.

J. Douglas Zona

25 March 2016

Date

35

# APPENDIX A

# J. DOUGLAS ZONA, Ph.D.

510.587.9396 □ Doug.Zona@SquareZResearch.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1986 | **The State University of New York** | Stony Brook, New York |

*Ph.D., Economics*
Fields of concentration:  Microeconomic Theory, Industrial Organization
Dissertation:  "Bid-rigging and the Competitive Bidding Process:  Theory and Evidence"
Committee:  Robert H. Porter, Robert W. Rosenthal and Kenneth Hendricks

| | | |
|---|---|---|
| 1984 | **The State University of New York** | Stony Brook, New York |

*M.A., Economics*

| | | |
|---|---|---|
| 1983 | **The University of New Hampshire** | Durham, New Hampshire |

*B.A., Economics*

## ACADEMIC EXPERIENCE

| | | |
|---|---|---|
| 2003 – 2005 | **New York University** | New York, New York |

*Graduate School of Arts and Science*
*Adjunct Professor of Economics*

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| | **Square Z Research LLC** | |
| 2013 – | *Economist* | Emeryville, California |
| | **CRA International, Inc.** | |
| 2010 – | *Senior Consultant* | |
| 2009 – 2010 | *Vice President* | Oakland, California |
| | **Berkeley Research Group  LLC** | |
| 2013- | *Contractor* | Emeryville, California |
| 2010 – 2013 | *Director* | |
| | **LECG, LLC** | |
| 2005 – 2009 | *Director* | Emeryville, California |
| | **Cornerstone Research, Inc.** | |
| 1999 – 2004 | *Vice President* | New York, New York |
| | **National Economic Research Associates** | |
| 1998 – 1999 | *Vice President* | White Plains, New York |
| 1991 – 1998 | *Senior Consultant* | |
| 1989 – 1991 | *Senior Analyst* | Cambridge, Massachusetts |

| 1988 – 1989 | **Cambridge Systematics** | Cambridge, Massachusetts |
|---|---|---|
| | *Associate* | |

| 1986 – 1988 | **American Telephone and Telegraph** | Bedminster, New Jersey |

*Staff Supervisor/Staff Manager*

## HONORS AND AWARDS

Peter J. Kalman Award for Academic Excellence, 1986.

Aninda K. Bose Memorial Award for "Alternating Patterns of Winners in Repeated Auctions," 1985.

Peter J. Kalman Award for Academic Excellence, 1985.

## BOOK CHAPTERS

"Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fifth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2008.

"Collusion," with R. Porter, in *Issues in Competition Law and Policy: Volume II*, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

"Simulation in Competitive Analysis," with G. Leonard, in *Issues in Competition Law and Policy: Volume II*, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

"Detection of Bid Rigging in Procurement Auctions" with R. Porter, in *Empirical Industrial Organization* edited by Paul L. Joskow and Michael Waterson, Edward Elgar Publishing, Ltd., 2005.

Lessons from the MCI/WorldCom Transaction, in *Econometrics in Antitrust* edited by John Harkrider, ABA Section on Antitrust Law, 2005.

"Energy Trading Strategies in California: Market Manipulation?" with Michael DeCesaris and Greg Leonard, in *Obtaining the Best from Regulation and Competition*, edited by Michael A. Crew and Menahem Spiegel.  Boston, MA: Kluwer Academic Publishers, 2004.

"Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fourth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2004.

## PUBLICATIONS

"BRIEF OF ECONOMISTS AND OTHER SOCIAL SCIENTISTS AS AMICI CURIAE IN SUPPORT OF RESPONDENTS" (with co-signers) in TYSON FOODS, INC., Petitioner, v. PEG BOUAPHAKEO, et al., Individually and on Behalf of All Other Similarly Situated Individuals, in the U.S. Supreme Court, September 29, 2015.

"GUPPI, the new horizontal merger guidelines and assessing potential competitive effects," with Chris Pleatsikas, *Australian Journal of Competition and Consumer Law*, Vol. 20/2 June

2012.

"Structural Approaches to Estimating Overcharges in Price Fixing Cases," *Antitrust Law Journal*, 77 No. 2 (2011).

"Lessons from the Superior/ICG Merger," with D. Neher and D. Russo, *The George Mason Law Review*, 2005.

"Regulating access: using economic principles to ensure fair and efficient competition," with P. Hinton, *The Electricity Journal,* August/September 1999, pp. 107-123.

"Ohio School Milk Markets: An Analysis of Bidding," with R. Porter, RAND *Journal of Economics,* Summer 1999, pp. 263-288.

"Issues in Antitrust Economics Testimony after Daubert," with F. Dunbar, *PLI Course Handbook, Antitrust Litigation: Strategies for Success,* November 1998, pp. 181-211.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," with P.J. Hinton, R. Schmalensee and W.E. Taylor, *Journal of Regulatory Economics,* 13 (1998) pp. 183-196.

"Ohio School Milk Markets: An Analysis of Bidding," with R. Porter, National Bureau of Economic Research Working Paper No. 6037, Cambridge, Massachusetts, May, 1997.

"An Analysis of the State of Competition in Long-Distance Telephone Markets," with W. E. Taylor, *Journal of Regulatory Economics,* 3 (1997) pp. 227-255.

"An Analysis of Asymmetric Demand Response to Price Changes: The Case of Local Telephone Calls," with M. Bidwell, Jr. and B. Wang, *Journal of Regulatory Economics,* 8 (1995) pp. 285-298.

"Competitive Analysis with Differenciated Products" with J. Hausman and G. Leonard, *Annales d' Economie et de Statistique,* 34 (1994) pp. 159-180.

"Detection of Bid Rigging in Procurement Auctions" with R. Porter, *Journal of Political Economy,* 3 (1993) pp. 518-538.

"A Proposed Method for Analyzing Competition Among Differentiated Products," with J. Hausman and G. Leonard, *Antitrust Law Journal*, 60 (1992) pp. 889-900.

"Detection of Bid-Rigging in Procurement Auctions" with R. Porter, National Bureau of Economic Research Working Paper No. 4013, Cambridge, Massachusetts, March 1992.

"Bid-Rigging and the Competitive Bidding Process: Theory and Evidence," Ph.D. Dissertation, Department of Economics, State University of New York at Stony Brook, 1986.

## PAPERS AND PRESENTATIONS

"Econometrics for Lawyers" with R. Shehadeh, presented for the ABA Section of Antitrust Law, various sessions, 2006.

"Bid-Rigging in School Milk Auctions: Evidence from Ohio," with N. Moshkin and R. Porter, presented at Barcelona Economics Workshop on Auction Markets, July 2005.

"Toward a Structural Non-Parametric Model of Bidding Behavior," with N. Moshkin and R. Porter, presented at the International Industrial Organization Conference, Boston, April 5, 2003.

"The Merger Investigation in Superior Propane/ICG: Economics Gone Amuck," presented at the George Mason Law Review Annual Symposium, January 15, 2003.

"MCI Worldcom/Sprint Merger Investigation," presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition, April 20, 2001.

"The Evolution of Competition in Local Exchange Markets:  A Case Study," with W.E. Taylor, presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition, January 8, 1999.

"Efficient Access to Competitors' Facilities, A Practical Approach," with P. J. Hinton, presented at the International Communications Forecasting Conference – 1998, St. Louis, Missouri, June 9-12, 1998.

"Efficient Access to Competitors' Facilities", presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition:  Network Industries In Transition, 17th Annual Conference, Vergennes, Vermont, May 27-29, 1998.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," with R. Schmalensee, W. E. Taylor, and P. J. Hinton, presented at the Rutgers 16th Annual Conference, Lake George, New York, May 21-23, 1997.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," With R. Schmalensee, W. E. Taylor, and P. J. Hinton, filed on behalf of The United States Telephone Association, March 7, 1997.

"An Analysis of Resale in Telecommunications," presented at the Rutgers 15th Annual Conference, Lake George, New York, May 29-31, 1996.

"Effects of Competitive Entry on Capital Recovery," with T. J. Tardiff, presented to The United States Telephone Association, Capital Recovery Seminar, Chicago, Illinois, October 19, 1995.

"Stranded Investment:  Lessons from the Telephone Industry for the Electric Power Industry," with H. Ware, presented at the Rutgers 14th Annual Conference, Newport, Rhode Island, May 25, 1995.

 "An Analysis of the State of Competition in Long-Distance Telephone Markets, " prepared for the Alliance for Competitive Communications, May 1995.

 "Telecommunications and Antitrust," presented at the New York State Bar Association Annual Meeting of the Antitrust Law Section, New York, New York, January 26, 1995.

"An Analysis of Asymmetric Demand Response to Price Changes:  The Case of Local Telephone Calls," with M. Bidwell and B. Wang, presented at the Rutgers 13th Annual Conference, Newport, Rhode Island, May 25, 1994.

"Rockets & Feathers:  The Asymmetry of Response to Telephone Price Change," with M. Bidwell, presented at the Advanced Workshop in Regulation and Public Utility Economics Twelfth Annual Conference, Brewster, Cape Cod, Massachusetts, May 26-28, 1993.

"Company-Specific Estimates of the Pass-Through of Commodity Taxes:  Theory and Evidence," with R. Schmalensee and M. Klass, presented to the U.S. Department of Commerce, March 12, 1993.

J. DOUGLAS ZONA

"Detecting Bid-Rigging," Seminar at the Economic Analysis Group of the Antitrust Division of the United States Department of Justice, Washington, D.C., January 18, 1993.

"Detecting and Proving Bid Rigging Using Bid Data," presented for the Joint Program of Economics and Sherman Act Section 1 Committees, Section of Antitrust Law, American Bar Association Annual Meeting, San Francisco, California, August 11, 1992.

"Passthrough of Commodity Taxes on Color Televisions in Taiwan:  Economic Theory and Empirical Analysis," with R. Schmalensee and B. Reddy, presented to the U.S. Department of Commerce, December 23, 1991.

"Substitution Among Imperfect Substitutes," presented to The American Bar Association Section of Antitrust Law, The Cutting Edge of Antitrust:  Market Power, at the Williard Intercontinental Hotel, Washington, D.C., October 17, 1991.

"Incentive Regulation and the Diffusion of New Technology in Telecommunications," with William E. Taylor and Charles J. Zarkadas, presented to the 19th Annual Telecommunications Policy Research Conference, Solomon's Island, Maryland, September 29, 1991.

"Merger Analysis with Differentiated Products" with J. Hausman and G. Leonard, presented at National Bureau of Economic Research Summer Institute Workshop on Plant and Firm Dynamics and Productivity, Cambridge, Massachusetts, July 11, 1991.

"On the Detection of Bid-Rigging in Procurement Auction Data," with R. Porter, presented at the April 1991 meeting of the National Bureau of Economic Research Industrial Organization Program in Cambridge, Massachusetts, April 19, 1991.

"Merger Analysis with Differentiated Products," with J. Hausman and G. Leonard, Seminar at the Economic Analysis Group of the Antitrust Division of the United States Department of Justice, Washington, D.C., April 17, 1991.

"The Total Bill Concept:  Defining and Testing Alternative Views," with B. Jacob, presented at Bellcore/Bell Canada Industry Forum, Hilton Head, South Carolina, April 22-25, 1990.

"Two Stage Budgeting and the Total Bill Effect:  An Application to AT&T's Inter- and Intra-State Long Distance Market," presented at the Bellcore/Bell Canada Industry Forum, Key Biscayne, Florida, January 1988.

## EXPERT REPORTS

"Declaration of J. Dougas Zona Ph.D." (Damages) in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, December 11, 2015 (Confidential)

"Expert Report of J. Douglas Zona, Ph.D. Submitted on Behalf of Defendant XPO Logistics, Inc." in C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., , et al., State of Minnesota District Court, County of Hennepin, Court File No. 27-CV-12-16003, July 20, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." (Damages) in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, February 3, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." in Containerboard Antitrust Litigation, (Kleen Products

LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, December 19, 2014 (Confidential)

"Affidavit of J. Dougas Zona Ph.D." in Lithium Ion Battery Antitrust Litigation, (Cohen v. LG Chem, et al.) PROVINCE OF QUEBEC, DISTRICT OF MONTREAL, NO: 500-06-000632-121 and 9113-5699 QUEBEC INC., March 26, 2014

"Expert Declaration of J. Dougas Zona Ph.D." in Lithium Ion Battery Antitrust Litigation, (Wilson v LG Chem, et al.)  ONTARIO SUPERIOR COURT OF JUSTICE,  Court File No. CV-13-56893, March 17, 2014

"Expert Rebuttal Report of J. Douglas Zona, Ph.D." in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, June 29, 2012

"Expert Report of J. Douglas Zona, Ph.D." in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, May 15, 2012

"Declaration of J. Douglas Zona, Ph.D.," in *ADVANCED MICROTHERM, INC., et al V. NORMAN WRIGHT MECHANICAL*, et al. United States District Court, Northern District of California, San Jose Division, No. 04-CV-02266-JW., April 13, 2010.

"Expert Report of J. Douglas Zona," in *re Graphics Processing Units*, N.D. Cal., Case No.: M:07-CV-01826-WHA, September 19, 2008.

"Declaration of J. Douglas Zona in Support of Defendant Intel Corporation's Opposition to Plaintiffs' Motion for Class Certification," in Skold and Dossantos, et al., v. Intel, HP, et al., Superior Court of California for the County of Santa Clara, Case No. 1-05-CV-039231, September 28, 2007.

"Declaration of J. Douglas Zona, Ph.D.," prepared in *re CR Antitrust Litigation*, Case No. 3:05 MD 1642 (PCD) (D. Conn); *re EPDM Antitrust Litigation*, Case No. 3:03 MD 1542 (PCD) (D. Conn.); and *re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (MJJ) (N.D. Cal.), May 22, 2006.

"Supplemental Declaration of J. Douglas Zona, Ph.D.," prepared for defendants in an investigation of parcel tanker shipping pending before the Korea Fair Trade Commission, April 19, 2005.

"Declaration of J. Douglas Zona, Ph.D.," prepared for defendants in an investigation of parcel tanker shipping pending before the Korea Fair Trade Commission, December 20, 2004.

"Declaration of J. Douglas Zona, Ph.D.," prepared for plaintiffs in *re: Organic Peroxide Antitrust Litigation*, Case No. 1:02CV00593 (JR) pending in the United States District Court for the District of Columbia, July 27, 2004

"Declaration of J. Douglas Zona, Ph.D.," prepared in *re CR Antitrust Litigation*, Case No. 3:05 MD 1642 (PCD) (D. Conn); *re EPDM Antitrust Litigation*, Case No. 3:03 MD 1542 (PCD) (D. Conn.); and *re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (MJJ) (N.D. Cal.), February 16, 2004.

"Declaration of J. Douglas Zona, Ph.D.," prepared for plaintiffs in *re: Organic Peroxide Antitrust Litigation*, Case No. 1:01CV01714 (JR) pending in the United States District Court for

the District of Columbia, May 7, 2002

"Rebuttal Report of J. Douglas Zona," prepared for plaintiffs in *Specialized Clutch & Brake of Stockton, Inc. v. United Brake Systems, Inc. et al.* Alameda County Superior Court Case No. 659087-3, March 19, 2002.

"Expert Report of J. Douglas Zona," prepared for plaintiffs in *Sorbates Indirect Antitrust Litigation-Wisconsin,* October 3, 2001.

"Rebuttal Report of J. Douglas Zona," prepared on behalf of defendants in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726, May 16, 2001.

"Declaration of J. Douglas Zona, Ph.D. Regarding Preliminary Damage Estimate," prepared on behalf of plaintiffs in *Charles Shaw, et al. Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al.*, U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184, March 1, 2001.

"Preliminary Expert Report of J. Douglas Zona," prepared on behalf of defendants in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726, January 15, 2001.

"Affidavit of J. Douglas Zona, Ph.D., Regarding Class Certification," prepared on behalf of plaintiffs in Charles Shaw, et al. Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al., U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184, October 30, 2000.

"Declaration of J. Douglas Zona, Ph.D.," prepared on behalf of plaintiffs in *re:  Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95-CV193HLM, September 15, 1999.

"Rebuttal Report of J. Douglas Zona, Ph.D.," prepared on behalf of plaintiffs in *re: Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95-CV193HLM, June 15, 1999.

 "Analysis of Issues Raised by AT&T in AT&T v. NYNEX, FCC File No. E-96-27," with P. Hinton, prepared for NYNEX in connection with *AT&T v. NYNEX*, FCC File No. E-96-27, April 23, 1997.

 "An Analysis of Interexchange Carrier Sent-Paid Payphone Fraud," with P. Hinton, prepared for NYNEX in connection with *AT&T v. NYNEX*, FCC File No. E-96-27, April 23, 1997.

 "Expert Report of J. Douglas Zona," prepared for Defendant in *AT&T, Corp. v. American Teletronics Long Distance, Inc.,* U.S.D.C. District of New Jersey Civil Actions No. 94-14680, June 30, 1997.  (Confidential)

"An Analysis of Resale in Long Distance Telecommunications Markets," with W. Taylor and T. Tardiff, prepared for plaintiff in connection with *Darren B. Swain, Inc. d/b/a U.S. Communications v. AT&T Corp., v. Mike Maxey, et al.*, U.S.D.C. N.D. Tx., Civil Action 394CV-1088D November 15, 1995.

"An Analysis of Long Distance Telecommunications Markets," with William E. Taylor and Timothy J. Tardiff, prepared for plaintiffs in *US WATS, Inc. and USW Corp. v. AT&T Corp.* U.S.D.C. E.D. Pa. No. 93-CV-1038, August 22, 1995.  (Confidential)

"The Effect of Competitive Entry into Local Exchange and State Toll Markets on the Revenues of Southern New England Telephone," with Timothy J. Tardiff, prepared for *Southern New England Telephone*, February 27, 1995.  (Confidential)

"An Economic Analysis of Ohio School Milk Markets:  Damages" with R.H. Porter, prepared for the Attorney General for the State of Ohio in connection with *The State of Ohio v. Louis Trauth Dairy, Inc. et al.,* U.S.D.C. S.D. Oh. No. C-1-93-553, December 1, 1994. (Confidential)

"An Analysis of Ohio School Milk Markets," with R.H. Porter, prepared for the Attorney General for the State of Ohio in connection with *The State of Ohio v. Louis Trauth Dairy, Inc. et al.,* U.S.D.C. S.D. Oh. No. C-1-93-553, October 31, 1994. (Confidential)

"Passthrough of Commodity Taxes on Color Televisions in Taiwan:  Economic Theory and Empirical Analysis," with R. Schmalensee and B. Reddy, presented to the U.S. Department of Commerce, December 23, 1991.

**TESTIMONY**

Deposition testimony in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, February 11, 2016

Deposititon testimony in C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., , et al., State of Minnesota District Court, County of Hennepin, Court File No. 27-CV-12-16003, September 30, 2015

Deposition testimony in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, March 30, 2015

Deposition testimony in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ,  July 26, 2012

Deposition testimony in *Donald Michalco, et al. v. Comcast of Greater Florida/Georgia, Inc., et al.*,  Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 02-03448 CV-B.

Deposition testimony in *re: Organic Peroxide Antitrust Litigation*, U.S. District Court for the District of Columbia, Case No. 1:02CV00593 (JR)

Deposition and trial testimony in *Specialized Clutch & Brake of Stockton, Inc. v. United Brake Systems, Inc. et al.*  Alameda County Superior Court, Case No. 659087-3

Deposition testimony in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726.

Deposition testimony in Charles Shaw, Bret D. Schwartz, And Steve Promislo, Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al., U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184.

Deposition and trial testimony in re:  *Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95CV193HLM.

Deposition testimony in *Darren B. Swain, Inc., et al.  v. AT&T Corp., v. Mike Maxey, et al.,* U.S. District Court, for the Northern District of Texas, Dallas Division, Civil Action No.

394CV-1088D.

Deposition testimony in *US Wats, Inc., et al. v. AT&T Corp.,* U.S. District Court, Eastern District of Pennsylvania, Civil Action No. 93-CV-1038.

Deposition testimony in *State of Ohio v. Louis Trauth Dairy, Inc., et al.*, Case No. C-1-93-553 in the United States District Court, Southern District of Ohio, Western Division.

Deposition and trial testimony in *Dialogic Corporation v. VMX, Inc. and Rhetorex Inc.,* Civil Action No. 93-1712-(MLP), in the United States District Court for the District of New Jersey.

**REFEREE**

| | |
|---|---|
| Journal of Econometrics | Southern Economic Journal |
| RAND Journal of Economics | Journal of Law and Economics |
| Journal of Industrial Economics | American Economic Review |
| Journal of Regulatory Economics | Construction Management and Economics |

**OTHER PROFESSIONAL ACTIVITIES**

Audit and Evaluation Branch of Industry Canada – Member of Steering Committee to oversee an evaluation of the anti bid-rigging activities of the Canadian Competition Bureau. July 2007.

# APPENDIX B

AMPAL0000001

AMPAL0000012

AMPAL0000053

AMPAL0000221

AMPAL0000255

AMPAL0000350

AMPAL0000512

AMPAL0000514

AMPAL0000518

AMPAL0000523

AMPAL0000527

AMPAL0000530

AMPAL0000533

AMPAL0000542

AMPAL0000544

AMPAL0000551

AMPAL0000555

AMPAL0000608

AMPAL0000610

AMPAL0001358

AMPAL0004660

AMPAL0004661

AMPAL0004672

AMPAL0004905

AMPAL0004906

AMPAL0004968

AMPAL0004969

AMPAL0004970

AMPAL0004972

AMPAL0004973

AMPAL0005003

AMPAL0005004

AMPAL0012428

AMPAL0012432

AMPAL0012448

AMPAL0014261

AMPAL0016577

AMPAL0016776

AMPAL0017020

AMPAL0017301

AMPAL0020186

Christoper R. Knittel and Robert S. Pindyck, The Simple Economics of Commodity Price Speculation, MIC Center for Energy and Environmental Policy Research, April 2013, CEEPR WP 2013-006

CLARIDGE0000001

CLARIDGE0000034

CLARIDGE0000070

CLARIDGE0000547

CLARIDGE0002796

CLARIDGE0003100

CLARIDGE0003369

CLARIDGE0003370

CLARIDGE0003373

CLARIDGE0003374

CLARIDGE0003491

CLARIDGE0003692

CLARIDGE0003695

CLARIDGE0003702

CLARIDGE0003795

CLARIDGE0003805

CLARIDGE0004834

CLARIDGE0004901

CLARIDGE0009728

CLARIDGE0009731

CLARIDGE0009738

CUSTOM0000001

CUSTOM0000008

CUSTOM0000029

CUSTOM0000050

CUSTOM0000053

CUSTOM0000064

CUSTOM0000067

CUSTOM0000070

CUSTOM0000073

CUSTOM0000079

CUSTOM0000080

CUSTOM0000081

CUSTOM0000082

CUSTOM0000087

CUSTOM0000099

CUSTOM0000105

CUSTOM0000117

CUSTOM0000127

CUSTOM0000134

CUSTOM0000138

CUSTOM0000140

CUSTOM0000141

CUSTOM0000142

CUSTOM0000143

CUSTOM0000144

CUSTOM0000145

CUSTOM0000146

CUSTOM0000147

CUSTOM0000148

CUSTOM0000155

CUSTOM0000196

CUSTOM0000217

CUSTOM0000223

CUSTOM0000228

CUSTOM0000229

CUSTOM0000233

CUSTOM0000294

CUSTOM0000302

CUSTOM0000314

CUSTOM0000326

CUSTOM0000330

CUSTOM0000331

CUSTOM0000332

CUSTOM0000333

CUSTOM0000334

CUSTOM0000335

CUSTOM0000336

CUSTOM0000337

CUSTOM0000338

CUSTOM0000339

CUSTOM0000340

CUSTOM0000350

CUSTOM0000362

CUSTOM0000373

CUSTOM0000384

CUSTOM0000387

CUSTOM0000436

CUSTOM0000477

CUSTOM0000488

CUSTOM0000494

CUSTOM0000498

CUSTOM0000508

CUSTOM0000512

CUSTOM0000525

CUSTOM0000535

CUSTOM0000539

CUSTOM0000546

CUSTOM0000552

CUSTOM0000557

CUSTOM0000567

CUSTOM0000574

CUSTOM0000576

CUSTOM0000585

CUSTOM0000595

CUSTOM0000600

CUSTOM0000609

CUSTOM0000620

CUSTOM0000626

CUSTOM0000634

CUSTOM0000642

CUSTOM0000650

CUSTOM0000654

CUSTOM0000659

CUSTOM0000662

CUSTOM0000664

CUSTOM0000669

CUSTOM0000671

CUSTOM0000673

CUSTOM0000676

CUSTOM0000678

CUSTOM0000681

CUSTOM0000683

CUSTOM0000687

CUSTOM0000689

CUSTOM0000691

CUSTOM0000693

CUSTOM0000700

CUSTOM0000703

CUSTOM0000706

CUSTOM0000712

CUSTOM0000719

CUSTOM0000722

CUSTOM0000731

CUSTOM0000745

CUSTOM0000751

CUSTOM0000758

CUSTOM0000765

CUSTOM0000770

CUSTOM0000779

CUSTOM0000786

CUSTOM0000791

CUSTOM0000802

CUSTOM0000813

CUSTOM0000820

CUSTOM0000827

CUSTOM0000831

CUSTOM0000847

CUSTOM0000852

CUSTOM0000865

CUSTOM0000884

CUSTOM0000895

CUSTOM0000898

CUSTOM0000901

CUSTOM0000905

CUSTOM0000909

CUSTOM0000910

CUSTOM0000911

CUSTOM0000912

CUSTOM0000913

CUSTOM0001031

CUSTOM0001033

CUSTOM0001039

CUSTOM0001049

CUSTOM0001057

CUSTOM0001062

CUSTOM0001064

CUSTOM0011271

CUSTOM0011286

CUSTOM0011871

CUSTOM0012463

CUSTOM0016983

CUSTOM0016988

CUSTOM0024345

CUSTOM0028782

Data from Professor Gilbert

Dennis W. Carlton and Jeffrey M. Perloff, <u>Modern Industrial Organization</u>, 2005, Fourth Edition, New York: Pearson Addison Wesley

EXTRUDED0000001

EXTRUDED0000008

EXTRUDED0000021

EXTRUDED0000027

EXTRUDED0000032

EXTRUDED0002204

EXTRUDED0002207

EXTRUDED0002211

EXTRUDED0002221

EXTRUDED0002227

EXTRUDED0002323

EXTRUDED0002358

EXTRUDED0002365

EXTRUDED0002371

EXTRUDED0002381

EXTRUDED0002400

EXTRUDED0002499

EXTRUDED0002518

EXTRUDED0002533

EXTRUDED0002563

EXTRUDED0002615

EXTRUDED0002682

EXTRUDED0003072

EXTRUDED0003077

EXTRUDED0003081

EXTRUDED0003245

EXTRUDED0003251

EXTRUDED0003304

EXTRUDED0003322

EXTRUDED0003340

EXTRUDED0003372

EXTRUDED0003382

EXTRUDED0003477

EXTRUDED0003533

EXTRUDED0003657

EXTRUDED0003690

EXTRUDED0003747

EXTRUDED0003757

EXTRUDED0003861

EXTRUDED0003894

EXTRUDED0003961

EXTRUDED0004006

EXTRUDED0004188

EXTRUDED0004271

EXTRUDED0004274

EXTRUDED0004330

EXTRUDED0004365

EXTRUDED0004467

EXTRUDED0004474

EXTRUDED0004480

EXTRUDED0004527

EXTRUDED0004528

EXTRUDED0004540

EXTRUDED0004546

EXTRUDED0004559

EXTRUDED0004564

EXTRUDED0004597

EXTRUDED0004616

EXTRUDED0004631

EXTRUDED0004645

EXTRUDED0004700

EXTRUDED0004720

EXTRUDED0004730

EXTRUDED0004811

EXTRUDED0004820

EXTRUDED0004829

EXTRUDED0004837

EXTRUDED0004849

EXTRUDED0004863

EXTRUDED0004877

EXTRUDED0004889

EXTRUDED0004897

EXTRUDED0004943

EXTRUDED0004959

EXTRUDED0004988

EXTRUDED0004996

EXTRUDED0005002

F. Scherer, Industrial Market Structure and Economic Performance, 56 (2d ed. 1980), p. 232, as cited in Richard A. Posner & William M. Landes, "Market Power in Antitrust Cases ," 94 Harvard Law Review 937 (1980)

Gilbert Report

Gilbert Workpapers

Granger, C. W. J.. "Investigating Causal Relations by Econometric Models and Cross-spectral Methods". *Econometrica* 37.3 (1969)

GS-METRO-00000016 2010-2011.xls

GS-METRO-00000016 2010-2011.xls; GS-METRO-00000437 2011-2012.xls; GS-METRO-00001883 2012-2013.xls; GS-METRO-00002891 2013-2014.xls; GS-METRO-00635116 2014-2015.xls; and GS-METRO-00693610 2015-2016.xls.

GS-METRO-00000018

GS-METRO-00000309

GS-METRO-00000437 2011-2012.xls

GS-METRO-00000817

GS-METRO-00001882

GS-METRO-00001883 2012-2013.xls

GS-METRO-00002891 2013-2014.xls

GS-METRO-00005231

GS-METRO-00005524

GS-METRO-00009385

GS-METRO-00009804

GS-METRO-00009809

GS-METRO-00009810

GS-METRO-00009827

GS-METRO-00009828

GS-METRO-00009839

GS-METRO-00009840

GS-METRO-00022433

GS-METRO-00027606

GS-METRO-00029517 2008-2009.xls

GS-METRO-00029569

GS-METRO-00029575 2009-2010.xls

GS-METRO-00030837

GS-METRO-00031544

GS-METRO-00032011

GS-METRO-00049890

GS-METRO-00055677

GS-METRO-00055975

GS-METRO-00071549

GS-METRO-00071621

GS-METRO-00089383

GS-METRO-00090092

GS-METRO-00090225

GS-METRO-00097728

GS-METRO-00117770

GS-METRO-00154643

GS-METRO-00176972

GS-METRO-00212888

GS-METRO-00212949

GS-METRO-00214039

GS-METRO-00218707

GS-METRO-00237065

GS-METRO-00237899

GS-METRO-00237900

GS-METRO-00284561

GS-METRO-00284582

GS-METRO-00298894

GS-METRO-00334112

GS-METRO-00345080

GS-METRO-00438967

GS-METRO-00473645

GS-METRO-00473718

GS-METRO-00490613

GS-METRO-00490655

GS-METRO-00490657

GS-METRO-00512630

GS-METRO-00534203

GS-METRO-00534203

GS-METRO-00628944

GS-METRO-00628945

GS-METRO-00635116 2014-2015.xls

GS-METRO-00693610 2015-2016.xls

GS-METRO-00729258

GSPSICOMMODS00046875

GUPPI, the new horizontal merger guidelines and assessing potential competitive effects," J. Douglas Zona and Chris Pleatsikas, *Australian Journal of Competition and Consumer Law*, Vol. 20/2 June 2012

Harbor Aluminum, "HARBOR's estimated aluminum load-out waiting time in LME D[etroit Warehouses]," 103-091 PSI-HarborAluminum-03-000004.pdf.

Horizontal Merger Guidelines, Section 5.1, pp.15-16. https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

http://www.bloomberg.com/news/articles/2012-04-22/rusal-s-43-billion-seven-year-glencore-deal-feeds-investor-feud

http://www.glencore.com/assets/investors/doc/reports_and_results/2014/GLEN-2014-Annual-Report.pdf

http://www.goldmansachs.com/who-we-are/at-a-glance/index.html

http://www.lme.com/about-usa

http://www.platts.com/about.

http://www.platts.com/price-assessments/metals/aluminum-transaction

http://www.reuters.com/article/jpmorgan-commodities-henrybath-idUSL2N0J90HZ20131127

http://www.reuters.com/article/lme-warehousing-home-idUSL6N0RG2KQ20140915

http://www.reuters.com/article/us-lme-warehousing-idUSTRE76R3YZ20110729.

http://www.scmp.com/business/commodities/article/1582399/china-may-dull-shine-aluminium-profits.

https://www.dallasfed.org/assets/documents/research/papers/2014/wp1413.pdf

https://www.lme.com/en-gb/pricing-and-data/pricing/convergence

https://www.lme.com/en-gb/sitecore/content/site/site-global-content/glossary/w/warrant/.

https://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/approval-process/.

https://www.lme.com/trading/warehousing-and-brands/warehousing/approved-warehouses (as of 1-28-2016).

 J. Church and R. Ware, Industrial Organization: A Strategic Approach, 2000, Irwin, McGraw-Hill

JP Morgan Chase & Co. Form 10-K, For the fiscal year ended December 31, 2011

JPMS-ALI-0309019

JPMS-ALI-0387656

JPMS-ALI-0387656

JPMS-ALI-0387663

Opinion and Order, dated March 26, 2015, Case 1:14 -cv-00211-KBF document 138 filed 032615

Pigou, Arthur C. The Economics of Welfare. London: Macmillan and Co. 1932. http://www.econlib.org/library/NPDBooks/Pigou/pgEW58.html

Presentation to the Court, E5SMALUF_4pp.pdf (Case 1:13-md-02481-KBF Document 738 Filed 04/09/15)

Robert H. Porter & J. Douglas Zona, *Collusion*, in 2 Issues in Competition Law and Policy 1069 (ABA Section of Antitrust Law 2008)

Salop, Steven C. and O'Brien, Daniel P., "Competitive Effects of Partial Ownership: Financial Interest and Corporate Control", Antitrust Law Journal, pp. 559-614 (2000). http://ssrn.com/abstract=192629

Sheng-Peng Yang, "Measuring Market Power in the U.S. Aluminum Industry: A Residual Demand Approach", Review of Industrial Organization 19(3):365-380

Steven C. Salop, Serge X. Moresi & John Woodbury, CRA Competition Memo, Scoring Unilateral Effects with the GUPPI: The Approach of the New Horizontal Merger Guidelines 2 (Aug. 31, 2010), available at http://crai.com/sites/default/files/publications/Commentary-on-theGUPPI_0.pdf

Summary Public Report of the LME Warehousing Consultation Pursuant to LME Notice 13/208:A201:W076 November 2013

Tenth Report on Competition Policy, Commission of the European Communities, 1980

THULE00000026

Tutorial, Presented by Mark Bradley For Judge Katherine Forrest, United States District Court, Southern District of New York, 28 May 2014

United States Senate, Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs, Majority and Minority Staff Report, 113th Cong., Wall Street Bank Involvement with Physical Commodities (released Nov. 20, 2014), available at http://www.hsgac.senate.gov/download/report-wall-street-involvement-with-physical-commodities ("Senate Report")

Written Statement of Novelis Inc. to the Permanent Subcommittee on Investigations hearing on "Wall Street Bank Involvement With Physical Commodities", Nov. 18, 2014